No. 21-1826

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

JANE DOES 1-6, JOHN DOES 1-3, JACK DOES 1-1000, and JOAN DOES 1-1000

Plaintiffs-Appellants

v.

JANET T. MILLS, Governor of the State of Maine, JEANNE M. LAMBREW, Commissioner of the Maine Department of Health and Human Services, NIRAV D. SHAH, Director of the Maine Center for Disease Control, MAINEHEALTH, GENESIS HEALTHCARE OF MAINE, LLC, GENESIS HEALTHCARE, LLC, NORTHERN LIGHT FOUNDATION, and MAINEGENERAL HEALTH

Defendants-Appellees

On Appeal from The United States District Court for the District of Maine

## STATE DEFENDANTS'-APPELLEES' PRINCIPAL BRIEF

AARON M. FREY
Attorney General

KIMBERLY L. PATWARDHAN
Assistant Attorney General

THOMAS A KNOWLTON
Deputy Attorney General
Chief, Litigation Division

VALERIE A. WRIGHT
Assistant Attorney General

Office of the Maine Attorney General
6 State House Station
Augusta, Maine 04333-0006
207-626-8800
Attorneys for State Defendants

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITTIES................................................................................ ii

INTRODUCTION ............................................................................................1

JURISDICTIONAL STATEMENT ..................................................................4

STATEMENT OF THE ISSUES.......................................................................5

STATEMENT OF THE CASE...........................................................................5

SUMMARY OF THE ARGUMENT ................................................................17

STANDARD OF REVIEW .............................................................................18

ARGUMENT ..................................................................................................19

    I.    THE DISTRICT COURT CORRECTLY HELD THAT APPELLANTS
        ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR
        FREE EXERCISE CLAIM ......................................................................19

        A.    Mandatory vaccination laws are constitutional without religious
                exemptions .........................................................................................20

        B.    The Rule and the Statute are neutral laws of general applicability
                that are rationally related to achieve the State's legitimate goal
                of stemming the spread of COVID-19 and protecting patients,
                healthcare workers, and persons medically unable to be
                vaccinated .........................................................................................26

                1.    Neutrality ...................................................................................27

                2.    General applicability..................................................................35

                3.    Rational basis review.................................................................38

C.    The Rule and Statute are narrowly tailored to achieve the State's compelling interests of protecting public health, stemming the spread of COVID-19 and protecting patients, healthcare workers, and persons medically unable to be vaccinated ...................................38

D.    Appellants' other arguments are meritless...........................................44

II.    THE DISTRICT COURT CORRECTLY HELD THAT APPELLANTS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR REMAINING CLAIMS.................................................................................44

A.    The Supremacy Clause is not a source of independent rights ............44

B.    Neither the Rule nor the State denies Appellants equal protection of the law under the Fourteenth Amendment......................................47

C.    Appellants' civil conspiracy claim is without merit ...........................48

III.    THE DISTRICT COURT CORRECTLY DETERMINED THAT THE REMAINING FACTORS SUPPORT DENYING AN INJUNCTION .......................................................................................48

CONCLUSION.........................................................................................................50

CERTIFICATE OF COMPLIANCE.......................................................................52

CERTIFICATE OF SERVICE ...............................................................................53

# TABLE OF AUTHORITIES

## Cases

*Alston v. Spiegel*, 988 F.3d 564 (1st Cir. 2021) ........................................48

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) ...........................44

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) .......................................... 40, 43

*Bayley's Campground, Inc. v. Mills*, 985 F.3d 153 (1st Cir. 2021)..........................2

*Boone v. Boozman*, 217 F. Supp. 2d 938 (E.D. Ark. 2002)....................................23

*Braunfeld v. Brown*, 366 U.S. 599 (1961) ................................................31

*Brown v. Smith*, 235 Cal. Rptr. 3d 218 (Cal. Ct. App. 2018) ..................................23

*Brown v. Stone*, 378 So. 2d 218 (Miss. 1979) ..........................................24

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ............................. 43, 44

*Calvary Chapel of Bangor v. Mills*, 984 F.3d 21 (1st Cir. 2020) .............................2

*Cantwell v. Connecticut*, 310 U.S. 296 (1940) ........................................19

*Cassell v. Snyders*, 990 F.3d 539 (7th Cir. 2021) ....................................49

*Castillo v. Whitmer*, 823 F. App'x 413 (6th Cir. 2020)..........................................50

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) ..................................................................... passim

*City of Boerne v. Flores*, 521 U.S. 507 (1997) .......................................44

*City of New Braunfels v. Waldschmidt*, 207 S.W. 303 (Tex. 1918) .......................27

*Commack Self-Serv. Kosher Meats, Inc. v. Hooker*,
    680 F.3d 194 (2d Cir. 2012) ................................................................27

*Cude v. Arkansas*, 377 S.W.2d 816 (Ark. 1964) ....................................24

*Cunningham v. City of Shreveport*, 407 F. Supp. 3d 595 (W.D. La. 2019) ...........37

*Dahl v. Bd. of Trs. of W. Mich. Univ.*, -- F.4th ---, No. 21-2945,
    2021 WL 4618519 (6th Cir. Oct. 7, 2021) ..................................................... 37, 38

*Davis v. Maryland*, 451 A.2d 107 (Md. 1982) ................................................. 24, 25

*Doe v. Mills*, No. 21A83 (U.S. Oct. 15, 2021) ........................................................28

*Dr. A. v. Hochul*, No. 1:21-cv-1009, 2021 WL 4734404
    (N.D.NY. Oct. 12, 2021) ..................................................... 28, 29, 30, 42

*Dr. A. v. Hochul*, Docket No. 21-2566 (2d Cir. Oct. 14, 2021) .............................30

*Emp't Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872 (1990)............ passim

*Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13
    (1st Cir. 2006)..............................................................................................19

*F.F. v. New York*, 143 N.Y.S.3d 734 .....................................................................23

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*,
    170 F.3d 359 (3d Cir. 1999) ................................................. 33, 34, 36, 37

*Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021)..........................................37

*Griffin v. Breckenridge*, 403 U.S. 88 (1971) .........................................................48

*Harris v. Univ. of Mass., Lowell*, No. 21-CV-11244-DJC,
    2021 WL 3848012 (D. Mass. Aug. 27, 2021).......................................23

*Hines v. S.C. Dep't of Corr.*, 148 F.3d 353 (4th Cir. 1998) ...................................27

*In re Z.S.*, 2015 ME 110, 121 A.3d 1286................................................................22

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905) ............................................ passim

*Klaassen v. Trs. of Ind. Univ.*, No. 1:21-CV-238,
    2021 WL 3073926 (N.D. Ind. July 18, 2021) ......................................23

*Litzman v. N.Y City Police Dep't*, No. 12 Civ. 4681, 2013 WL 6049066, *
    (S.D.N.Y. Nov. 15, 2013)....................................................................37

*Locke v. Davey*, 540 U.S. 712 (2004) ....................................................................47

*Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020) ..............32

*McCullen v. Coakley*, 573 U.S. 464 (2014) ............................................................40

*Mosier v. Barren Cnty. Bd. of Health*, 215 S.W.2d 967 (Ky. 1948) ......................24

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1
   (1st Cir. 2002).....................................................................................................19

*Nikolao v. Lyon*, 875 F.3d 310 (6th Cir. 2017).......................................................22

*Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008).........................................................26

*Phillips v. City of New York*, 775 F.3d 538 (2d Cir. 2015)............................... 22, 25

*Prince v. Massachusetts*, 321 U.S. 158 (1944)................................................. 22, 25

*Respect Me. PAC v. McKee*, 622 F.3d 13 (1st Cir. 2010) .......................................47

*Resurrection Sch. v. Hertel*, 11 F.4th 437 (6th Cir. 2021).......................................34

*Robinson v. Children's Hospital Boston*, No. 14-10263-DJC,
   2016 WL 1337255 (D. Mass. Apr. 5, 2016) .......................................................46

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) .......... passim

*Romer v. Evans*, 517 U.S. 620 (1996) ....................................................................47

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996)........18

*Sadlock v. Bd. of Ed.*, 58 A.2d 218 (N.J. 1948) ......................................................24

*Singh v. McHugh*, 185 F. Supp. 3d 201 (D.D.C. 2015)...........................................37

*Soto–Padró v. Pub. Bldgs. Auth.*, 675 F.3d 1 (1st Cir. 2012)..................................48

*South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716 (2021) ..... passim

*Tandon v. Newsom*, 141 S. Ct. 1294 (2021) ..................................................... passim

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707 (1981) ...........................39

*Trafon Grp., Inc. v. Butterball, LLC*, 820 F.3d 490 (1st Cir. 2016) .......................19

*United States v. Lee*, 455 U.S. 252 (1982)...............................................................26

*Valente v. Bd. of Env'tl Prot.*, 461 A.2d 716 (Me. 1983)........................................39

*W.D. v. Rockland Cnty.*, 521 F. Supp. 3d 358 (S.D.N.Y. 2021) ................ 23, 25, 35

*We the Patriots v. Hochul*, No. 21-2179 (2d Cir. Oct. 1, 2021) ............................29

*Wirzburger v. Galvin*, 412 F.3d 271 (1st Cir. 2005) ........................................ 31, 47

*Workman v. Mingo Cnty. Bd. of Educ.*,
  419 F. App'x 348 (4th Cir. 2011) ....................................................... 22, 25, 39

*Wright v. DeWitt School Dist.*, 385 S.W.2d 644 (Ark. 1965) .................................24

*Yellowbear v. Lampert*, 741 F.3d 48, 61 (10th Cir. 2014) ......................................36

*Zucht v. King*, 260 U.S. 174 (1922) .................................................................. 21, 25

## Statutes

42 U.S.C. § 1985(3) ..............................................................................................47

28 U.S.C.A. § 1292(a)(1) .......................................................................................4

28 U.S.C.A. § 1331 ...............................................................................................4

42 U.S.C.A. § 1983 ...............................................................................................4

42 U.S.C.A. §§ 2000bb to 2000bb-4 ......................................................................44

20-A M.R.S.A. § 6359(3)(B) (2008) ......................................................................6

22 M.R.S. § 802(4-B) ............................................................................................1

22 M.R.S.A § 802(4-B)(B) (2019) ....................................................................6, 29

22 M.R.S.A. § 802(4-B)(A) ......................................................................... 20, 30, 3

Me. Const. art. IV, pt. 3, § 17 ...............................................................................1

U.S. Const. amend. I ................................................................................... passim

U.S. Const. amend XIV .............................................................................. passim

**Regulations**

10-144 C.M.R. ch. 264, §§ 2(A)-(B) ......................................................................49

10-144 C.M.R. ch. 264, § 2(A)(7) (2021)..........................................................2, 35

10-144 C.M.R. ch. 264, § 2(B) .............................................................................35

10-144 C.M.R. ch. 264, § 2(E) .............................................................................35

**Other Authorities**

Pub. L. 103-141...................................................................................................43

Pub. L. 117-50.......................................................................................................4

P.L. 1989, ch. 487 § 11 ......................................................................................1, 5

P.L. 2001, ch. 185 .............................................................................................5, 6

P.L. 2019, ch. 154 ................................................................................. 1, 8, 29, 39

L.D. 798 (129th Legis. 2019)............................................................................ 6, 7, 8

L.D. 1401, Statement of Fact (120th Legis. 2001) ...................................................5

Maine Secretary of State:
    https://www.maine.gov/sos/cec/elec/results/index.html .......................................9

WHO Coronavirus (COVID-19) Dashboard, World Health Organization (updated
    Oct. 15, 2021), https://covid19.who.int/................................................................9

CDC Covid Tracker: United States at a Glance, United States Center for Disease
    Control and Prevention (updated Oct. 17, 2021),
    https://covid.cdc.gov/covid-data-tracker/#global-counts-rates ............................9

COVID-19: Maine Data, Maine CDC (updated Oct. 16, 2021),
    https://www.maine.gov/dhhs/mecdc/infectious-
    disease/epi/airborne/coronavirus/data.shtml ...................................................... 10

**INTRODUCTION**

Requiring health care workers to be vaccinated against highly communicable diseases has a long history in Maine.  Maine has mandated that hospitals and other healthcare facilities require their employees to be vaccinated against several highly communicable diseases since 1989.  *See* P.L. 1989, ch. 487, § 11 (eff. Sept. 30, 1989) (requiring employees of hospitals to be vaccinated against measles and rubella). Since 2002, the required vaccinations for healthcare workers have been designated by rule in state regulations adopted by the Maine Department of Health and Human Services (Department) and Maine Center for Disease Control and Prevention (Maine CDC).  In contrast, the exemptions to these vaccination requirements are provided in state statute: 22 M.R.S.A. § 802(4-B) (Supp. 2021) [hereinafter, "the Statute"].

In 2019, the Maine Legislature eliminated all nonmedical vaccination exemptions (religious <u>and</u> philosophical) for healthcare workers and schoolchildren—nearly a full year before the COVID-19 pandemic.  *See* P.L. 2019, ch. 154 (eff. Apr. 19, 2020).[1]  This change was the direct result of falling vaccination rates within the State and the concomitant rising risk of communicable diseases spreading amongst the general population and particularly vulnerable populations, including those who are medically unable to be vaccinated.

---

[1]  The Legislature voted in May of 2019, but the law did not become effective until April 19, 2020, 30 days after Governor Mills issued a proclamation announcing the law had been ratified by the Maine electorate.  Me. Const. art. IV, pt. 3, § 17, cl. 1.  (*See also* ECF 48-27 & ECF 62-1.)

In the intervening months, a worldwide pandemic has gripped the country and the State.  The Court is well aware of some of the measures Maine officials took in response to the COVID-19 pandemic in order to prevent the spread of COVID-19.  *See, e.g.*, *Bayley's Campground, Inc. v. Mills*, 985 F.3d 153, 164-65 (1st Cir. 2021) (affirming denial of preliminary injunction regarding COVID-related self-quarantine requirements for interstate travelers); *Calvary Chapel of Bangor v. Mills*, 984 F.3d 21, 30 (1st Cir. 2020) (dismissing appeal of challenge to COVID-related gathering limits in houses of worship), *cert. denied*, -- S. Ct. ---, 2021 WL 4507640 (Oct. 4, 2021).

On August 12, 2021, the Department and Maine CDC promulgated an emergency amendment to its healthcare worker vaccination rule to require certain healthcare facilities to require their employees to be vaccinated fully against COVID-19.  Immunization Requirements for Healthcare Workers, 10-144 C.M.R. ch. 264, § 2(A)(7) (2021) [hereinafter, "Rule"].  The Rule requires healthcare facilities to comply by October 1, 2021, but the Department and Maine CDC have announced that they will not enforce the Rule until October 29, 2021.  (ECF 49-5, Declaration of Sara Gagné-Holmes [hereinafter, "SGH Decl."] ¶ 37.)

The pseudonymous Appellants are nine healthcare workers whose "sincerely held religious beliefs compel them to abstain from obtaining or injecting any of [the available COVID-19 vaccines] into their bod[ies], regardless of perceived benefit or

rationale." (ECF 1 ¶ 68.)  Seven Appellants are employed by healthcare facilities subject to the Rule; one of the Appellants (John Doe 1) owns his own practice subject to the Rule and employs the ninth Appellant (Jane Doe 6).  (ECF 1 ¶¶ 10-18.)  None of the Plaintiffs are State employees.

Appellants brought suit against Janet T. Mills, Maine's Governor, Jeanne M. Lambrew, the Department Commissioner, and Dr. Nirav D. Shah, Maine CDC Director (collectively, "State Defendants"), and several healthcare systems ("Hospital Defendants"), on August 25, 2021, in order to require the State to provide them with a religious exemption against vaccination.  Appellants also sought emergency and preliminary injunctive relief.

The District Court correctly denied Appellants' preliminary injunction motion.  Both the Rule and the Statute are neutral laws of general applicability that are rationally related to the State's goals of protecting public health, healthcare workers and patients, Maine's healthcare system, and the health of those persons who medically are unable to be vaccinated.  The Supreme Court's trio of gathering limit decisions—*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) (per curiam), *South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716 (2021) (mem.), and *Tandon v. Newsom*, 141 S. Ct. 1294 (2021) (per curiam)— do not compel a different result.  Even if strict scrutiny were to apply, the District Court cogently and correctly held that the Rule and the Statute were narrowly

tailored to achieve the State's compelling state interests. (ECF 65 at 29-34.) Thus, Appellants are unlikely to succeed on the merits of their case.

Finally, the District Court properly found that the remaining relevant factors support denying an injunction. Most notably, the public interest weighs heavily in favor of State Defendants, who are charged with protecting the public health from deadly communicable diseases. The harm to the public health if they are not allowed to do so far outweighs any potential harm to the Appellants. State Defendants request that this Court affirm the District Court's denial of preliminary injunctive relief.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction because this case involves questions of federal law arising under the United States Constitution and claims brought under 42 U.S.C.A. § 1983 (Westlaw current through Pub. L. 117-50). *See* 28 U.S.C.A. § 1331 (Westlaw current through Pub. L. 117-50). This Court has jurisdiction because this is an interlocutory appeal of a decision of the District Court declining to issue an injunction. 28 U.S.C.A. § 1292(a)(1) (Westlaw current through Pub. L. 117-50).

The District Court denied Appellants' motion for preliminary injunction on October 13, 2021; Appellants timely filed their notice of appeal on October 13, 2021.

## STATEMENT OF THE ISSUES

I.    Whether the District Court correctly held that Appellants were not entitled to preliminary injunctive relief because they failed to demonstrate that they are likely to succeed on the merits of their claims challenging the Rule and the Statute.

II.   Whether the District Court correctly held that the remaining relevant factors support denying preliminary injunctive relief.

## STATEMENT OF THE CASE

**History on Mandatory Immunizations in Maine.**  Since 1989, Maine has mandated that hospitals and other healthcare facilities require their employees to be vaccinated against several highly communicable diseases.  *See* P.L. 1989, ch. 487, § 11 (requiring employees of hospitals to be vaccinated against measles and rubella). These requirements were enacted in the wake of the HIV/AIDS epidemic as part of comprehensive legislation designed to identify, report, prevent, and control communicable diseases that threaten the health of the people of Maine.

In 2001, the Maine Legislature moved the mandatory vaccination requirements from statute to rules adopted by the Department.  P.L. 2001, ch. 185, §§ 1-2 (eff. Sept. 21, 2001).[2]  In response, the Department and Maine CDC

---

[2]  Rulemaking provided a nimbler, more efficient process than legislation to address the rapid development of vaccines and vaccine recommendations. *See* L.D. 1401, Statement of Fact (120th Legis. 2001).

promulgated the Rule in 2002, which required that designated healthcare facilities (DHCFs) mandate immunizations against several diseases for their employees.[3] (ECF 49-2.)

Up until 2019, Maine law provided medical, religious, and philosophical exemptions from the Rule's vaccination requirements and from vaccination requirements required for school children.[4]  22 M.R.S.A. § 802(4-B)(B) (2019); 20-A M.R.S.A. § 6359(3)(B) (2008).  The rationale for requiring immunization against vaccine-preventable diseases is the same in school and healthcare settings: high vaccination rates are necessary to prevent the spread of communicable diseases through the population and among vulnerable populations, i.e., children and patients. (ECF 49-4, Declaration of Dr. Nirav D. Shah [hereinafter, "Shah Decl."] ¶ 37.)

By 2018, vaccination rates for required vaccinations for school children and healthcare workers in Maine had fallen below the population-wide rates of vaccination necessary to prevent the spread of those communicable diseases.  (SGH Decl. Ex. 2; ECF 48-2 to 48-5.)  Legislation thus was introduced in 2019 to eliminate nonmedical exemptions from these vaccination requirements in order to protect public health.  *See* L.D. 798 (129th Legis. 2019).  (ECF 48-1.)

---

[3]  Those diseases were rubeola (measles), mumps, rubella (German measles), Hepatitis B, and varicella (chickenpox).  (ECF 49-2 § 2(A).)

[4]  A statutory exemption for sincere philosophical beliefs was added in 2001.  *See* P.L. 2001, ch. 185, § 2 (eff. Sept. 21, 2001) (enacting 22 M.R.S. § 802(4-B)(B)).  (*See also* ECF 49-2 § 3(B).)

Maine Representative Ryan Tipping, the sponsor of L.D. 798, provided the

following testimony on the bill's purpose:

> Senators, Representatives, please imagine that we are in a boat. The boat is leaking and is almost filled with water. It would make sense that we would all want to grab our bail buckets and try to keep afloat. And if, after much hard work, the boat is nearly dry, you could forgive some of us for relaxing a bit. Some might even set aside the bailing buckets. But, sure enough, the leak will eventually overtake us if we become complacent.

> There is a reason the Centers for Disease Control use this metaphor of a leaky boat to represent a community taking on the struggle of fighting infectious disease. It is a reminder that when our foe is a dangerous, intangible entity capable of putting [people's] lives at risk, we are in this together. The actions we take as individuals affect the lives of our neighbors.

> In this metaphor, the ultimate solution is to plug the hole. In reality, this can only happen when we work together as a society to raise our immunity threshold to the point where a disease cannot take root, and then keep it at that level until there is no source of that disease left to defend against. . . .

> But what we are seeing now is a rising tide of diseases that previous generations worked tirelessly to defeat. . . .

> . . . the bill before you is an attempt to reverse this trend and ensure that now and into the future our schools and daycares will be places where children can learn and grow without fear of serious, harmful, preventable diseases. The bill removes non-medical exemptions to the decades-old immunization requirements for the institutions where our children spend most of their waking hours. It also tightens the exemptions for health care workers, many of whom are here today, and daycare employees. . . .

> These changes are necessary if we want to prevent headlines [regarding measles outbreaks] from Washington and New York from appearing on the front page of the Bangor Daily News. . . .

> These headlines and stories are particularly troubling to people who cannot be immunized, whether due to illness or age. You will hear from some of these people today, . . . including parents of immunocompromised or immunosuppressed children who will never achieve the immunities needed to protect them and rely on their neighbors' vaccinations in order to even be in school at all. You will also hear from people who cannot receive the immunizations for medical reasons.

(ECF 48-2 at 1-3.) In the course of the Maine Legislature's consideration of L.D. 798, the Joint Standing Committee on Education and Cultural Affairs heard testimony from hundreds of Mainers, in support of, in opposition to, and neither for nor against the bill.[5] (ECF 48 ¶ 4; *see also* ECF 48-2 to -18.). The bill, as amended, was also the topic of significant debate and discussion on the floors of both the Maine House and Senate.[6] (ECF 48-20 to -26.)

Ultimately, in May of 2019, the Maine Legislature voted to eliminate nonmedical exemptions to vaccination requirements for healthcare workers and schoolchildren and likewise mandated the removal of nonmedical exemptions from all Department vaccination requirements. P.L. 2019, ch. 154, §§ 1-2, 9, 11-12 (varying effective dates). The law was the subject of a statewide people's veto

---

[5] Maine CDC and the Department offered testimony in support of L.D. 798, and that support was based in part on the then-existing insufficient rates of vaccination for healthcare workers. (ECF 48-4; SGH Decl. ¶ 32 & Ex. 2.)

[6] For example, Maine Senator Heather Sanborn spoke of the bill's purpose: "I rise again today to urge this Body to follow science and to vote in favor of Enactment to protect those who cannot be immunized. Those include newborns. They include severely immuno compromised or medically weakened individuals and the very old may also be very susceptible to communicable diseases." (ECF 48-26 at S-754.)

referendum on March 3, 3020; 72.8% of Maine voters elected to keep the law in place.[7]  In order to comply with the statutory change, the Department removed nonmedical exemptions from the Rule in April of 2021.  (SGH Decl. Ex. 1.)

**The COVID-19 Pandemic, COVID-19 Vaccinations, and the Rule**.  For the last 18 months, the world has contended with the worldwide COVID-19 pandemic.  COVID-19 is a respiratory illness caused by a virus (SARS-CoV-2) that spreads when an infected person exhales droplets and very small aerosol particles that contain the virus.  (Shah Decl. ¶¶ 11, 17.)  All variants of the COVID-19 virus exhibit asymptomatic transmission, meaning an infected person can spread the virus without noticing any symptoms.  (Shah Decl. ¶¶ 18-19, 26.)

As of October 15, 2021, there have been approximately 239 million confirmed cases of COVID-19 and 4.89 million deaths from COVID-19 worldwide.[8]  As of October 17, 2021, there have been approximately 44 million confirmed cases of COVID-19 and 722,000 deaths from COVID-19 in the United States.[9]  As of

---

[7]  Full results of the March 3, 2020, election are available on the website of the Maine Secretary of State:  https://www.maine.gov/sos/cec/elec/results/index.html.

[8]  WHO Coronavirus (COVID-19) Dashboard, World Health Organization (updated Oct. 15, 2021), https://covid19.who.int/.

[9]  CDC Covid Tracker: United States at a Glance, United States Center for Disease Control and Prevention (updated Oct. 17, 2021), https://covid.cdc.gov/covid-data-tracker/#global-counts-rates.

October 16, 2021, there have been 97,725 total confirmed cases of COVID-19 in Maine, including 1,095 deaths from COVID-19.[10]

Fortunately, there are now three COVID-19 vaccines that have been authorized for use by the Food and Drug Administration (FDA) and that are highly effective at preventing infection with COVID-19.[11] (Shah Decl. ¶¶ 40-43.) The first COVID-19 vaccine doses in Maine were administered on December 14, 2020. (SGH Decl. ¶ 15.) In the interest of preserving Maine's health system capacity, Maine CDC prioritized eligibility for those first doses to frontline healthcare professionals and patient-facing staff in, among other places, hospitals, long-term care facilities, emergency medical services, physician practices, and dental practices. (SGH Decl. ¶¶ 15-18.)

Nevertheless, given the length of the pandemic, several variants of SARS-CoV-2 have emerged over time, including the highly contagious Delta variant. (Shah Decl. ¶ 22.) The Delta variant is more than twice as contagious as previous variants and may cause more severe illness than previous variants in unvaccinated

---

[10] *See* COVID-19: Maine Data, Maine CDC (updated Oct. 16, 2021), https://www.maine.gov/dhhs/mecdc/infectious-disease/epi/airborne/coronavirus/data.shtml. A mere five weeks ago, there were 16,548 fewer cases and 126 fewer deaths. (*See* Shah Decl. ¶ 14.)

[11] Months before the COVID-19 vaccines were available, the Department and Maine CDC worked with hospitals, healthcare providers, health centers, and many others to develop a plan to facilitate distribution and administration of any COVID-19 vaccine that received authorization or approval from the FDA. (SGH Decl. ¶ 6.) The Department and Maine CDC also hosted weekly COVID-19 vaccine information sessions on, among other topics, the science of vaccines; methods for addressing vaccine hesitancy; and patient conversations. (SGH Decl. ¶¶ 8, 13.)

people.  (Shah Decl. ¶ 22.)  Individuals infected with the Delta variant carry a much higher viral load, making the virus far more contagious and allowing it to spread and multiply in a shorter time period; an individual infected with the Delta variant can begin spreading it to others within 24 to 36 hours of exposure.  (Shah Decl. ¶¶ 24-25.)

The gold standard to prevent and stop the spread of communicable diseases, including COVID-19, is vaccination.  (Shah Decl. ¶ 34.)  When immunization rates fall below the necessary population-level rate of vaccination for a particular disease, both vaccinated and unvaccinated individuals are at risk of infection.  (Shah Decl. ¶ 38.)  In light of the Delta variant, epidemiological models suggest that at least 90% of the population would need to be vaccinated against COVID-19 in order to achieve population-level immunity.  (Shah Decl. ¶ 29.)  Under prior models formulated based on prior variants, only around 70% of the population would have needed to be vaccinated to achieve population-level immunity.  (Shah Decl. ¶ 29.)

The Delta variant was first identified in Maine via genomic sequencing on May 11, 2021.  (Shah Decl. ¶ 49.)  As of August 27, 2021, the Delta variant accounted for 96.7% of all positive COVID-19 samples sequenced in Maine; the Delta variant is now the predominant variant within the United States.  (Shah Decl. ¶ 50.)

Throughout the pandemic, Maine CDC has tracked statewide confirmed cases of COVID-19, including the number of healthcare workers who have contracted

COVID-19, and investigated outbreaks of COVID-19, including in healthcare settings. After vaccines became available, Maine CDC also started tracking the rate of COVID-19 vaccination among the general population and among employees of DHCFs. (SGH Decl. ¶ 30.)

Most healthcare facility outbreaks are the result of healthcare workers who bring COVID-19 into the facility. (Shah Decl. ¶ 48.) As of September 9, 2021, 5,723 self-identified healthcare workers in Maine have contracted COVID-19. (Shah Decl. ¶ 45.) Of those, approximately 1,900 (or more than one third) have occurred since January 18, 2021 (i.e., the first date that any person could be considered fully vaccinated against COVID-19). (Shah Decl. ¶ 45.) On August 11, 2021, four of the fourteen outbreaks then under investigation by Maine CDC were occurring in healthcare facilities. (Shah Decl. ¶ 47.) By September 3, 2021, nineteen of the thirty-three COVID-19 outbreaks under investigation by Maine CDC were occurring in healthcare facilities. (Shah Decl. ¶ 46.)

For the monthly reporting period ending July 31, 2021, the rate of COVID-19 vaccines among healthcare workers in certain DHCFs was as follows:

- Ambulatory Surgical Centers: 85.9%
- Assisted Housing Facilities: 74.7%
- Hospitals: 80.3%
- Intermediate Care Facilities for Individuals with Intellectual Disabilities: 68.2%
- Nursing Homes: 73.0%

(Shah. Decl. ¶ 53.)  All facilities fell significantly below the minimum 90% threshold believed to be needed to reduce the likelihood of facility-based outbreaks of the Delta variant of COVID-19.  (Shah Decl. ¶¶ 54, 29.)

Based on these and other facts, Maine CDC determined that requiring COVID-19 vaccinations for healthcare workers in certain high-risk settings was necessary to protect public health, healthcare workers, and Maine's healthcare system from the further spread of COVID-19.  (Shah Decl. ¶ 55.)  Accordingly, the Department and Maine CDC amended the Rule on an emergency basis to require DHCFs, Dental Health Practices, and Emergency Medical Services (EMS) Organizations to ensure their employees were vaccinated against COVID-19.  (Shah Decl. ¶ 55.)  Maine CDC determined that these types of facilities and settings posed a higher risk for the transmission of the virus that causes COVID-19 because of the patient populations served and type of care provided.[12]  (Shah Decl. ¶ 55; *see also* Shah Decl. ¶¶ 56-58 (describing public health reasons for amendment of Rule.)

In reaching the decision to amend the Rule, Maine CDC considered whether there were other, less restrictive measures that might be appropriate.  As discussed *infra*, those options were considered, but would not have been as effective, or had

---

[12]  The facilities outbreaks described above were occurring in facilities that are now covered by the Rule.  (Shah Decl. ¶¶ 46-47.)

been proven <u>in</u>effective, at stopping the spread of COVID-19 in facilities covered by the Rule.  (Shah Decl. ¶¶ 59-67.)

Because the Rule was amended on an emergency basis, the amended rule became effective as of August 12, 2021.  *See* 5 M.R.S.A. § 8054 (2013).  The Rule requires compliance by October 1, 2021, but the Department and Maine CDC have announced that they will not enforce the Rule against covered facilities until October 29, 2021.  (SGH Decl. ¶ 37.)

**Procedural History**.  Appellants filed a five-count complaint on August 25, 2021, against State Defendants and Hospital Defendants, along with a motion for temporary and preliminary injunctive relief.  (ECF 1 & 3.)  As to State Defendants, Appellants claim that the Rule violates their First Amendment rights to free religious exercise and the Supremacy Clause and denies them Equal Protection of the law under the Fourteenth Amendment and that State Defendants conspired with the Hospital Defendants to abridge these rights by adopting the Rule.  Appellants sought only injunctive relief against State Defendants, who have been sued only in their official capacities.  The District Court denied Appellants' ex parte motion for a temporary restraining order on August 26, 2021, (ECF 11), and set briefing on the preliminary injunction motion (ECF 23 & 44).[13]

---

[13]  The District Court extended the briefing schedule on Hospital Defendants' motion after the Department announced the enforcement delay.  Appellants strenuously objected to the delay, arguing "that so long as the . . . Rule remains in effect, they must choose between losing their jobs

After a hearing on September 20, 2021, the District Court issued its decision on October 13, 2021.  With respect to Appellants' Free Exercise claim, the court concluded that both the Rule and Statute were neutral laws of general applicability that were subject to rational basis review.  (ECF 65 at 16-29.)  The court reasoned that both the Rule and the Statute were facially neutral and there was no evidence of animus towards religion in their adoption or enactment.  (ECF 65 at 16-18.)  The court also distinguished *Roman Catholic Diocese*, *South Bay*, and *Tandon*, concluding, contrary to Appellants' claims, that the Statute's medical exemption for vaccination requirements was not comparable to a religious exemption.  (ECF 65 at 18-22.)  The court explained: "The risks associated with the two are not comparable. Reducing the risk of adverse medical consequences for a high-risk segment of the population is essential to achieving the public health objectives of the vaccine mandate."  (ECF 65 at 19.)

The court also determined that the Statute and Rule were generally applicable because the medical exemption "is rightly viewed as an essential facet of the vaccine's core purpose of protecting the health of patients and healthcare workers, including those who, for bona fide medical reasons, cannot be safely vaccinated."

---

or being compelled to receive the vaccine in violation of their religious beliefs."  (ECF 44 at 2.) In briefly extending the schedule, the District Court recognized that Appellants had sworn in their Verified Complaint that they would "'abstain from obtaining or injecting any of the [three currently available vaccines for COVID-19] into their body, regardless of the perceived benefit or rationale.'"  (ECF 44 at 4 (quoting ECF 1 ¶ 68).)

(ECF 65 at 27.)  Having concluded the laws were neutral and generally applicable, the court applied rational basis review and found that both the Rule and the Statute were rationally related to the State's legitimate interest in "[s]topping the spread of COVID-19 in Maine, and specifically stemming outbreaks in designated healthcare facilities to protect patients and healthcare workers."  (ECF 65 at 28-29.)

The court also analyzed the Rule and the Statute for constitutionality using strict scrutiny review.  (ECF 65 at 29-34.)  The court concluded not only that the State's interests were compelling, but also that the Rule and the Statute were narrowly tailored to achieve those goals.  The court took judicial notice of information from the United States Centers for Disease Control and Prevention (US CDC) showing that "COVID-19 vaccinations reduce the risk of people spreading the virus that causes COVID-19."  (ECF 65 at 31-32.)  The court also reviewed the undisputed record evidence showing the other, less restrictive measures that State Defendants considered, but rejected as ineffective at achieving the State's goals.  The court agreed with State Defendants that these measures were either not as effective, or ineffective, to achieve the State's interests.  (ECF 65 at 32-34.)  The court therefore concluded, in the alternative, that the Statute and the Rule were narrowly tailored to serve the State's compelling interests.  (ECF 65 at 34.)

The court also concluded that Appellants were unlikely to succeed on the merits of their Equal Protection and conspiracy claims against State Defendants.

16

(ECF 65 at 37-38.)  Finally, the court held the remaining preliminary injunction factors weighed against injunctive relief.  (ECF 65 at 38-40.)

The District Court denied the motion for preliminary injunction, and this appeal followed.[14]  Appellants appealed to this Court and moved for emergency relief from the Rule before October 15, 2021.  The Court denied that motion and ordered expedited briefing on this appeal.

## SUMMARY OF THE ARGUMENT

The Court should affirm the District Court's denial of Appellants' motion for a preliminary injunction.  The Rule and the Statute do not violate Appellants' First Amendment rights to free religious exercise and are constitutional under any level of constitutional scrutiny.  Both the Rule and the Statute are neutral laws of general applicability that are rationally related to the State's legitimate interest in stemming the spread of COVID-19 in certain healthcare facilities and protecting patients, healthcare workers, and vulnerable populations, including those who are unable to be vaccinated for medical reasons.  Even if strict scrutiny were to apply, the Rule and the Statute are narrowly tailored to serve the State's compelling interests.  There are no other less-restrictive measures that would be as effective at achieving the State's goals.

---

[14]  Also on October 13, 2021, the District Court denied Appellants' motion for injunctive relief pending appeal.  (ECF 68.)

With respect to Appellants' other claims, the Supremacy Clause is not the source of any federal rights or any private cause of action, nor is it impossible for an employer to comply with both the Rule and Title VII. Further, because the Rule and the Statute survived Appellants' Free Exercise challenge, they are also constitutional under rational basis equal protection review.

Finally, all the other relevant factors warrant against preliminary injunctive relief. Appellants' refusals to be vaccinated will not cause any injury that cannot be remedied at a later date. With respect to the balance of harms, State Defendants are seeking to protect the health and lives of healthcare workers and patients across the State, and those interests far outweighs the harm, if any, that Appellants may suffer. Similarly, the public interest weighs heavily in State Defendants' favor. Appellants should not be permitted to interfere with the careful, medically based approach taken by State Defendants and the Legislature.

## STANDARD OF REVIEW

In considering whether to issue a preliminary injunction,

> trial courts must consider (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc*., 102 F.3d 12, 15 (1st Cir. 1996).

"The *sine qua non* of" the four relevant factors "is likelihood of success on the

merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

"The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006). "The district court's grant or denial of a preliminary injunction is reviewed for an abuse of discretion, with conclusions of law reviewed de novo and findings of fact for clear error." *Trafon Grp., Inc. v. Butterball, LLC*, 820 F.3d 490, 493 (1st Cir. 2016).

## ARGUMENT

## I.    THE DISTRICT COURT CORRECTLY HELD THAT APPELLANTS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR FREE EXERCISE CLAIM.

In Count I, Appellants assert a violation of their right to free religious exercise. (ECF 1 ¶¶ 122-39.)   The First Amendment's Free Exercise Clause provides in pertinent part: "Congress shall make no law . . . prohibiting the free exercise" of religion.   U.S. Const. amend. I; *Cantwell v. Connecticut*, 310 U.S. 296, 303-04 (1940) (incorporating Free Exercise Clause against the States via the Fourteenth Amendment).

As described above, Appellants' claim involves two different legal authorities: the Rule and the Statute.   Regardless of the standard of review, neither

the Rule nor the Statute violates Appellants' First Amendment rights to free religious

exercise.

### A. Mandatory vaccination laws are constitutional without religious exemptions.

The courts of this country, including the Supreme Court, have long upheld

states' mandatory vaccination laws against constitutional challenges.  In *Jacobson*

*v. Massachusetts*, the City of Cambridge had an outbreak of smallpox, and it enacted

a regulation requiring that, under threat of criminal penalties, <u>all</u> inhabitants, adults

and children alike, be vaccinated.  197 U.S. 11, 12-13 (1905).  The ordinance

included an exception for children "who present[ed] a certificate, signed by a

registered physician, that they are unfit subjects for vaccination."  *Id.* at 12; *cf.* 22

M.R.S.A. § 802(4-B)(A) (including similar medical exemption for healthcare

workers).  Mr. Jacobson refused to be vaccinated based on his personal beliefs, was

convicted of violating the regulation, and then challenged the law on Fourteenth

Amendment grounds.  197 U.S. at 13-14.  The Supreme Court rejected the challenge,

reasoning that

> There are manifold restraints to which every person is necessarily
> subject for the common good.  On any other basis organized society
> could not exist with safety to its members.  <u>Society based on the rule
> that each one is a law unto himself would soon be confronted with
> disorder and anarchy</u>.

*Id.* at 26 (emphasis added); *accord Emp't Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 890 (1990) (rejecting system of religious accommodation "in which each conscience is a law unto itself").

The Court held that a regulation intended to protect against "an epidemic of disease which threatens the safety of its members" would be struck down only if it has "no real or substantial relation" to its goal of protecting the public health or is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Jacobson*, 197 U.S. at 27, 31. Applying this test, the Court upheld the compulsory vaccination law because the means chosen to "stamp out the disease of smallpox"—mandatory vaccination—had "a real and substantial relation to the protection of the public and the public safety." *Id.* at 31.

Relying in part on *Jacobson*, the Supreme Court likewise has upheld a state's compulsory school vaccination laws against a Fourteenth Amendment challenge brought by a parent whose child was denied enrollment in both public and private schools. *See Zucht v. King*, 260 U.S. 174, 176 (1922) (explaining *Jacobson* "settled that it is within the police power of a state to provide for compulsory vaccination"). Later, when confronted with First Amendment challenges to laws regulating the conduct of children, the Supreme Court wrote:

> The rights of children to exercise their religion, and of parents to give them religious training and to encourage them in the practice of religious belief, as against preponderant sentiment and assertion of state power voicing it, have had recognition here . . . .

21

> But the family itself is not beyond regulation in the public interest, as against a claim of religious liberty. And neither rights of religion nor rights of parenthood are beyond limitation. <u>[A parent] cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death.</u>

*Prince v. Massachusetts*, 321 U.S. 158, 165–67 (1944) (citations omitted) (emphasis added); *Smith*, 494 U.S. at 888-89 ("The First Amendment's protection of religious liberty does not require" "religious exemptions [to] compulsory vaccination laws").

*see also In re Z.S.*, 2015 ME 110, ¶¶ 7-10, 121 A.3d 1286 (affirming Maine trial court decision to approve vaccination of child in Department custody over mother's non-medical objections to vaccination).

Numerous courts subsequently have affirmed the principle that mandatory vaccination laws do not violate Free Exercise rights. *See, e.g.*, *Nikolao v. Lyon*, 875 F.3d 310, 316 (6th Cir. 2017) ("[Nikolao] has not been denied any legal right on the basis of her religion. Constitutionally, Nikolao has no right to [a vaccine] exemption."), *cert. denied*, 138 S. Ct. 1999 (2018) (mem.); *Phillips v. City of New York*, 775 F.3d 538, 543-44 (2d Cir. 2015) ("mandatory vaccination as a condition for admission to school does not violate the Free Exercise Clause"), *cert. denied*, 577 U.S. 822 (2015); *Workman v. Mingo Cnty. Bd. of Educ.*, 419 F. App'x 348, 352-54 (4th Cir. 2011) (concluding West Virginia's mandatory vaccination law that allowed for only medical exemptions withstood strict scrutiny review), *cert. denied*,

565 U.S. 1036 (2011); *Harris v. Univ. of Mass., Lowell*, No. 21-CV-11244-DJC, 2021 WL 3848012, at *7 (D. Mass. Aug. 27, 2021) ("UMass is under no constitutional obligation to offer a religious exemption to its Vaccine Requirement."); *Klaassen v. Trs. of Ind. Univ.*, --- F. Supp. 3d ---, No. 1:21-CV-238, 2021 WL 3073926, at *17-22, *39 (N.D. Ind. July 18, 2021) (upholding vaccination requirement applied to college students and reasoning "courts have consistently held that schools that provided a religious exemption from mandatory vaccination requirements did so *above and beyond* that mandated by the Constitution"), *aff'd*, 7 F.4th 592 (7th Cir. 2021) ("there can't be a constitutional problem with vaccination against SARS-CoV-2" because, although *Jacobson* has been criticized, "a court of appeals must apply the law established by the Supreme Court"); *W.D. v. Rockland Cnty.*, 521 F. Supp. 3d 358, 396-409 (S.D.N.Y. 2021) (upholding emergency exclusion order during measles outbreak that applied to all unvaccinated persons except those with medical exemptions in free exercise challenge); *Boone v. Boozman*, 217 F. Supp. 2d 938, 954 (E.D. Ark. 2002) (upholding compulsory vaccination law with medical  exemption but no religious exemption against free exercise challenge), *appeal dismissed as moot*, 359 F.3d 1029 (8th Cir. 2004); *F.F. v. New York*, 143 N.Y.S.3d 734 *passim* (N.Y. App. Div. 2021) (upholding repeal of religious exemptions from mandatory school vaccination law against free exercise challenge); *Brown v. Smith*, 235 Cal. Rptr. 3d 218, 224-25 (Cal. Ct. App. 2018)

(holding mandatory school vaccination law with only medical exemptions did not violate free exercise clause under California Constitution); *Davis v. Maryland*, 451 A.2d 107, 111-112 (Md. 1982) (explaining state need not "provide a religious exemption from its immunization program"); *Brown v. Stone*, 378 So. 2d 218, 222 (Miss. 1979) ("it is within the police power of the State to require that school children be vaccinated against smallpox"; "such requirement does not violate the constitutional rights of anyone, on religious grounds or otherwise"), *cert. denied*, 449 U.S. 887 (1980); *Wright v. DeWitt School Dist.*, 385 S.W.2d 644, 647-48 (Ark. 1965) (rejecting challenge to mandatory vaccination law on ground it did not include religious exemption); *Cude v. Arkansas*, 377 S.W.2d 816, 818-20 (Ark. 1964) (upholding State's power to require compulsory immunization of school children over parents' religious objections); *Mosier v. Barren Cnty. Bd. of Health*, 215 S.W.2d 967, 969 (Ky. 1948) (rejecting parents' religious objections to mandatory vaccination requirements for schoolchildren when there was no ongoing pandemic); *Sadlock v. Bd. of Ed.*, 58 A.2d 218, 220-22 (N.J. 1948) (upholding mandatory school vaccination ordinance with only a medical exemption to state and federal free exercise challenge); *City of New Braunfels v. Waldschmidt*, 207 S.W. 303, 308-09 (Tex. 1918) (concluding mandatory school vaccination law with only medical exemptions did not violate free exercise clause of state or federal constitution).

In their trial court filings, Appellants minimized *Jacobson* by arguing that it was not a First Amendment case and was decided before the First Amendment was incorporated against the States. (ECF 57 at 13-16.) But four years <u>after</u> the First Amendment was incorporated against the States in *Cantwell*, the Supreme Court decided *Prince*, which addressed a First Amendment claim. There, the Court explained that a parent "cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds," <u>and cited *Jacobson* in support of this proposition</u>. *Prince*, 321 U.S. at 166 & n.12. Appellants' claim that *Jacobson* is irrelevant to their First Amendment claim is incorrect.

Appellants also claim that *Jacobson* preceded modern tiers of constitutional scrutiny, and it is thus unhelpful and not controlling. But Appellants fail to acknowledge the decades of modern precedent where federal and state courts have applied *Jacobson*, *Zucht*, and *Prince* to uphold compulsory vaccination laws without religious exemptions against Free Exercise challenges and <u>applying</u> those same tiers of scrutiny. *See, e.g.*, *Phillips*, 775 F.3d at 543-44; *Workman*, 419 F. App'x at 353-54; *W.D. v. Rockland Cnty.*, 521 F. Supp. 3d at 396-409; *Davis*, 451 A.2d at 111-12. And while *Jacobson* has been criticized, *see, e.g.*, *Roman Cath. Diocese*, 141 S. Ct. at 70 (Gorsuch, J., concurring), those criticisms have come in cases addressing COVID-19-related restrictions on conduct—<u>not</u> in cases addressing vaccination requirements.

Despite Appellants' claims, *Jacobson* and its progeny apply directly to the facts here: a mandatory vaccination law for adults that includes a medical exemption, but not a religious exemption.  These decisions provide a sound basis for this Court to uphold the District Court decision without any additional analysis because the United States Constitution does not require a religious exemption to a State's mandatory vaccination law.[15]  Regardless, as the District Court held, and as shown below, tiered constitutional analysis leads to the same result.  (ECF 65 at 12-34.)

### B. The Rule and the Statute are neutral laws of general applicability that are rationally related to achieve the State's legitimate goal of stemming the spread of COVID-19 and protecting patients, healthcare workers, and persons medically unable to be vaccinated.

The Free Exercise Clause protects "the right to believe and profess whatever religious doctrine one desires," *Smith*, 494 U.S. at 877, but it "does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his [or her] religion prescribes (or proscribes),'" *id.* at 879 (quoting *United States v. Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring in judgment)).  Under *Smith*, as this Court has held, a neutral law of general applicability is constitutional if it is supported by a rational basis, even when applied to religious practices.  *Parker v. Hurley*, 514 F.3d 87, 96 (1st Cir. 2008) (describing *Smith* as "mere rationality

---

[15]  The only type of vaccination exemption that the Supreme Court ever has suggested is constitutionally required is a medical exemption.  *Jacobson*, 197 U.S. at 38-39.

standard"); *see also Commack Self-Serv. Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 212 (2d Cir. 2012) (neutral and generally applicable laws subject to rational basis review in Free Exercise analysis).

### 1.    Neutrality.

"A law is considered neutral if it proscribes conduct without regard to whether that conduct is religiously motivated or not." *Hines v. S.C. Dep't of Corr.*, 148 F.3d 353, 357 (4th Cir. 1998).  The neutrality inquiry begins with the text of the law in question.  *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993).  "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context."  *Id.*  Neither the text of the Rule nor the text of the Statute refers to religious practice, conduct, belief, or motivation.  The Rule and the Statute are public health measures designed to stop the spread of communicable diseases.  The Rule and Statute are facially neutral.  (ECF 65 at 16.)

As the District Court held (ECF 65 at 22-24), the laws are also neutral because their object or purpose is not to infringe or restrict any particular religious practice, and they are not "specifically directed at [Appellants'] religious practice."  *Smith*, 494 U.S. at 878.  As the record demonstrates, and as the District Court found (ECF 65 at 19-22), the object of the Rule is to prevent the spread of COVID-19 among healthcare workers in high risk settings, protect patients and individuals from disease

and death, and protect Maine's healthcare system. (Shah Decl. ¶¶ 56-58.) Similarly, the Legislature's elimination of <u>all</u> nonmedical exemptions was intended to increase the overall rate of vaccination and protect individuals who are unable to be vaccinated for medical reasons.[16]  Neither the Rule nor the Statute can be said to be directed at religious practice.

Nevertheless, Appellants claim that they have been targeted for their religious beliefs because Maine allegedly eliminated only the religious exemption from the Rule on August 14, 2021.  Appellants compare their case to the recent decision in *Dr. A. v. Hochul*, No. 1:21-cv-1009, 2021 WL 4734404, at *8 (N.D.N.Y. Oct. 12, 2021), wherein New York officials established a COVID-19 vaccine mandate with both medical and religious exemptions, only to eliminate the religious exemption 8 days later.

But Appellants continue to misstate when and what type of exemptions were eliminated in Maine.[17]  The record demonstrates conclusively that religious and

---

[16] (*See, e.g.* ECF 48-2 (Rep. Tipping testimony); ECF 48-18; ECF 48-20 at H-397 (Rep. Ingwersen remarks); ECF 48-21 at S-556 to -557 & S-563 (Sen. Millett remarks) & S-561 to -562 (Sen. Chenette remarks); ECF 48-22 at H-492 (Rep. Fecteau remarks); ECF 48-23 at S-653 to -654 (Sen. Carson remarks); ECF 48-24 at H-595 to -596 (Rep. McDonald remarks); ECF 48-26 at S-754 (Sen. H. Sanborn remarks) & S-755 (Sen. L. Sanborn remarks).)

[17] Appellants have been peddling this theory—that Maine eliminated <u>only</u> the religious exemption on August 14, 2021—throughout this case, from their complaint (ECF 1 ¶ 48), to their Motion for Preliminary Injunction (ECF 3 at 12) and reply in support of that motion (ECF 57 at 3), to their motion to this court (Emer. M. 10), and finally to the Supreme Court three days ago, *see* Petitioner's Motion for Writ of Injunction Pending Appel [sic], *Doe v. Mills*, No. 21A83, at 1, 14, 15-16, 26 (U.S. Oct. 15, 2021).  While Appellants may have been forgiven for not being entirely

philosophical exemptions were eliminated at the same time in Maine, these being all of the nonmedical exemptions in effect at that time. 22 M.R.S.A. § 802(4-B)(B) (2019), *repealed by* P.L. 2019, ch. 154, § 9. The record also demonstrates that these nonmedical exemptions were eliminated by legislation enacted in 2019 that ultimately became effective in April 2020, (*see* ECF 62 & 62-1), not April 2021 or August 2021. When the Department and Maine CDC eliminated all references to nonmedical exemptions from the Rule in April 2021, they simply updated the Rule to reflect the Statute's amendment effective April 2020. (SGH Decl. Ex. 1.) In any event, the nonmedical exemptions in the Rule were invalid 30 days after the Governor proclaimed that the statutory amendment was ratified by the electorate, notwithstanding that the Rule was not amended until April 2021. (ECF 62-1.)

Viewing these facts accurately, not as Appellants misstate them, it becomes clear that the circumstances present in *Dr. A.*, are not present here. 2021 WL 4734404, at *8. All nonmedical exemptions, religious <u>and</u> philosophical, were eliminated by the Legislature in 2019, and after the statutory amendment was sustained in a statewide referendum in 2020, the amendment became effective in April 2020. (ECF 62 & 62-1.) This timeline bears no resemblance to that in *Dr. A.*[18]

familiar with the intricacies of the Rule and Statute's textual histories seven weeks ago when they filed their complaint, they have no excuse for continuing to peddle this falsehood today.

[18] Appellants have also relied on the Second Circuit interim order in *We the Patriots v. Hochul*, No. 21-2179 (2d Cir. Oct. 1, 2021). But that order did not contain any analysis and was time limited to coincide with the temporary restraining order entered in *Dr. A. v. Hochul*, No. 1:21-cv-

Appellants also contend that the existence of a medical exemption from vaccination requirements means the law is not neutral. As of September 1, 2021, "[a] medical exemption is available to an employee who provides a written statement from a licensed physician, nurse practitioner or physician assistant that, in the physician's, nurse practitioner's or physician assistant's professional judgment, immunization against one or more diseases may be medically inadvisable." 22 M.R.S.A. § 802(4-B)(A) (Supp. 2021). According to Appellants, the Supreme Court's trio of decisions on gathering limits, *Roman Catholic Diocese*, *South Bay*, and *Tandon*, dictates the result here because persons with medical exemptions are treated more favorably than persons seeking to claim religious exemptions. Appellants are mistaken and have misread those recent decisions.

First, the gathering limit trio addressed substantially different concerns than this case presents. In each case considered by the Supreme Court, the gathering limits imposed by the States applied directly to religious conduct and made certain types of gatherings, including religious gatherings, unlawful. *See Roman Cath. Diocese*, 141 S. Ct. at 66; *South Bay*, 141 S. Ct. at 717; *Tandon*, 141 S. Ct. at 1297.

---

1009 (N.D.N.Y. Sept. 14, 2021). The New York State officials have now appealed the *Dr. A* preliminary injunction decision. Notice of Appeal, *Dr. A. v. Hochul*, No. 1:21-cv-1009 (N.D.N.Y. Oct. 13, 2021), ECF No. 23. The Second Circuit has ordered that the two appeals will be heard in tandem, with oral argument to occur on both matters on October 27, 2021. Order, *Dr. A. v. Hochul*, Docket No. 21-2566 (2d Cir. Oct. 14, 2021).

But here, there is no direct regulation of religious conduct or exercise. Appellants remain free to decline vaccination in accordance with their religious beliefs, and the Rule imposes no requirement on the individual Appellants. "The Supreme Court [is reluctant] to strike down 'legislation which imposes only an indirect burden on the exercise of religion, i.e., legislation which does not make unlawful the religious practice itself.'" *Wirzburger v. Galvin*, 412 F.3d 271, 281 (1st Cir. 2005) (quoting *Braunfeld v. Brown*, 366 U.S. 599, 606 (1961)); *accord Smith*, 494 U.S. at 878 ("if prohibiting the exercise of religion . . . is not the object of the [law] but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended.").

Second, the regulations at issue in the gathering limit cases were riddled with exceptions and exemptions for non-religious activities. For example, in *Roman Catholic Diocese*, the regulation at issue allowed houses of worship in a designated area to admit only 10 persons, but "essential" businesses, such as "acupuncture facilities, camp grounds, garages, [and] plants manufacturing chemicals" could admit as many people as they wished. 141 S. Ct. at 66; *see also Tandon*, 141 S. Ct. at 1297 (noting regulation permitted persons at "hair salons, retail stores, personal care services, movie theaters, private suites at sporting events" "to bring together more than three households at a time" but did not allow the same for "at-home religious exercise"). The breadth of these exceptions undermined the State's goals.

*See Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 614 (6th Cir. 2020) ("As a rule of thumb, the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law."). But here, the Statute contains only one exemption to mandatory vaccination: a medical exemption.

Appellants point to the Supreme Court's decision in *Tandon*, where the Court stated "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." 141 S. Ct. at 1296 (second emphasis added). Appellants ignore the word "comparable" and the next step of the Supreme Court's analysis. The Supreme Court went on to explain that "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.* Appellants simply assume that medical exemptions are comparable to religious exemptions without any analysis. That assumption ignores the Supreme Court's instruction in *Tandon*, and the analysis employed in the law enforcement facial hair cases cited below by Appellants.

For example, the constitutional defect in *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3d Cir. 1999), was not that the medical exemption from the facial hair policy was secular per se—the problem was that it undermined the City's stated goal in maintaining a uniform, easily identifiable

32

appearance for its officers. *Id.* at 365-66. In the same decision, the court explained that a <u>different</u> exception to the facial hair rule for undercover officers was not problematic. *Id.* at 366. Undercover officers were not held out as members of the force, so exempting them from the no facial hair policy did not undermine the City's interest in a uniform appearance for its officers. *Id.* In other words, the undercover officer exception was acceptable because it was consistent with the City's goal; the medical exemption was not.

Here, like the undercover officer exception in *Fraternal Order*, providing a medical exemption is consistent with (and certainly does not undermine) the State's interests. The record shows that religious and philosophical exemptions were eliminated from the Statute to increase vaccination rates to population-level immunity in order to protect those people who are not able to be vaccinated from communicable diseases. There are certain circumstances when vaccination may be medically inadvisable or harmful, and those people can claim a medical exemption. (Shah Decl. ¶ 39.) As the District Court reasoned:

> In the unique context of a vaccine mandate intended to protect public health, there is a fundamental difference between a medical exemption—which is integral to achieving the public health aims of the mandate—and exemptions based on religious or philosophical objections—which are unrelated to the mandate's public health goals. The risks associated with the two are not comparable. Reducing the risk of adverse medical consequences for a high-risk segment of the population is essential to achieving the public health objective of the vaccine mandate. A religious exemption would not address a risk

33

associated with the vaccine mandate's central objectives.    Under *Tandon's* reasoning, rational basis review applies.

(ECF 65 at 19.)

Framed in the gathering limit context, the Statute's vaccination requirement with only a medical exemption is like a theoretical COVID-19 gathering limit that applied equally to all indoor activities based on square footage of the facility (regardless of whether they were secular or religious), but that exempted hospitals and other healthcare facilities from its purview.  Such a gathering limit would further the State's goal of protecting public health without the defects identified by the Supreme Court; the exception also furthers that goal by ensuring all persons can receive medical care.  Such a gathering limit surely would have survived any constitutional challenge because, as the District Court held, medical exceptions are not comparable to religious exceptions.

Requiring vaccination of persons whose health may be harmed by vaccination would <u>not</u> serve the State's interest in protecting those same individuals from the spread of communicable diseases and death.  *Fraternal Order*, 170 F.3d at 366 ("the Free Exercise Clause does not require the government to apply its laws to activities that it does not have an interest in preventing").  In addition to not serving the State's interest, *Jacobson* strongly suggests that requiring individuals with health issues to be vaccinated would be unconstitutional. 197 U.S. at 38-39.  In sum, medical exemptions are not "comparable" to religious exemptions under *Tandon* or

*Fraternal Order*.  *See also Resurrection Sch. v. Hertel*, 11 F.4th 437, 458-59 (6th Cir. 2021) (concluding COVID-related mask mandate for secular and religious schools with exception for those medically unable to mask was neutral and generally applicable); *Rockland Cnty.*, 2021 WL 707065, at \*29 ("the medical exemption furthered Defendants' public health purpose by encouraging community-wide vaccination on the one hand, and protecting the lives and safety of those who could not be vaccinated, on the other").

In sum, because neither the Rule nor the Statute facially or purposefully discriminates against religious exercise, they are neutral laws.

## 2.     General applicability.

The general applicability requirement prohibits the government from "in a selective manner impos[ing] burdens <u>only</u> on conduct motivated by religious belief." *Lukumi*, 508 U.S. at 543 (emphasis added).  It "protect[s] religious observers against unequal treatment[] and inequality [occurring] when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued <u>only</u> against conduct with a religious motivation."  *Id.* at 542–43 (emphasis added).

Here, the Rule applies equally to all covered entities.  Those organizations must require their employees to show proof of vaccination against COVID-19, unless the employee is medically exempt.  Rule §§ 2(A)(7), (B), (E).  The Statute permits employees to assert only medical exemptions to mandatory vaccination

requirements; exemptions based on any other reason, religious or otherwise, are not permitted. *Cf. Lukumi*, 508 U.S. at 535-36 (explaining how ban on ritual animal sacrifice without banning other animal slaughter targeted specific practice of Santeria faith). An individual's personal, philosophical, or religious beliefs simply do not come into play under the Statute[19]; thus, the District Court correctly held that the laws in question are generally applicable. (ECF 65 at 24-27.)

Appellants nevertheless argue that the Department and Maine CDC have made a value judgment in favor of a secular, medical exemptions and prioritized it over a religious exemption. Appellants contend this alleged value judgment means the Statute is not generally applicable, again citing *Fraternal Order* and a series of similar cases.

But, as the District Court recognized, whether a medical exemption reflects a value judgment that discriminates against religious motivation must be evaluated based on the policy objective to be achieved. *Cf. Yellowbear v. Lampert*, 741 F.3d 48, 61 (10th Cir. 2014) (Gorsuch, J.) (explaining a State may "identify[] a qualitative or quantitative difference between the particular religious exemption requested and other secular exceptions already tolerated, and then explain[] how such differential treatment furthers" the State's concern). As the District Court held, "[e]xempting

---

[19] Any individual who may have nonmedical reasons to object to vaccinations could still qualify for a medical exemption: Maine law distinguishes not by belief, but by medical condition.

individuals whose health will be threatened if they receive a COVID-19 vaccine is an essential, constituent part of a reasoned public health response to the COVID-19 pandemic.  It does not suggest a bias against religion." (ECF 65 at 26.)  Put another way, Maine's vaccination requirement and the statutory medical exemption further the same goal.[20]

Appellants have also contended that the State has a discriminatory scheme of individualized exemptions from vaccination, allowing medical exemptions but not religious.  *See, e.g.*, *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021) ("[a] law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions").    State Defendants disagree that the Statute contemplates such a "scheme."  On the contrary, the Statute vests authority regarding medical exemptions with <u>healthcare providers</u>, not State officials.  Those healthcare providers are to utilize their professional judgment in deciding whether to sign a written statement in support of a medical exemption.  22 M.R.S.A. § 802(4-B)(A).

This is unlike the situation recently addressed by the Sixth Circuit in *Dahl v. Bd. of Trs. of W. Mich. Univ.*, -- F.4th ---, No. 21-2945, 2021 WL 4618519 (6th Cir.

---

[20]  In contrast, medical exemptions that do not further the stated governmental interest have been found to be an unwarranted value judgment against religious belief.  *See, e.g.*, *Fraternal Order*, 170 F.3d at 365-66; *Cunningham v. City of Shreveport*, 407 F. Supp. 3d 595, 607-08 (W.D. La. 2019); *Singh v. McHugh*, 185 F. Supp. 3d 201, 211-13 (D.D.C. 2015); *Litzman v. N.Y City Police Dep't*, No. 12 Civ. 4681, 2013 WL 6049066, * (S.D.N.Y. Nov. 15, 2013).

Oct. 7, 2021).  In *Dahl*, the university retained full discretion to grant or deny religious and medical exemptions to its vaccine mandate for student athletes, which, according to the court, meant the policy was neither neutral nor generally applicable. *Id.* at *4.

### 3.    Rational basis review.

Because the Rule and the Statute are neutral and generally applicable, the applicable standard of constitutional review is rational basis.  Because "[s]temming the spread of COVID–19 is unquestionably a compelling interest," *Roman Cath. Diocese*, 141 S. Ct. at 67, the State's goals of stopping the spread of COVID-19 in certain facilities and protecting those unable to be vaccinated are unquestionably legitimate state interests.  And requiring vaccination, the most effective method of stopping the spread of communicable diseases (Shah Decl. ¶¶34, 67), is rationally related to achieving that goal.  *Accord Jacobson*, 197 U.S. at 31 (upholding municipality's mandatory vaccination law based on its "real and substantial relation" to protecting public health).

### C.    The Rule and Statute are narrowly tailored to achieve the State's compelling interests of protecting public health, stemming the spread of COVID-19 and protecting patients, healthcare workers, and persons medically unable to be vaccinated.

As shown above, and as the District Court held (ECF 65 at 16-27), both Maine laws in question are neutral and generally applicable and "need not be justified by a compelling governmental interest even if the law has the incidental effect of

burdening a particular religious practice." *Lukumi*, 508 U.S. at 531. But if strict scrutiny were to apply, then both laws would still stand up against Appellants' Free Exercise challenge.

As an initial matter, Appellants have not grappled with the Statute. More than two years ago, the Legislature determined that whatever vaccination requirements might be adopted through the Rule, the only exemption to those requirements would be a medical exemption. Appellants have not argued that the State's specified goals in 2019 in eliminating religious and philosophical exemptions – to increase vaccination rates and protect vulnerable populations, including people medically unable to be vaccinated – are not compelling interests. *See Workman*, 419 F. App'x at 353 (holding state vaccine mandate without religious exemption to "prevent the spread of communicable diseases clearly constitutes a compelling interest"). Nor do they explain what steps they contend the Maine Legislature should have taken two years ago to more narrowly tailor the Statute (instead of eliminating non-medical exemptions).

Appellants' main focus is on the Rule, claiming that the Rule is not narrowly tailored, and that the Department and Maine CDC should have done something different in August 2021.[21] Narrow tailoring requires the government to show that

---

[21]  Neither the Department nor Maine CDC could have included a religious exemption in the text of the Rule. Executive agencies are creatures of statute and have only that authority provided to them by law. *See Valente v. Bd. of Env'tl Prot.*, 461 A.2d 716, 718 (Me. 1983). The Maine

its policy is the "least restrictive means" of achieving its objective, *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981), and that it "seriously undertook to address the problem with less intrusive tools readily available to it," *McCullen v. Coakley*, 573 U.S. 464, 494 (2014). To evaluate the requirement of narrow tailoring, "the court should ask whether the challenged regulation is the least restrictive means among available, effective alternatives." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

Appellants propose two alternatives to the Rule that they assert are less restrictive: require employees to 1) comply with existing face covering and other reasonable health and safety requirements or 2) submit to reasonable testing and reporting requirements. But these options would not be effective at achieving the State's goals, and some measures that Appellants propose have been <u>not</u> effective.

At all times, the Appellants who were employees of the Hospital Defendants, were required to comply with applicable law for infection control practices, including those pertaining to COVID-19. (*E.g.*, ECF 50-2 ¶ 6.) Notwithstanding these existing health and safety protocols, there have been numerous outbreaks of COVID-19 at healthcare facilities during the last 18 months. (Shah Decl. ¶ 65.) As of September 3, 2021, 19 of the 33 outbreaks that Maine CDC was investigating

---

Legislature instructed the Department and Maine CDC to remove all religious and philosophical vaccine exemptions from their rules in 2019. P.L. 2019, ch. 154, §§ 9, 11.

occurred at healthcare facilities that are now covered by the Rule.  (Shah Decl. ¶ 46.)

Continuing to operate under conditions as they existed as of August 11, 2021, would

not achieve the State's goals of stopping the spread of COVID-19 in high risk

facilities or protecting Maine's healthcare system.   Moreover, there is no

equivalency between measures taken before and after vaccines became available;

when more effective measures to achieve the State's goals become available, the

State should not be required to continue using less effective measures.

Appellants also propose regular testing for employees.   Maine CDC

considered, but rejected, regular testing as an alternative to protect against the Delta

variant.  (Shah Decl. ¶ 61.)  Given the speed with which the Delta variant is

transmitted, weekly or twice weekly testing would be wholly ineffective as a tool

for preventing transmission.  (Shah Decl. ¶ 61.)  An employee who tests negative on

a Monday morning could be exposed that afternoon and, within 36 hours, could be

spreading the virus to vulnerable patients and other employees over the course of the

several days until the next test.  (Shah Decl. ¶ 61.)

Daily testing was also considered, but rejected.  The most effective test

utilized for the detection of the virus that causes COVID-19 is a polymerase chain

reaction (PCR) test; a PCR test requires a minimum of 24 hours before results are

available, and sometimes results are not available for up to 72 hours.  (Shah Decl.

¶ 62.)  Because of this delay, PCR testing on a daily basis would be insufficient for

41

the same reasons that occasional testing is insufficient. (Shah Decl. ¶ 62.) Daily testing likely would require the use of the less-effective rapid antigen test, which provides results in fifteen minutes, but is more likely to provide false negative result; research shows that these tests correctly identify only about 50% of positive COVID-19 cases. (Shah Decl. ¶ 62.) Moreover, the nation is experiencing a shortage of rapid antigen tests, which is not expected to end until November. (Shah Decl. ¶ 62.) Daily testing would not be effective at stopping the spread of COVID-19 in covered facilities, particularly in light of the Delta variant. (Shah Decl. ¶ 62.)

Appellants argue that the State of Maine must follow what measures other States have taken. But what other States may choose to do does not answer the question of what is constitutionally required. Further, Appellants have provided no evidence that these measures are <u>effective</u> at achieving those States' goals, or even a recitation of what those asserted goals are. And contrary to Appellants' claims, the record shows that Maine <u>is</u> different: unlike other states, the size of Maine's workforce is limited, such that the impact of any outbreaks among personnel is far greater than it would be in a state with more extensive healthcare delivery systems, such as California. (Shah Decl. ¶ 66.) *Cf. Dr. A.*, 2021 WL 4734404, at *9 (reasoning New York vaccine mandate was not narrowly tailored because the State had not "explained why they chose to depart from similar healthcare vaccination mandates issued in other jurisdictions" that include religious exemptions).

Considering the unique circumstances of the State of Maine, it is necessary to take every available precaution to limit the spread of COVID-19 in healthcare facilities and among their workers.  (Shah Decl. ¶ 66.)  As the District Court explained, "what may be good enough for other states is not necessarily good for the conditions presented in Maine."  (ECF 65 at 34.)

Finally, Appellants' limited challenge to the State's scientific evidence is not well taken.  They claim that both vaccinated and unvaccinated persons infected with the Delta variant can transmit the virus.  (ECF 1 ¶ 79.)  But as the District Court reasoned, this argument "does not address the broader question of whether COVID-19 vaccinations reduce the risk of people spreading the virus that causes COVID-19."  (ECF 65 at 31.)  Data from US CDC shows that "COVID-19 vaccinations reduce the risk of people spreading the virus that causes COVID-19."  (ECF 65 at 31-32; *see also* Shah Decl. ¶ 51 ("In Maine, [as of] September 1, 2021, the rate of infection in the population of individuals aged 12 and older is 8 times higher than among the unvaccinated.").)  In any event, Appellants put forth no scientific evidence, expert testimony, or other information to support their claim that there are "equally effective, less restrictive alternatives" to the Rule.  (ECF 65 at 34.)

In sum, the record shows that there were no less restrictive alternatives that would have been effective at achieving the State's goals.  *Ashcroft*, 542 U.S. at 666.

**D.     Appellants' other arguments are meritless.**

In support of his Free Exercise claim, Appellant John Doe 1 claims that his sincerely held religious beliefs are substantially burdened by the Rule and the Statute.  (ECF 3 at 5-7.)  In support, he relies on *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).  *Burwell* is inapplicable to this case because its analysis rested on the Religious Freedom Restoration Act (RFRA), 42 U.S.C.A. §§ 2000bb to 2000bb-4 (Westlaw, through Publ. L. 103-141).  Congress enacted RFRA in response to *Smith* in order to provide increased protection to religious exercise.  *Burwell*, 573 U.S. at 693-95.  But RFRA categorically does not apply to State and municipal actors.  *See City of Boerne v. Flores*, 521 U.S. 507, 529-36 (1997).

## II.     THE DISTRICT COURT CORRECTLY HELD THAT APPELLANTS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR REMAINING CLAIMS.

**A.     The Supremacy Clause is not a source of independent rights.**

In Count II, Appellants assert State Defendants have violated the Supremacy Clause of the federal Constitution.  (ECF 1 ¶¶ 140-51.)  Appellants have framed this case as primarily the "simple question" of "Does federal law apply in Maine?"  (ECF 1 ¶ 1.)  The answer to that question is obviously yes, as State Defendants already explicitly have acknowledged.  (ECF 43 at 1.)  The real issues before the Court are whether the application of federal law provides Appellants with the relief they seek.

Regardless, as the District Court held (ECF 65 at 38), the Supremacy Clause is not "the source of any federal rights" or any private cause of action, but a "rule of decision" that courts should not give effect to state laws that conflict with federal law. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015) (cleaned up). Thus, as the Supreme Court held in *Armstrong*, the Supremacy Clause "certainly does not create a cause of action." 575 U.S. at 325.

In any event, to the extent that this count is directed at State Defendants, Appellants have provided no evidence of how State Defendants have denied the supremacy of federal law or the inapplicability of Title VII.[22] (ECF 1 ¶ 144 (alleging State Defendants "tacitly stated" Title VII is inapplicable in Maine).) Appellants also confuse a vaccination exemption under the Statute with a religious accommodation under Title VII. A valid exemption exempts a healthcare worker from the vaccination requirements of the Rule. But whether a person can claim a valid exemption does not answer the question of whether an employer must provide that person with a religious accommodation under Title VII. The two are separate inquiries, governed by separate legal frameworks.

In any event, Maine CDC published guidance explaining that, in the State's view, the Rule does <u>not</u> prohibit employers from providing accommodations under Title VII:

---

[22] None of the Appellants are employed by the State.

> Does this rule prohibit Designated Health Care Facilities, Dental Health Practices, or Emergency Medical Services Organizations from making accommodations for unvaccinated employees who object to receiving the COVID-19 vaccine because of sincerely held religious beliefs, as may be required by the Maine Human Rights Act and/or Title VII of the Civil Rights Act?
>
> This rule does not prohibit employers from providing accommodations for employees' sincerely held religious beliefs or practices that may otherwise be required by law. For example, this rule does not prohibit employers from allowing employees to work remotely or reassigning employees to positions outside of a Designated Health Care Facility, Dental Health Practice, or Emergency Medical Services Organization. However, if accommodations provided by a Designated Health Care Facility, Dental Health Practice, or Emergency Medical Services Organization are not in compliance with this rule, then the Designated Health Care Facility, Dental Health Practice, or Emergency Medical Services Organization may be subject to enforcement action.

(SGH Decl. ¶ 36.)[23] And even if Appellants could be said to making a preemption claim in Count II—a claim they do not articulate or analyze under any traditional preemption analysis—they only, as to State Defendants, have asserted "preemption" of Maine law by the First Amendment. (ECF 3 at 5.) Those arguments have been addressed above. Because the Supremacy Clause does not create a cause of action, Appellants are unlikely to succeed on the merits of Count II.

---

[23]   Moreover, Title VII does not require employers to make accommodations that compromise workplace safety. *See, e.g.*, *Robinson v. Children's Hospital Boston*, No. 14-10263-DJC, 2016 WL 1337255, at **9-10 (D. Mass. Apr. 5, 2016) (concluding hospital did not violate Title VII when it terminated an employee who refused the flu vaccine based on her religious beliefs pursuant to a hospital vaccination policy that only allowed for medical exemptions).

**B.**    **Neither the Rule nor the Statute denies Appellants equal protection of the law under the Fourteenth Amendment.**

In Count III of their Complaint, Appellants allege that their right to equal protection of the laws has been violated by the lack of a religious exemption in the Rule and the Statute. (ECF 1 ¶¶ 152-67.) "Where a plaintiff's First Amendment Free Exercise claim has failed, the Supreme Court has applied only rational basis scrutiny in its subsequent review of an equal protection fundamental right to religious free exercise claim based on the same facts." *Wirzburger*, 412 F.3d at 282 (citing *Locke v. Davey*, 540 U.S. 712, 720 n.3 (2004)).

As shown above, the State's goals of stopping the spread of COVID-19 in certain facilities and protecting those unable to be vaccinated are legitimate state interests. Requiring vaccination, the most effective method of stopping the spread of communicable diseases (Shah Decl. ¶¶ 34, 67), is rationally related to achieve those goals.

Appellants have also argued that *Romer v. Evans*, 517 U.S. 620, 635 (1996), dictates the result in this case. But *Romer* involved an amendment to the Colorado state constitution that targeted, with express language, persons of homosexual, lesbian, or bisexual orientation, *Romer*, 517 U.S. at 624; the Rule and the Statute do no such thing. Further, the Supreme Court applied a rational basis review to the law in question in *Romer,* and State Defendants have already demonstrated how the laws at issue are rationally related to a legitimate state interest.

### C.     Appellants' civil conspiracy claim is without merit.

Finally, in Count V, Appellants allege in conclusory fashion that State Defendants and Appellants' employers have engaged in a civil conspiracy to deprive them of equal protection under the law by prohibiting any religious exemption or accommodation.[24]  (ECF 1 ¶¶ 180-97.)  *See Alston v. Spiegel*, 988 F.3d 564, 577 (1st Cir. 2021) (describing elements of civil conspiracy claim under 42 U.S.C. § 1985(3)).  The District Court correctly summarily rejected this claim for lack of any evidentiary support.  (ECF 65 at 37-38.)

## III.   THE DISTRICT COURT CORRECTLY DETERMINED THAT THE REMAINING FACTORS SUPPORT DENYING AN INJUNCTION.

As the District Court ruled (ECF 65 at 38-40), Appellants have not established irreparable harm, that the balance of hardships tips in their favor, or that the public interest warrants an injunction.

As to irreparable harm, Appellants assert that they will suffer irreparable injury to their First Amendment rights if the Rule is enforced.  "The fact that appellants are asserting First Amendment rights does not automatically require a finding of irreparable injury."  *Respect Me. PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010) (cleaned up).  Further, unlike in the religious gathering limit trio of *Tandon*,

---

[24]  While the Supreme Court and this Court have speculated that Section 1985 might apply to other class-based invidiously discriminatory animus, they have never applied Section 1985 to anything other than race.  *Griffin v. Breckenridge*, 403 U.S. 88, 102 & n.9 (1971); *Soto–Padró v. Pub. Bldgs. Auth.*, 675 F.3d 1, 4 (1st Cir. 2012).

*South Bay*, and *Roman Catholic Diocese*, Appellants are not being restricted from engaging in any religious practice.  Appellants may continue to adhere to their sincerely held religious beliefs and refuse vaccination against COVID-19 if they wish to do so.  And Appellants have already attested, under oath, that their "sincerely held religious beliefs compel them to abstain from obtaining or injecting any of [the available COVID-19 vaccines] into their bod[ies], regardless of perceived benefit or rationale."  (ECF 1 ¶ 68.)

Appellants have also argued that they will suffer loss of current employment and all potential employment in the healthcare field if the Rule is enforced.  The Rule is not so broad as Appellants claim.  The Rule covers only employees of certain healthcare facilities; it does not apply to private physician practices, urgent care clinics, or any other facility not identified in the rule.  Rule, §§ 2(A)-(B).  The Rule also only applies to employees physically present in covered healthcare facilities; employees working remotely are not affected.  (SGH Decl. ¶ 35.)  Regardless, as the trial court held, Appellants' "loss of their employment [is] serious and substantial, [but] is not irreparable.  [Appellants] may pursue remedies at law for alleged discriminatory firings, including reinstatement, back pay, and damages."  (ECF 65 at 39.)

With respect to the balance of harms, State Defendants are seeking to protect the health and lives of healthcare workers and patients across the State, and that far

49

outweighs the harm, if any, that Appellants may suffer.  *See Cassell v. Snyders*, 990 F.3d 539, 550 (7th Cir. 2021) ("When balancing the public interest—meaning the interests of those not before the court—courts must also keep in mind that plaintiffs are not asking to be allowed to make a self-contained choice to risk only their own health").  Finally, the public interest weighs heavily in State Defendants' favor. *Castillo v. Whitmer*, 823 F. App'x 413, 417–18 (6th Cir. 2020) ("enjoining the testing scheme poses a substantial risk of harm to others given that identifying and isolating COVID-19-positive workers limits the spread of the virus"; "enforcing it serves the public interest").  Appellants should not be permitted to interfere with the careful, medically based approach taken by State Defendants and the Maine Legislature.

## CONCLUSION

For the reasons set forth above, State Defendants request that the Court affirm the District Court's denial of Appellants' motion for a preliminary injunction.

Dated: October 18, 2021        Respectfully submitted,

AARON M. FREY
Attorney General

THOMAS A. KNOWLTON
Deputy Attorney General
Chief, Litigation Division
thomas.a.knowlton@maine.gov


/s/ Kimberly L. Patwardhan
KIMBERLY L. PATWARDHAN
Assistant Attorney General
kimberly.patwardhan@maine.gov

VALERIE A. WRIGHT
Assistant Attorney General
valerie.a.wright@maine.gov

Office of the Attorney General
6 State House Station
Augusta ME  04333-0006
Tel.  (207) 626-8800
Fax (207) 287-3145

Attorneys for State Defendants-Appellees

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6). I further certify that all text in this opposition brief is in proportionally spaced Times New Roman Font and is 14 points in size. I further certify that, according to the word count function of the word-processing software used to prepare this opposition brief (Microsoft Word 365), this brief contains 12,390 words.

/s/ Kimberly L. Patwardhan
KIMBERLY L. PATWARDHAN
Assistant Attorney General
207-626-8570
kimberly.patwardhan@maine.gov

Office of the Attorney General
6 State House Station
Augusta, Maine 04333-0006

Attorney for State Defendants-Appellees

## CERTIFICATE OF SERVICE

I, Kimberly L. Patwardhan, hereby certify that on October 18, 2021, I electronically filed the State Defendants'-Appellees' Principal Brief  with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.


/s/ Kimberly L. Patwardhan
KIMBERLY L. PATWARDHAN
Assistant Attorney General
207-626-8570
kimberly.patwardhan@maine.gov

Office of the Attorney General
6 State House Station
Augusta, Maine 04333-0006

Attorney for State Defendants-Appellees