No. 21-1826

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

JANE DOES 1–6, JOHN DOES 1–3, JACK DOES 1–1000, JOAN DOES 1–1000,

Plaintiffs–Appellants

*v.*

JANET T. MILLS, in her official capacity as Governor of the State of Maine, JEANNE M. LAMBREW, in her official capacity as Commissioner of the Maine Department of Health and Human Services, NIRAV D. SHAH, in his official capacity as Director for the Maine Center for Disease Control and Prevention, MAINEHEALTH, GENESIS HEALTHCARE OF MAINE, LLC, GENESIS HEALTHCARE, LLC, NORTHERN LIGHT HEALTH FOUNDATION, MAINEGENERAL HEALTH,

Defendants–Appellees.

On Appeal from the United States District Court for the District of Maine
In Case No. 1:21-cv-242-JDL before The Honorable John D. Levy

## PLAINTIFFS-APPELLANTS' OPENING BRIEF

Mathew D. Staver, *Counsel of Record*
Horatio G. Mihet
Roger K. Gannam
Daniel J. Schmid
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854 - (407) 875-1776
court@LC.org - hmihet@LC.org
rgannam@LC.org - dschmid@LC.org
*Attorneys for Plaintiff-Appellant*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS……………………………………………………...…ii

TABLE OF AUTHORITIES…………………………………………………….v

JURISDICTIONAL STATEMENT………………………………………..1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW…………………..1

INTRODUCTION…………………………………………………………….2

STATEMENT OF THE CASE…………………………………………………11

I.      FACTUAL BACKGROUND………………………………………………11

        A.      The Governor's COVID-19 Vaccine Mandate………………………11

        B.      Plaintiffs' Sincerely Held Religious Beliefs…………………………13

        C.      Plaintiffs' Willingness to Comply with Alternative Measures……….18

        D.      Defendants' Response Claiming Federal Law Does Not Apply…….19

        E.      Defendants Favor and Allow Medical Exemptions…………………23

        F.      Maine Is the Third Lowest in Total COVID-19 Cases and Fourth
                Lowest in Deaths…………………………………………………….25

II.     PROCEDURAL HISTORY…………………………………………………..25

SUMMARY OF THE ARGUMENT……………………………………………..26

STANDARD OF REVIEW……………………………………………………27

LEGAL ARGUMENT…………………………………………………………28

I.     THE DISTRICT COURT ERRED IN ITS DETERMINATION THAT DEFENDANTS' REMOVAL OF RELIGIOUS EXEMPTIONS FROM THE VACCINE MANDATE WAS NEUTRAL AND GENERALLY APPLICABLE……………………………………………..28

    A.     Defendants' Intentional Removal Of Religious Exemptions From The Vaccine Mandate While Allowing Medical Exemptions Is Neither Neutral Nor Generally Applicable…………..28

        1.     Maine's Singling Out of Religious Employees Who Decline Vaccination for Especially Harsh Treatment Is Not Religiously Neutral……………………………………28

        2.     The Vaccine Mandate's More Favorable Treatment of Employees Declining Vaccination for Secular, Medical Reasons as Compared to Employees Declining Vaccination for Religious Reasons Is Not Generally Applicable………………………………………………….30

    B.     Maine's Discriminatory Treatment of Religious Exemptions Is Subject to and Cannot Withstand Strict Scrutiny………………………………………………….36

        1.     Maine Stands Virtually Alone In Its Blanket Refusal to Extend Religious Accommodations, and Its Mandate is Not the Least Restrictive Means of Achieving Its Interests…………………………………36

        2.     The District Court Erred In Placing The Burden On Plaintiffs To Demonstrate That Less Restrictive Alternatives Are Sufficient To Protect the State's Asserted Interest…………………………………….40

        3.     The Government Failed To Demonstrate Narrow Tailoring………………………………………….42

II.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR TITLE VII CLAIMS, AND THE DISTRICT COURT'S SLAPDASH TREATMENT OF PLAINTIFFS' CLAIMS IS ERRONEOUS……………………………………………...44

A.     Title VII Supersedes Maine's Rule Because the Employer Defendants Have Admitted That Title VII's Requirement of Religious Accommodation and Maine's Revocation of Religious Exemptions Are in Conflict and That They Cannot Comply With Both………………………………………………………………….45

B.     Title VII Explicitly Preempts State Laws, Like Maine's, That Require the Doing of an Act That Is Prohibited by Title VII………..49

III.    PLAINTIFFS ARE SUFFERING IRREPARABLE HARM………………..50

A.     Plaintiffs Are Suffering Irreparable First Amendment Injury………..51

B.     Injunctive Relief Is Needed to Preserve The Status Quo For Plaintiffs' Title VII Claims…………………………………………..53

IV.    PLAINTIFFS SATISFY THE OTHER REQUIREMENTS FOR A PRELIMINARY INJUNCTION……………………………………………...54

CONCLUSION…………………………………………………………………...55

## TABLE OF AUTHORITIES

## CASES

*Agudath Israel of Am. v. Cuomo*, 983 F.3d 620 (2d Cir. 2020)……………………42

*Arizona Free  Enterprise Club's Freedom Club PAC v. Bennett*,
564 U.S. 721 (2011)……………………………………………………………………40

*Ashcroft v. ACLU*, 542 U.S. 656 (2004)…………………………………………………..41

*Bailey v. Delta Air Lines, Inc.*, 722 F.2d 942 (1st Cir. 1983)………………………53

*Bermand v. New York City Ballet, Inc.*, 616 F. Supp. 555 (S.D.N.Y. 1985)………54

*Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8 (1st Cir. 2004)…………………..27

*Brown v. City of Chicago*, 8 F. Supp. 2d 1095 (N.D. Ill. 1998)……………………50

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016)…………………………42

*California Fed. Savings & Loan Assoc. v. Guerra*, 479 U.S. 272 (1987)…...…47, 48

*Coalition for Economic Equality v. Wilson*, 122 F.3d 692 (9th Cir. 1997)………..49

*Cunningham v. City of Shreveport*, 407 F. Supp. 3d 595 (W.D. La. 2019)…………5

*Dahl v. Bd. of Trustees of W. Michigan Univ.*, No. 21-2945,
2021 WL 4618519 (6th Cir. Oct. 7, 2021)……………………………………*passim*

*Dr. A v. Hochul*, No. 1:21-CV-1009,
2021 WL 4734404 (N.D.N.Y. Oct. 12, 2021)………………………………..*passim*

*EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015)……………...6, 46

*Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963)……………47

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*,
170 F.3d 359 (3d Cir. 1999)……………………………….……………31, 32, 34

*Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021)……………………………40

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006)………………………………………………………….………41

*Goya Foods, Inc. v. Wallack Mgmt., Co.*, 290 F.3d 63 (1st Cir. 2002)……………41

*Guardians Ass'n v. Civil Serv. Comm.*, 630 F.2d 79 (2d Cir. 1980)………………50

*Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707 (1985)………5, 48

*Holt v. Continental Grp., Inc.*, 708 F.2d 87 (2d Cir. 1983)………………………..54

*Johnson v. California*, 543 U.S. 499 (2005)………………………………………40

*Klaassen v. Trs. of Ind. Univ.*, -- F. Supp. 3d --,
2021 WL 3073926, (N.D. Ind. July 18, 2021)……………………………………..30

*LeBlanc v. S. Bell Tel. & Tel. Co.*, 333 F. Supp. 602 (E.D. La. 1971)……………..50

*Lewis v. City of Unity City*, 918 F.3d 1213 (11th Cir. 2019)………………………..6

*Litzman v. N.Y. City Police Dep't*, No. 12 Civ. 4681(HB),
2013 WL 6049066 (S.D.N.Y. Nov. 15, 2013)…………………………………34, 35

*Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020)………......35

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014)…………………………………42, 44

*Murphy v. NCAA*, 138 S. Ct. 1461, 1480 (2018)…………………………………..46

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015)……………………………………40

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d cir. 2017)………………………….41

*Rinehart v. Westinghouse Elec. Corp.*, No. C 70-537,
1971 WL 174 (N.D. Ohio Aug. 20, 1971)…………………………………………50

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
141 S. Ct. 63 (2020)..................................................................8, 11, 28, 51

*Romero Feliciano v. Torres Gaztambide*, 836 F.2d 1 (1st Cir. 1987)…………..…52

*Sheehan v. Purolator Courier Corp.*, 676 F.2d 877 (2d Cir. 1981)…………...53, 54

*Sindi v. El-Moslimany*, 896 F.3d 1 (1st Cir. 2018)…………………………………27

*Sindicato Puertorriqueno de Trabajaddores v. Fortuno*,
699 F.3d 1 (1sr Cir. 2012)…………………………………………...…………27, 51

*Singh v. McHugh*, 185 F. Supp. 3d 201 (D.D.C. 2016)…………………………..35

*South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716 (2021)…..…11, 29

*Tandon v. Newsom*, 141 S. Ct. 1294 (2021)……………………………28, 36, 51, 52

*Top Entm't, Inc. v. Torrejon*, 351 F.3d 531 (1st Cir. 2003)………………………..41

*Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977)………………………45

*Veilleux v. Nat'l Broad. Co.*, 20 F.3d 92 (1st Cir. 2000)…………………………..27

*Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012)………………………………………34

*Westchester Legal Servs., Inc. v. Westchester Cnty.*,
607 F. Supp. 1379 (S.D.N.Y. 1985)………………………………………………….51

*We The Patriots USA, Inc. v. Hochul*, No. 21-2179,
dkt. 65 (2d Cir. Sept. 30, 2021)………………….…………………………………7

## STATUTES

28 U.S.C. §1291………………………………………………………………1

28 U.S.C. §1331………………………………………………………………1

28 U.S.C. §1343………………………………………………………………1

42 U.S.C. §1983………………………………………………………………1

42 U.S.C. §2000e………………………………………………...…………1, 5

U.S. Const. Art. VI, cl. 2……………………………………………………4

## OTHER

*1 Corinthians* 6:15-20……………………………………………………..17

*Exodus* 20:13………………………………………………………………15

*Exodus* 21:22–23…………………………………………………………..15

*Exodus* 23:7………………………………………………………………..15

*Genesis* 1:26–27…………………………………………………………...14

*Isaiah* 44:2………………………………………………………………...14

*Luke* 17:2…………………………………………………………………..15

*Matthew* 18:6……………………………………………………………...15

*Psalm* 139:13–14………………………………………………………….14

*Psalm* 139:16……………………………………………………………...14

*2 Timothy* 3:16……………………………………………………………14

## JURISDICTIONAL STATEMENT

Plaintiffs brought this action under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §1983 and 42 U.S.C. §2000e-2. (Dkt. 1, Verified Complaint, ¶34.) The district court had jurisdiction over Plaintiffs' claims under 28 U.S.C. §1331 and §1343. This Court has jurisdiction over this appeal under 28 U.S.C. §1291(a)(1) because it is from a denial of a motion for preliminary injunction.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

The issues presented for review are:

(1)     Whether the district court erred in finding that the Governor's COVID-19 Vaccination Mandate and its concomitant revocation of protections for sincerely held religious beliefs was neutral.

(2)     Whether the district court erred in holding that the Governor's continues, express allowance for nonreligious medical exemptions, while explicitly revoking religious exemptions that previously existed, was generally applicable.

(3)     Whether the district court erred in placing the burden on Plaintiffs to prove the efficacy of less restrictive alternatives rather than requiring the Government to prove that less restrictive alternative would not work, that it seriously considered them and ruled them out for good reason, and that the approaches tried

1

by 48 other states and several federal agencies would not advance its interest in Maine.

(4)    Whether the district court erred in finding that Employer Defendants' refusal to even consider religious exemption requests mandated by Title VII does not violate the requirements of the Supremacy Clause and the express demands of Title VII of the Civil Rights Act of 1964.

## **INTRODUCTION**

JANE DOES 1–6, JOHN DOES 1–3, JACK DOES 1–1000, JOAN DOES 1–1000 sought a preliminary injunction from the district court to avoid irreparable First Amendment injury at the hands of the Governor's mandate stripping all religious exemptions from Maine's COVID-19 vaccination requirement for healthcare workers. Because of the deadline imposed by Defendants' unconstitutional, unlawful, and unconscionable demanded that Plaintiffs violate their sincerely held religious beliefs by October 15, 2021, relief cannot wait another day. Plaintiffs and other healthcare workers in Maine are already being told not to report to work absent Court-ordered relief or violation of their sincerely held religious beliefs, and several of the Plaintiffs have already been terminated for their refusal to violate their sincerely held religious beliefs.

**For many years prior to the instant action and in strict compliance with federal law, Defendants permitted healthcare workers in Maine to apply for**

2

**and receive religious exemptions to mandatory vaccine requirements. Yet, effective September 1, 2021, Maine stripped all protections for religious objectors to any vaccination requirement in conjunction with its emergency declaration that all healthcare workers in Maine receive a COVID-19 vaccination.** (Dkt. 1, V. Compl. ¶41-49.) Defendants now also threaten all Plaintiffs with the immediate termination of their ability to feed their families, and revocation of their licenses for failing to abide by the unconstitutional and unlawful mandate. The district court's denial of preliminary injunctive relief must be reversed.

The seminal issue before this Court can be boiled down to a simple question: Does federal law apply in Maine? Though the question borders on the absurd, so does Defendants' answer to it. Defendants have explicitly claimed to healthcare workers in Maine, including Plaintiffs, that federal law does not apply, and neither should they. Defendants have informed Plaintiffs, who have sincerely held religious objections to the Governor's mandate that all healthcare workers in Maine must receive a COVID-19 vaccine by October 29, 2021 (the "**COVID-19 Vaccine Mandate**"), that no protections or considerations are given to religious beliefs in Maine. Indeed, Defendants' answer has been an unequivocal (and demonstrably fallacious) claim that federal law does not provide protections to Maine's healthcare workers. When presented with requests from Plaintiffs for exemption and

accommodation for their sincerely held religious beliefs, Defendants have responded in the following ways:

- "I can share MaineHealth's view that **federal law does not supersede state law in this instance**." (V. Compl. ¶87 (emphasis added).)

- "**[W]e are no longer able to consider religious exemptions for those who work in the state of Maine**." (V. Compl. ¶84 (bold emphasis original).)

- "All MaineGeneral employees will have to be vaccinated against COVID-19 by Oct. 1 unless they have a medical exemption. The mandate also states that only medical exemptions are allowed, **no religious exemptions are allowed**." (V. Compl. ¶93 (emphasis added).)

- "Allowing for a religious exemption would be a violation of the state mandate issued by Governor Mills. So, unfortunately, that is not an option for us." (V. Compl. ¶94.)

The answer to the question before this Court is clear: federal law and the United States Constitution are supreme over any Maine statute or edict, and Maine cannot override, nullify, or violate federal law. *See* U.S. Const. Art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."). Indeed, "**[i]t is a familiar and well-established principle that the Supremacy Clause . . . invalidates state laws that interfere**

**with, or are contrary to, federal law. Under the Supremacy Clause . . . state law is nullified to the extent that it actually conflicts with federal law**." *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712-13 (1985) (emphasis added) (cleaned up).

Thus, Maine is required to abide by federal law and provide protections to employees who have sincerely held religious objections to the COVID-19 vaccines. And, here, the federal law is clear: There can be no dispute that Title VII of the Civil Rights Act prohibits Defendants from discriminating against Plaintiffs on the basis of their sincerely held religious beliefs. 42 U.S.C. §2000e-2(a) ("It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's . . . religion."). And, Defendants have a duty under Title VII to provide religious exemptions and accommodations to those with sincerely held religious objections to the COVID-19 Vaccine Mandate.

In direct contrast to this unquestionable principle of black letter law, however, every Defendant in this suit has seen fit to claim to its healthcare workers that the converse is true, and that Maine law is supreme over federal law; has pressured, coerced, and discouraged employees with religious objections to the mandatory vaccines from even seeking religious exemptions from such a policy; has informed

Plaintiffs that their requests for an exemption and accommodation from the mandate cannot even be evaluated or considered; and has flatly denied all requests for religious exemption and accommodation from the mandate that all healthcare workers receive a COVID-19 vaccine. Employers bent on discrimination "usually don't post help wanted signs reading 'blacks need not apply.'" *Lewis v. City of Unity City*, 918 F.3d 1213, 1261 (11th Cir. 2019) (Rosenbaum, J., concurring in part). But Maine and its healthcare employers have no problem being direct: "religious misbelievers need not apply."

The dispute in this case is not about what accommodations are available to Plaintiffs or whether accommodation of Plaintiffs' sincerely held religious objections can be conditioned on compliance with certain reasonable requirements. Plaintiffs have already acknowledged to Defendants that they are willing to comply with reasonable health and safety requirements that were deemed sufficient for more than 19 months. **The dispute is about whether Defendants are required to even consider a request for reasonable accommodation of Plaintiffs' sincerely held religious beliefs. The answer is clear: yes**.

As the Northern District of New York held when it enjoined New York's nearly identical scheme: "'Title VII does not demand mere neutrality with regard to religious practices . . . rather, it gives them favored treatment.' Thus, under certain circumstances, Title VII 'requires otherwise-neutral policies to give way to the need

for an accommodation.'" *Dr. A v. Hochul*, No. 1:21-CV-1009, 2021 WL 4734404,
*9 (N.D.N.Y. Oct. 12, 2021) (quoting *EEOC v. Abercrombie & Fitch Stores, Inc.*,
575 U.S. 768, 775-776 (2015)). Indeed, the court in *Dr. A* plainly held that plaintiffs
were likely to succeed on the merits of their claims because – as here – the
Governor's mandate "has effectively foreclosed the pathway to seeking a religious
accommodation that is guaranteed under Title VII." *Id.* at *6.

On September 30, 2021, the Second Circuit gave its imprimatur to the *Dr. A.*
TRO against State Defendants in *We The Patriots USA, Inc. v. Hochul*, No. 21-2179,
dkt. 65 (2d Cir. Sept. 30, 2021). There, the Second Circuit issued an injunction
pending appeal against the Governor's COVID-19 Vaccine Mandate, ordering that
the New York State Defendants are enjoined from enforcing their mandate.

On October 7, 2021, the Sixth Circuit issued an order affirming a preliminary
injunction against Western Michigan University for its similar refusal to grant
requested religious accommodations from a mandatory COVID-19 vaccine policy.
*See Dahl v. Bd. of Trustees of W. Michigan Univ.*, No. 21-2945, 2021 WL 4618519
(6th Cir. Oct. 7, 2021). In denying the university's request for a stay, the Sixth
Circuit concluded that the student athletes' "free exercise challenge will likely
succeed on appeal." *Id. at* *1.  Specifically,

> the University's failure to grant religious exemptions to plaintiffs
> burdened their free exercise rights. The University **put plaintiffs to the
> choice: get vaccinated or stop fully participating in intercollegiate
> sports**. . . . **By conditioning the privilege of playing sports on**

> **plaintiffs' willingness to abandon their sincere religious beliefs, the University burdened their free exercise rights**.

*Id.* at *3 (emphasis added).

> The court continued,

> But the mandate does penalize a student otherwise qualified for intercollegiate sports by withholding the benefit of playing on the team should she refuse to violate her sincerely held religious beliefs. **As a result, plaintiffs have established that the University's vaccination policy for student-athletes burdens their free exercise of religion.**

*Id.* (emphasis added).

As here, the university offered medical exemptions and, theoretically, religious exemptions to its student-athletes, but refused to provide religious accommodations. *Id.* at *1. The Sixth Circuit found that such a discriminatory scheme of individualized exemptions made the vaccine mandate not neutral or generally applicable. *Id.* at *4. That alone was sufficient to mandate the application of strict scrutiny under *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020).

**Plaintiffs face termination and deprivation of their ability to feed their families for not complying with the vaccine mandate by Friday, October 15. Plaintiffs are facing a deadline to become fully vaccinated to October 29, <u>which required Plaintiffs to accept a vaccination by no later than Friday, October 15</u>.** Relief cannot wait another day. No American should be faced with this

unconscionable choice, especially the healthcare heroes who have served us admirably for the entire duration of COVID-19. The district court should be reversed to ensure that Defendants are enjoined from their continued efforts to deny that federal law even applies in Maine, and to compel Defendants to extend the protections that federal law demands of them. Plaintiffs will suffer (and some have already suffered) irreparable harm by being forced to choose between their jobs and their sincerely held religious beliefs. Despite the Governor's mandate only requiring full vaccination by October 29, Plaintiff Jane Doe 2 was told her deadline to comply with the mandate was August 23, and she has already suffered termination as a result of the Governor's mandate. (V. Compl. ¶88.) Relief from this unconscionable and unlawful deprivation of Plaintiffs' liberties cannot come soon enough.

Neither the Governor nor any of the Defendant employers is permitted to blatantly ignore federal protections under the First Amendment and Title VII, yet that is precisely the district court stamped its imprimatur on in the instant action: Plaintiffs need **an order mandating that Defendants follow federal protections for religious objectors to the COVID-19 Vaccine Mandate, and they need that order as soon as possible.**

Plaintiffs are all healthcare workers in Maine who have sincerely held religious beliefs that preclude them from accepting any of the COVID-19 vaccines because of the vaccines' connections to aborted fetal cell lines and for other religious

reasons that have been articulated to Defendants. (V. Compl. ¶¶50-95.) Since COVID-19 first arrived in Maine, Plaintiffs have risen every morning, donned their personal protective equipment, and fearlessly marched into hospitals, doctor's offices, emergency rooms, operating rooms, and examination rooms with one goal: to provide quality healthcare to those suffering from COVID-19 and every other illness or medical need that confronted them. They did it bravely and with honor. They answered the call of duty to provide healthcare to the folks who needed it the most and worked tirelessly to ensure that those ravaged by the pandemic were given appropriate care. **All Plaintiffs seek in this lawsuit is to be able to continue to provide the healthcare they have provided to patients for their entire careers, and to do so under the same protective measures that have sufficed for them to be considered superheroes for the last 19 months**. Defendants shamelessly seek to throw these healthcare workers out into the cold and ostracize them from the very medical facilities for which they have sacrificed so much solely because of Plaintiffs' desire to continue to provide quality healthcare while still exercising their sincerely held religious beliefs.

The law mandates that Defendants permit them to do both. Regardless of whether Maine sees fit to extend protections to religious objectors under its own statutory framework, federal law demands that these Plaintiffs and all employees in Maine receive protections for their sincerely held religious beliefs. This Court should

hold Maine to the bargain it made with its citizens when it joined the union and ensure that Maine extends the required protections that federal law demands. As the Supreme Court held just last year, "**even in a pandemic, the Constitution cannot be put away and forgotten**." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2021) (emphasis added). Indeed, **"[e]ven in times of crisis—perhaps** *especially* **in times of crises—we have a duty to hold goverments to the Constitution**." *South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 718 (2021) (Gorsuch, J., statement) (bold emphasis added; italics original). When we have demanded so much of our healthcare heroes, we owe them nothing less than the full measure of our own commitment to constitutional principles. Anything less would be desecrating the sacrifice these medical heroes made for untold numbers of people—including Defendants—when the call of duty demanded it of them.

## STATEMENT OF THE CASE

### I.    FACTUAL BACKGROUND.

#### A.    The Governor's COVID-19 Vaccine Mandate.

On August 12, 2021, Governor Mills announced that Maine will now require health care workers to accept or receive one of the three, currently available COVID-19 vaccines in order to remain employed in the healthcare profession. (V. Compl. ¶41 (citing Office of Governor Janet Mills, *Mills Administration Requires Health Care Workers To Be Fully Vaccinated Against COVID-19 By October 1*

11

(Aug. 12, 2021), https://www.maine.gov/governor/mills/news/mills-administration-requires-health-care-workers-be-fully-vaccinated-against-covid-19-october (last visited Oct. 18, 2021) (hereinafter "COVID-19 Vaccine Mandate").) The Governor's COVID-19 Vaccine Mandate defines health care workers as "any individual employed by a hospital, multi-level health care facility, home health agency, nursing facility, residential care facility, and intermediate care facility for individuals with intellectual disabilities that is licensed by the State of Maine" as well as "those employed by emergency medical service organizations or dental practices." (V. Compl. ¶42.) The Governor's COVID-19 Vaccine Mandate also provides that "[t]he organizations to which this requirement applies must ensure that each employee is vaccinated, with this requirement being enforced as a condition of the facilities' licensure." (*Id.*, ¶43.) **Thus, the Governor has threatened to revoke the licenses of all health care employers who fail to mandate that all employees receive the COVID-19 vaccine**. (*Id.*, ¶44.)

In addition to the Governor's mandate, Plaintiffs and all health care workers in Maine were also stripped of their pre-existing rights to request a religious exemption and accommodation from the COVID-19 Vaccine Mandate. Effective on September 1, 2021, Dr. Shah and the Maine Center for Disease Control and Prevention ("MCDC") amended 10-144 C.M.R. Ch. 264 to eliminate the ability of health care workers in Maine to request and obtain a religious exemption and

accommodation from the COVID-19 Vaccine Mandate. (*Id.*, ¶46.) The only exemptions Maine now lists as available to health care workers are those outlined in 22 M.R.S. § 802.4-B, which purports to exempt only those individuals for whom an immunization is medically inadvisable and who provide a written statement from a doctor documenting the need for an exemption. (*Id.*, ¶47.) Under the prior version of the rule, 10-144 C.M.R. Ch. 264, §3-B a health care worker could be exempt from mandatory immunizations if the "employee states in writing an opposition to immunization because of a sincerely held religious belief." (*Id.*, ¶48.) In fact, as acknowledged by MCDC, Maine removed the religious exemption to mandatory immunizations effective September 1, 2021. (*Id.*, ¶49 ("The health care immunization law has removed the allowance for philosophical and religious exemptions and has included influenza as a required immunization.").)

## B.    Plaintiffs' Sincerely Held Religious Beliefs.

Plaintiffs have sincerely held religious beliefs that preclude them from accepting or receiving any of the three available COVID-19 vaccines because of their connection to cell lines of aborted fetuses, whether in the vaccines' origination, production, development, testing, or other inputs. (V. Compl. ¶50.) A fundamental component of Plaintiffs' sincerely held religious beliefs is that all life is sacred, from the moment of conception to natural death, and that abortion is a grave sin against God and the murder of an innocent life. (*Id.*, ¶51.) Plaintiffs' sincerely held religious

beliefs are rooted in Scripture's teachings that "[a]ll Scripture is given by inspiration of God, and is profitable for doctrine, for reproof, for correction, [and] for instruction in righteousness." (*Id.*, ¶52. (quoting *2 Timothy* 3:16 (KJV).) Because of that sincerely held religious belief, Plaintiffs must conform their lives, including their decisions relating to medical care, to the commands and teaching of Scripture. (*Id.*, ¶53.)

Plaintiffs have sincerely held religious beliefs that God forms children in the womb and knows them prior to their birth, and that life is sacred from the moment of conception. (*Id.*, ¶54 (quoting, *inter alia*, *Psalm* 139:13–14 (ESV) ("For you formed my inward parts; you knitted me together in my mother's womb. I praise you, for I am fearfully and wonderfully made."); *Psalm* 139:16 (ESV) ("Your eyes saw my unformed substance; in your book were written, every one of them, the days that were formed for me, when as yet there was none of them."); *Isaiah* 44:2 (KJV) ("the LORD that made thee, and formed thee from the womb").)

Plaintiffs also have sincerely held religious beliefs that every child's life is sacred because they are made in the image of God. (*Id.*, ¶55 (quoting *Genesis* 1:26–27 (KJV) ("Let us make man in our image, after our likeness. . . . So God created man in his own image; in the image of God created he him; male and female created he them.").) Plaintiffs also have sincerely held religious beliefs that because life is sacred from the moment of conception, the killing of that innocent life is the murder

of an innocent human in violation of Scripture. (*Id.,* ¶56 (quoting, *inter alia*, *Exodus* 20:13 (KJV) ("Though shalt not kill."); *Exodus* 21:22–23 (setting the penalty as death for even the accidental killing of an unborn child); *Exodus* 23:7 (KJV) ("the innocent and righteous slay thou not, for I will not justify the wicked").)

Plaintiffs also have the sincerely held religious belief that it would be better to tie a millstone around their necks and be drowned in the sea than bring harm to an innocent child. (*Id.*, ¶57 (quoting *Matthew* 18:6; *Luke* 17:2).) Plaintiffs have sincerely held religious beliefs, rooted in the Scriptures listed above, that anything that condones, supports, justifies, or benefits from the taking of innocent human life via abortion is sinful, contrary to the Scriptures, and must be denounced, condemned, and avoided altogether. (*Id.*, ¶58.) Plaintiffs believe that it is an affront to Scripture's teaching that all life is sacred for them to uses a product derived from or connected in any way with abortion. (*Id.*, ¶59.) Plaintiffs' sincerely held religious beliefs preclude them from accepting any one of the three currently available COVID-19 vaccines because of their connection to aborted fetal cell lines. (*Id.*, ¶60.)

Plaintiffs have sincerely held religious objections to the Johnson & Johnson (Janssen Pharmaceuticals) vaccine because it unquestionably used aborted fetal cells lines to produce and manufacture the vaccine. (*Id.*, ¶60.)  As reported by the North Dakota Department of Health, in its handout literature for those considering one of the COVID-19 vaccines, "[t]he non-replicating viral vector vaccine produced by

Johnson & Johnson **did require the use of fetal cell cultures, specifically PER.C6, in order to produce and manufacture the vaccine**." (*Id.*, ¶62 (quoting North Dakota Health, *COVID-19 Vaccines & Fetal Cell Lines* (Apr. 20, 2021), https://www.health.nd.gov/sites/www/files/documents/COVID%20Vaccine%20Page/COVID-19_Vaccine_Fetal_Cell_Handout.pdf (bold emphasis original).) The Louisiana Department of Health likewise confirms that the Johnson & Johnson COVID-19 vaccine, which used the PER.C6 fetal cell line, "is a retinal cell line that was **isolated from a terminated fetus in 1985**." (*Id.*, ¶63 (quoting Louisiana Department of Public Health, *You Have Questions, We Have Answers: COVID-19 Vaccine FAQ* (Dec. 12, 2020), https://ldh.la.gov/assets/oph/CenterPHCH/CenterPH/immunizations/You_Have_Qs_COVID-19_Vaccine_FAQ.pdf (emphasis added).)

Scientists at the American Association for the Advancement of Science have likewise published research showing that the Johnson & Johnson vaccine used aborted fetal cell lines in the development and production phases of the vaccine. (*Id.*, ¶64 (quoting *Meredith Wadman*, *Vaccines that use human fetal cells draw fire*, Science (June 12, 2020), *available at* https://science.sciencemag.org/content/368/6496/1170.full).)

Plaintiffs have sincerely held religious objections to the Moderna and Pfizer/BioNTech COVID-19 vaccines because both of these vaccines, too, have their

16

origins in research using aborted fetal cell lines. (*Id.*, ¶65.) In fact, "[e]arly in the development of mRNA vaccine technology, **fetal cells were used for 'proof of concept' (to demonstrate how a cell could take up mRNA and produce the SARS-CoV-2 spike protein) or to characterize the SARS-CoV-2 spike protein**." (*Id.*, ¶66 (quoting North Dakota Health, *COVID-19 Vaccines & Fetal Cell Lines*.) The Louisiana Department of Health's publications again confirm that aborted fetal cells lines were used in the "proof of concept" phase of the development of their COVID-19 mRNA vaccines. (*Id.*, ¶67 (quoting Louisiana Department of Public Health, *You Have Questions, We Have Answers: COVID-19 Vaccine FAQ*).

Because all three of the currently available COVID-19 vaccines are developed and produced from, tested with, researched on, or otherwise connected with the aborted fetal cell lines HEK-293 and PER.C6, Plaintiffs' sincerely held religious beliefs compel them to abstain from obtaining or injecting any of these products into their body, regardless of the perceived benefit or rationale.

Plaintiffs have sincerely held religious beliefs that their bodies are temples of the Holy Spirit, and that to inject medical products that have any connection whatsoever to aborted fetal cell lines would be defiling the temple of the Holy Spirit. (*Id.*, ¶69 (quoting *1 Corinthians* 6:15-20 (KJV).) Plaintiffs also have sincerely held religious beliefs that they shall receive all answers to their questions through prayer and supplication, including for decisions governing their medical health. (*Id.*, ¶73.)

17

Through much prayer and reflection, Plaintiffs have sought wisdom, understanding, and guidance concerning the COVID-19 vaccines, and Plaintiffs have been convicted by the Holy Spirit in their beliefs that accepting any of the three currently available vaccines is against the teachings of Scripture and would be a sin.

### C.    Plaintiffs' Willingness to Comply with Alternative Measures.

Plaintiffs have offered, and are ready, willing, and able to comply with all reasonable health and safety requirements to facilitate their religious exemption and accommodation from the COVID-19 Vaccine Mandate. (V. Compl. ¶75.) Plaintiffs have all informed their respective employers that they are willing to wear facial coverings, submit to reasonable testing and reporting requirements, monitor symptoms, and otherwise comply with reasonable conditions that were good enough to permit them to do their jobs for the last 18 months. (*Id.*, ¶76.) In fact, last year the State said Plaintiffs were heroes because of their willingness to abide by the same conditions and requirements that Plaintiffs are still willing to follow. (*Id.*, ¶77.) Defendant Shah and the MCDC continues to say that facial coverings are one of the most effective ways to prevent COVID-19. (*Id.*, ¶78.) In its Face Covering FAQs page, the MCDC states:

> How does wearing a face covering prevent the spread of COVID-19?
>
> COVID-19 is an airborne virus that most commonly spreads between people who are in close contact with one another. It spreads through respiratory droplets or small particles, such as those in aerosols, produced when an infected person coughs, sneezes, sings, talks, or

breathes. Because it helps contain respiratory droplets, **wearing a face covering has been proven to be one of the most significant, effective, and easiest ways to reduce the spread of COVID-19**.

(*Id.* (quoting COVID-19 Response, *Face Covering FAQs* (July 29, 2021), https://www.maine.gov/covid19/faqs/face-coverings (emphasis added).)

Additionally, the MCDC still recommends that vaccinated individuals wear a mask in public settings. (*Id.*, ¶79.) And the reason for this is simple,

> A preliminary study has shown that in the case of a breakthrough infection, the Delta variant is able to grow in the noses of vaccinated people **to the same degree as if they were not vaccinated at all**. The virus that grows is just as infectious as that in unvaccinated people, meaning vaccinated people can transmit the virus and infect others.

(*Id.* (quoting National Geographic, *Evidence mounts that people with breakthrough infections can spread Delta easily* (Aug. 20, 2021), https://www.nationalgeographic.com/science/article/evidence-mounts-that-people-with-breakthrough-infections-can-spread-delta-easily (emphasis added).) Masking and testing protocols remain sufficient to prevent the spread of COVID-19 among healthcare workers, and constitute a reasonable alternative to vaccination as an accommodation of sincerely held religious beliefs. (*Id.*, ¶80.)

## D. Defendants' Response Claiming Federal Law Does Not Apply.

Consistent with her sincerely held religious beliefs, Jane Doe 1 submitted to her employer, Defendant MaineHealth, a request for a religious exemption from the Governor's COVID-19 Vaccine Mandate. (V. Compl. ¶82.) On August 17, 2021,

MaineHealth denied Jane Doe 1's request for a religious exemption and accommodation. (*Id.*, ¶83 and dkt. 1-2.) In its response, MaineHealth stated:

> Please be advised that due to the addition of the COVID-19 vaccine to Maine's Healthcare Worker Immunization law announced by the governor in a press conference on 8/12/21, **we are no longer able to consider religious exemptions for those who work in the state of Maine. This also includes those of you who submitting [sic] influenza exemptions as well.** The State of Maine now requires all healthcare workers to be fully vaccinated by October 1st, which means you are two weeks beyond the completion of a COVID-19 vaccination series. (i.e. Both doses of the mRNA vaccine, or the single dose of J & J) as of that date.

> You submitted a religious exemption, your request is unable to be evaluated due to a change in the law. Your options are to receive vaccination or provide documentation for a medical exemption to meet current requirements for continued employment.

(V. Compl. ¶84 and dkt. 1-2 at 2 (bold emphasis original).)

On August 20, 2021, after receiving her first denial from MaineHealth, Jane Doe 1 responded to MaineHealth, stating:

> My request for an exemption was made under federal law, including Title VII of the Civil Rights [Act] of 1964. The Constitution provides that federal law is supreme over state law, and Maine cannot abolish the protections of federal law. You may be interested in this press release from Liberty Counsel, and the demand letter they have sent to Governor Mills on this issue (which is linked in the press release): https://lc.org/newsroom/details/081821-maine-governor-must-honor-religious-exemptions-for-shot-mandate. Regardless of what the Governor chooses to do, Franklin Memorial has a legal obligation under federal law to consider and grant my proper request for a religious exemption. Please let me know promptly if you will do so.

(V. Compl. ¶85 and dkt .1-2 at 1.) That same day, MaineHealth responded to Jane Doe 1 stating that federal law does not supersede state law or the Governor's COVID-19 Vaccine Mandate and that MaineHealth would not be following federal law on the issue. (V. Compl. 86.)

Specifically, MaineHealth stated:

Although I cannot give legal guidance to employees, **I can share MaineHealth's view that federal law does not supersede state law in this instance**. The EEOC is clear in its guidance that employers need only provide religious accommodations when doing so does not impose an undue hardship on operations. Requiring MaineHealth to violate state law by granting unrecognized exemptions would impose such a hardship. **As such, we are not able to grant a request for a religious exemption from the state mandated vaccine**.

(V. Compl. ¶87 and dkt. 1-2 at 1 (emphasis added).)

Plaintiff Jane Doe 2 submitted to her employer, Genesis Healthcare, a request for a religious exemption and accommodation from the Governor's COVID-19 Vaccine Mandate. (V. Compl. ¶88.) After reviewing Jane Doe 2's submission, which articulated her sincerely held religious beliefs, Genesis Healthcare sent Jane Doe 2 a cursory response stating that her religious beliefs did not qualify for an exemption from the vaccine mandate. (*Id.*) **Plaintiff Jane Doe 2 was given until August 23 to become vaccinated, and when her request for a religious objection and accommodation was denied, Jane Doe 2 was terminated from her employment**. (*Id.*)

Plaintiff Jane Doe 3 submitted a request to her employer, Defendant Northern Light Health Foundation, seeking an exemption and accommodation from the Governor's COVID-19 Vaccine Mandate. (*Id.*, ¶89.) Northern Light responded to Jane Doe 3, denying her request and stating that the Governor's COVID-19 Vaccine Mandate does not permit exemptions or accommodations for sincerely held religious beliefs. (*Id.*) Specifically, Northern Light informed Jane Doe 3 that her request for a religious exemption could not be granted because Maine law and the Governor do not permit "non-medical exemptions," and stated, "the only exemptions that may be made to this requirement are medical exemptions supported by a licensed physician, nurse practitioner, or physician assistant." (*Id.*, ¶90 and dkt. 1-3 at 1.) Northern Light therefore ignored federal law on the basis that the Governor has removed any exemptions for sincerely held religious beliefs. (*Id.*, ¶91.)

On August 19, 2021, Jane Doe 5 submitted a request to her employer, Defendant MaineGeneral Health, stating that she has sincerely held religious objections to the COVID-19 vaccines and requesting an exemption and accommodation from the Governor's COVID-19 Vaccine Mandate. MaineGeneral told Jane Doe 5 that no religious exemptions were permitted under the Governor's mandate and that her request for a religious exemption and accommodation was denied. (*Id.*, ¶92 and dkt. 1-4.) Specifically, MaineGeneral stated:

> MaineGeneral Health must comply with Governor's Mill's [sic] COVID-19 vaccination mandate for all health care employees. All

MaineGeneral employees will have to be vaccinated against COVID-19 by Oct. 1 unless they have a medical exemption. **The mandate also states that only medical exemptions are allowed, no religious exemptions are allowed**.

(V. Compl. ¶93 and dkt. 104 at 1 (emphasis added).) Thus, MaineGeneral has made it abundantly clear to its employees that religious exemptions are not available because of the Governor's Mandate. But, if its initial denials left any room for doubt, its follow-up response to Jane Doe 5 put all doubt to rest: "**Allowing for a religious exemption would be a violation of the state mandate issued by Governor Mills. So, unfortunately, it is not an option for us.**" (V. Compl. ¶94 and dkt. 1-4 at 2.)

The responses from Defendants MaineHealth, Genesis Healthcare, Northern Light Health Foundation, and MaineGeneral Health have been virtually identical for all other Plaintiffs as well, indicating that the various Defendants are not permitted by the Governor's COVID-19 Vaccine Mandate to allow for (or even consider) an exemption and accommodation for sincerely held religious beliefs.

### E.    Defendants Favor and Allow Medical Exemptions.

Defendants' responses to Plaintiffs' requests for exemption and accommodation for their sincerely held religious beliefs confirm that Maine is, indeed, willing to grant other exemptions from the Governor's COVID-19 Vaccine Mandate but has relegated religious exemptions to constitutional orphan status. (V. Compl. ¶96-97.) In its response to Jane Doe 1, Defendant MaineHealth indicated it is perfectly willing to accept and grant medical exemptions but will not allow

religious exemptions. (*Id.*, ¶97). Thus, while MaineHealth says it will consider and grant the preferred medical exemptions, **it will not even consider the constitutionally orphaned religious exemption requests**. To make matters even more clear, MaineHealth subsequently informed Jane Doe 1 that she was permitted to seek any other exemption, except a religious one: "If you seek an accommodation **other than a religious exemption** from the state mandated vaccine, please let us know." (V. Compl. ¶99 and dkt. 1-2 at 1 (emphasis added).)

Defendant Northern Light gave a similar response to Jane Doe 3, indicating that only medical exemptions would be considered or approved. (V. Compl. ¶100.) Specifically, it stated that "the only exemptions that may be made to this requirement are medical exemptions" and that all Northern Light employees must comply with the Governor's COVID-19 Vaccine Mandate "except in the case of an approved medical exemption." (*Id.*, ¶100 and dkt. 1-3 at 1.)

Defendant MaineGeneral issued a similar response to Jane Doe 5, stating that all healthcare workers must comply with the Governor's COVID-19 Vaccine Mandate "unless they have a medical exemption," and that the Governor's "mandate states that only medical exemptions are allowed, no religious exemptions are allowed." (V. Compl. ¶101 and dkt. 1-4 at 1.)

The Governor, through her COVID-19 Vaccine Mandate, has created a two-tiered system of exemptions, and placed religious beliefs and those who hold them

in a class less favorable than other exemptions that Defendants are perfectly willing to accept. Under the Governor's scheme of creating a disfavored class of religious exemptions, Defendants are not even willing to consider religious exemptions, much less grant them to those who have sincerely held religious objections to the COVID-19 vaccines.

### F.    Maine Has the Third Lowest Total COVID-19 Cases and Fourth Lowest Deaths in the Nation.

As the Governor of Maine has noted, even before it implemented its draconian and unique ban on religious exemptions, Maine's statistics relating to COVID-19 were some of the best in the Nation, despite having one of the oldest median age in the country.

> **Despite having the oldest median age population in the country, Maine, adjusted for population, ranks third lowest in total number of cases and fourth lowest in number of deaths from COVID-19 from the start of the pandemic, according to the U.S. CDC.**

(*See* dkt. 34-1 at 3, *Mills Administration Provides More Time for Health Care Workers to Meet COVID-19 Vaccination Requirement* (emphasis added).)

## II.    PROCEDURAL HISTORY.

Plaintiffs initiated this instant action on August 25, 2021 with the filing of a Verified Complaint (dkt. 1) and a Motion for Temporary Restraining Order and Preliminary Injunction. (Dkt. 3.) On August 26, the district court held a hearing on Plaintiffs' Motion for Temporary Restraining Order and issued an order denying

Plaintiffs' Motion the same day. (Dkt. 11.) The district court initially scheduled a hearing on Plaintiffs' Motion for Preliminary Injunction for September 10, 2021, but granted Defendants' request, over Plaintiffs' objection, to continue that hearing to September 20. (*See* dkt. 44.) The court held a hearing on Plaintiffs' Motion for Preliminary Injunction on September 20, took the matter under advisement, and informed the parties that a decision would issue expeditiously. Twenty-three days later, **two days before Plaintiffs' deadline to become vaccinated**, the district court issued its decision denying Plaintiffs' Motion for Preliminary Injunction. (Dkt. 65.) Plaintiffs noticed their appeal to this Court within an hour of the district court's decision. (Dkt. 66.)

## SUMMARY OF THE ARGUMENT

The Governor's COVID-19 Vaccine Mandate and its concomitant revocation of any process for requesting and receiving a religious exemption and accommodation is neither neutral nor generally applicable, and is thus subject to strict scrutiny. Government Defendants fail strict scrutiny because they have not and cannot demonstrate that their revocation of all religious exemptions and accommodations is the least restrictive means of accomplishing their asserted interests of decreasing the spread of COVID-19 at healthcare facilities. Employer Defendants violate Title VII by refusing to even provide a process through which

Plaintiffs may request or receive religious exemptions and accommodations to the Governor's COVID-19 Vaccine Mandate.

## STANDARD OF REVIEW

Typically, "the district court's conclusions of law are reviewed de novo and its findings of fact are reviewed for clear error." *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004). In the First Amendment context, however, this Court must embark on a plenary review of the record to those facts "that specifically involve the application of First Amendment law to specific facts." *Veilleux v. Nat'l Broad. Co.*, 20 F.3d 92, 107 (1st Cir. 2000). *See also Sindi v. El-Moslimany*, 896 F.3d 1, 14 (1st Cir. 2018) ("The First Amendment . . . requires an appellate court to review the supporting evidence independently.")

To obtain a preliminary injunction, Plaintiffs must demonstrate four factors: "'(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.'" *Bl(a)ck Tea*, 378 F.3d at 11. "In the First Amendment context . . . the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012).

## LEGAL ARGUMENT

### I. THE DISTRICT COURT ERRED IN ITS DETERMINATION THAT DEFENDANTS' REMOVAL OF RELIGIOUS EXEMPTIONS FROM THE VACCINE MANDATE WAS NEUTRAL AND GENERALLY APPLICABLE.

The district court concluded that the Governor's COVID-19 Vaccination Mandate, and its intentional and discriminatory removal of religious exemptions, was both neutral and generally applicable. (Dkt. 65, Order at 22 (holding that the law was facially neutral); *Id.* at 26-27 (holding that the mandate was neutral even though it removed the religious exemptions).) The district court's conclusion was erroneous.

#### A. Defendants' Intentional Removal Of Religious Exemptions From The Vaccine Mandate While Allowing Medical Exemptions Is Neither Neutral Nor Generally Applicable.

##### 1. Maine's Singling Out of Religious Employees Who Decline Vaccination for Especially Harsh Treatment Is Not Religiously Neutral.

"**[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise**." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (bold emphasis added). In fact, "the regulations cannot be viewed as neutral because they single out [religion] for especially harsh treatment." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020). "**When a state so obviously targets religion for differential**

28

**treatment, our job becomes much clearer**." *South Bay*, 141 S. Ct. at 717 (Gorsuch, J.) (emphasis added).

Here, Maine has plainly singled out religious employees who decline vaccination for especially harsh treatment (*i.e.*, depriving them from earning a living anywhere in the State), while favoring employees declining vaccination for secular, medical reasons. Thus, Maine has treated medical exemptions more favorably than religious exemptions and is not neutral or generally applicable under *Tandon*. Under the *Tandon*, *South Bay*, and *Catholic Diocese* triumvirate, Government Defendants' discriminatory treatment of unvaccinated religious employees violates the First Amendment. Under the prior version of Maine's immunization exemption requirements, Maine allowed for (a) medical exemptions, and (b) exemptions for any employee who "states in writing an opposition to immunization because of a sincerely held religious belief." (V. Compl. ¶ 48.) On August 14, 2021, however, Maine removed **only the religious exemption from the rule**. (V. Compl. ¶46.) Indeed, where – as here – the government has removed a previously available religious exemption, that "intentional change in language is the kind of 'religious gerrymander' that triggers heightened scrutiny." *Dr. A v. Hochul*, No. 1:21-cv-1009, 2021 WL 4734404, *8 (N.D.N.Y. Oct. 12, 2021). Indeed, "**where a state extends discretionary exemptions to a policy, it must grant exemptions for cases of**

29

'religious hardship' or present compelling reasons not to do so." *Dahl*, 2021 WL 4618519, at *3 (emphasis added).

Moreover, as it relates to John Doe 1, the Governor's mandate forces him to violate the federal protections available to his employees. (V. Compl. ¶111-112.) Indeed, the Governor's intentional discrimination of religious beliefs in Maine forces John Doe 1 into the Hobson's choice of violating the protections available to his employees or potentially losing his license to practice in Maine. (*Id.*) The First Amendment demands more.

> **2.    The Vaccine Mandate's More Favorable Treatment of Employees Declining Vaccination for Secular, Medical Reasons as Compared to Employees Declining Vaccination for Religious Reasons Is Not Generally Applicable.**

Maine's continuing recognition of only medical exemptions also removes the Vaccine Mandate from general applicability. As *Dr. A* held last week, where the government permits medical exemptions from the mandate, but excludes religious exemptions, the law is not neutral. 2021 WL 4734404, at *8. *See also Dahl*, 2021 WL 4618519, at *3 ("The University's vaccine mandate likewise provides a mechanism for individualized exemptions. . . . As a result, the University must prove that its decision not to grant religious exemptions to plaintiffs survives strict scrutiny."). *Cf. Klaassen v. Trs. of Ind. Univ.*, -- F. Supp. 3d --, 2021 WL 3073926, *5 (N.D. Ind. July 18, 2021), *aff'd* 7 F.4th 592 (7th Cir. 2021) (holding that a university's vaccine mandate was neutral and generally applicable where it provided

30

a mechanism for students to request and receive religious exemptions to the vaccine mandate).

In *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, Justice (then-Judge) Alito wrote unequivocally for the court that "**[b]ecause the Department makes exemptions from its [no beards] policy for secular reasons and has not offered any substantial justification for refusing to provide similar treatment for officers who are required to wear beards for religious reasons, we conclude that the Department's policy violates the First Amendment**." 170 F.3d 359, 360 (3d Cir. 1999) (emphasis added). There, like Maine here, the city argued that it was required to provide medical accommodations under federal law but that religious exemptions were not required. *Id.* at 365. The court squarely rejected that rationale: "It is true that the ADA requires employers to make reasonable accommodations for individuals with disabilities. However, **Title VII of the Civil Rights Act of 1964 imposes an identical obligation on employers with respect to accommodating religion.**" *Id.* (emphasis added) (cleaned up). Thus, the court held, "**we cannot accept the Department's position that its differential treatment of medical exemptions and religious exemptions is premised on a good-faith belief that the former may be required by law while the latter are not**." *Id.* (emphasis added).

31

Here, the district court found that the continued availability of medical exemptions, while religious exemptions were specifically targeted and excluded, does not violate the First Amendment because the two are not comparable. (PI Order at 19.) Justice Alito squarely rejected that contention:

> We also reject the argument that, because the medical exemption is not an "individualized exemption," the *Smith* /*Lukumi* rule does not apply. While the Supreme Court did speak in terms of "individualized exemptions" in *Smith* and *Lukumi,* **it is clear from those decisions that the Court's concern was the prospect of the government's deciding that secular motivations are more important than religious motivations. If anything, this concern is only further implicated when the government does not merely create a mechanism for individualized exemptions, but instead, actually creates a categorical exemption for individuals with a secular objection but not for individuals with a religious objection**.

*Fraternal Order of Police*, 170 F.3d at 365 (emphasis added) (cleaned up). The same is true here. Maine maintained a policy that permitted religious exemptions and medical exemptions to mandatory vaccinations. (V. Compl. ¶ 48.) Then, Maine specifically removed religious exemptions while maintaining medical exemptions. (V. Compl. ¶¶ 46–47.) And, that discriminatory removal of religious exemptions while maintaining medical exemptions violates the First Amendment. 170 F.3d at 365 ("**Therefore, we conclude that the Department's decision to provide medical exemptions while refusing religious exemptions is sufficiently suggestive of discriminatory intent so as to trigger heightened scrutiny under *Smith* and *Lukumi.***" (emphasis added)).

32

Here, Maine claims secular, medical reasons for declining vaccination are important enough to overcome its interest in ensuring high vaccination rates but that religious reasons for declining vaccination are not. And, the district court held that such a value judgment was perfectly permissible under the First Amendment because it was in advance of the purported public health goals. (dkt. 65, Order at 26.) But the asserted goal of the Government here is to stop the spread of COVID-19 at healthcare facilities. (*See* dkt. 49-4, Declaration of Nirav Shah, ¶53 ("Maine CDC determined that requiring vaccinations for healthcare workers in certain high-risk settings was necessary to protect public health, healthcare workers and Maine's health care system from the further spread of COVID-19.").) Since the COVID-19 virus does not know whether a healthcare worker has declined vaccination based on medical or religious grounds, to the extent unvaccinated workers pose any increased risk of viral spread, that risk is equal (indeed, exact the same) whether they are unvaccinated because of medical or religious reasons. Therefore, the risks to the spread of COVID-19 at healthcare facilities posed by unvaccinated healthcare workers who decline vaccination because of medical reasons is not merely **comparable, but actually identical,** to the risks posed by unvaccinated healthcare workers who decline vaccination because of religious reasons. And the Government has made a value judgment that one risk (the secular) is acceptable and can be

mitigated, while the other risk (the religious) is unacceptable and cannot be mitigated.

Such a value judgment does not legitimize a discriminatory policy:

**[T]he medical exemption raises concern because it indicates that the Department has made a value judgment that secular (i.e., medical) motivations for wearing a beard are important enough to overcome its general interest in uniformity but that religious motivations are not. As discussed above, when the government makes a value judgment in favor of secular motivations, but not religious motivations, the government's actions must survive heightened scrutiny.**

170 F.3d at 366 (emphasis added). Essentially, as here, "**[w]e thus conclude that the Department's policy cannot survive any degree of heightened scrutiny and thus cannot be sustained.**" *Id.* at 367 (emphasis added). Contrary to the district court's conclusions, it matters not what the particular reasons for the discriminatory treatment are. What matters is that the Governor prioritized secular motivations over religious motivations for the same exemption requests, and that rendered the law **not** generally applicable.

The Northern District of New York's decision in *Dr. A*, and Justice Alito's opinion for the court in *Fraternal Order of Police* hardly represent a novel proposition. As the Sixth Circuit explained, "**a double standard is not a neutral standard**." *Ward v. Polite*, 667 F.3d 727, 740 (6th Cir. 2012) (emphasis added). As many courts have recognized, allowing medical exemptions while prohibiting religious exemptions is unconstitutional. *See, e.g.*, *Litzman v. N.Y. City Police Dep't*,

34

No. 12 Civ. 4681(HB), 2013 WL 6049066, *3 (S.D.N.Y. Nov. 15, 2013) (holding that a policy that permits medical exemptions but not religious exemptions is neither neutral nor generally applicable and must be subject to strict scrutiny); *Singh v. McHugh*, 185 F. Supp. 3d 201, 225 (D.D.C. 2016) ("In sum, it is difficult to see how accommodating plaintiff's religious exercise would do greater damage to the Army's compelling interests in uniformity, discipline, credibility, unit cohesion, and training than the tens of thousands of medical shaving profiles the Army has already granted."); *Cunningham v. City of Shreveport*, 407 F. Supp. 3d 595, 607 (W.D. La. 2019) (allowing medical exemptions while precluding religious exemptions removes law from neutrality and general applicability). Maine's discriminatory retention of medical exemptions while excluding religious exemptions must be subjected to, and cannot withstand, strict scrutiny. Put simply, "**restrictions inexplicably applied to one group and exempted from another do little to further [the government's] goals and do much to burden religious freedom**." *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 615 (6th Cir. 2020) (emphasis added).

**B.    Maine's Discriminatory Treatment Of Religious Exemptions Is Subject To And Cannot Withstand Strict Scrutiny.**

**1.    Maine Stands Virtually Alone in Its Blanket Refusal to Extend Religious Accommodations, and Its Mandate is Not the Least Restrictive Means of Achieving Its Interests.**

Because the Vaccine Mandate's targeting and removal of religious exemptions is neither neutral nor generally applicable, it must be subject to strict scrutiny, the most severe test known to constitutional law. The Vaccine Mandate decisively fails strict scrutiny because it is not the least restrictive means of achieving the government's asserted interest of preventing the spread of COVID-19 at healthcare facilities. As the Supreme Court held in *Tandon*,

> narrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest in reducing the spread of COVID. **Where the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied.** Otherwise, precautions that suffice for other activities suffice for religious exercise too.

141 S. Ct. at 1296–97 (emphasis added). Now that New York's unconstitutional exemption regime has been judicially enjoined, 48 other states have demonstrated that preventing the spread of COVID-19 and encouraging vaccination of patient-facing healthcare workers can still be achieved while protecting the sincerely held religious beliefs of conscientious objectors. **These states have found a way to accommodate religion under the same alternative protective measures**

36

**Plaintiffs request here. Maine stands virtually alone** in its refusal to recognize this truth.

In *Dr. A*, the court held that defendants' failure to explain "why they chose to depart from similar healthcare vaccination mandates issued in other jurisdictions that include the kind of religious exemption that was originally included" demonstrates a lack of narrow tailoring. 2021 WL 4734404, at *9.

In *Dahl*, as is true here, the court found that the university failed strict scrutiny under the narrow tailoring prong:

> the University falters on the narrow tailoring prong. For one, public health measures are not narrowly tailored if they allow similar conduct that creates a more serious health risk. That is the case at the University, which allows non-athletes—the vast majority of its students—to remain unvaccinated. One need not be a public health expert to recognize that the likelihood that a student-athlete contracts COVID-19 from an unvaccinated non-athlete with whom she lives, studies, works, exercises, socializes, or dines may well meet or exceed that of the athlete contracting the virus from a plaintiff who obtains a religious exemption to participate in team activities. For another, narrow tailoring is unlikely if the University's conduct is "more severe" than that of other institutions. **To that point, several other universities grant exemptions from their COVID-19 mandates.**

2021 WL 4618519, at *5 (emphasis added) (cleaned up)

In fact, despite Maine's contentions that there are no alternatives to a vaccine mandate that prohibits religious exemptions, healthcare providers in Maine (and across the country) are regularly providing religious accommodations to healthcare workers. An employee of the Department of Veterans Affairs at the VA Maine

Healthcare System in Augusta was merely required to check a box requesting a religious exemption. This employee, who is employed as Chief Chaplin of Service at the VA Maine Healthcare System in Augusta, notes that the VA "permits and freely grants exemptions and accommodations to healthcare employees with sincerely held religious objections to mandatory vaccinations." (Dkt. 57-2 ¶ 5.) This employee was granted an accommodation of wearing a mask while at work, and he is "permitted to carry out [his] duties and responsibilities to the same extent as always," including interacting with patients "both with COVID and without COVID." (*Id.* ¶ 10.)

Another VA employee was likewise given an accommodation in Maine. (Dkt. 57-2, ¶¶ 2–6.) That employee's experience highlights the dichotomous treatment of healthcare workers in Maine. Her VA exemption allowed her to "continue all of [her] previous duties and responsibilities, including working on-site, interacting with colleagues, and providing quality and safe care to [her] patients," and her accommodation only requires that she wear a mask and submit to testing twice weekly. (*Id.* ¶ 10.) This same employee, however, was also a per diem employee at Eastport Memorial Nursing Home in Maine where she requested a religious accommodation similar to her VA accommodation but was informed that such accommodations were not available under Maine law, and her employment was discriminatorily terminated. (*Id.* ¶ 11.)

The availability and workability of accommodations for patient-facing healthcare workers with sincerely held religious objections to COVID-19 vaccination is evident from sea to shining sea, at large employers and small. (Dkt. 57-3 – 57-33 (demonstrating accommodations granted to healthcare employees in Maine, Oregon, California, Washington, New Mexico, Missouri, Texas, Wisconsin, Minnesota, Illinois, Colorado, Michigan, Ohio, Pennsylvania, Delaware, Maryland, and Florida.) Maine's contention that it simply cannot provide any reasonable accommodation to the sincerely held religious beliefs of healthcare workers in Maine is demonstrably false. Indeed, the list of healthcare providers granting exemptions across the country involves (a) top education and research hospitals, including University of Colorado, University of Chicago, University of Maryland, Temple University, (b) some of the largest healthcare providers in the nation, including Kaiser Permanente, Trinity Health, and Advocate Aurora Healthcare with hundreds of thousands of employees providing patient-facing care and accommodating the subset of those with sincere religious beliefs, and (c) mid-size and smaller healthcare providers that have also readily accommodated patient-facing personnel with sincere religious beliefs. (*See* Dkt. 57-3 – 57-33.). *See Dr. A*, 2021 WL 4734404, at *9 (regulation not narrowly tailored if other jurisdictions have proven less restrictive alternative available).

2.    **The District Court Erred in Placing the Burden on Plaintiffs to Demonstrate That Less Restrictive Alternatives Are Sufficient to Protect the State's Asserted Interest.**

Among its erroneous conclusions, the district court improperly placed the burden on Plaintiffs to demonstrate that alternatives are available and sufficient to protect the State's asserted interest, rather than requiring the State to demonstrate that other alternatives are not sufficient. (Dkt. 65, Order at 34 ("the Plaintiffs have not provided any scientific or expert evidence demonstrating the efficacy of the approaches adopted in other states.") This impermissible burden flipping ignores the fundamental requirements of strict scrutiny. Indeed, **strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest**." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015) (quoting *Arizona Free  Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 7345 (2011)) (emphasis added); *Johnson v. California*, 543 U.S. 499, 505 (2005) ("Under strict scrutiny review, **the government has the burden** . . .") (emphasis added)); *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021) (the government "can survive strict scrutiny review **only if [the government]** advances interests of the highest order and is narrowly tailored to achieve those interests.") (emphasis added).

And it is the Governor's burden to make this showing even at this stage of litigation, because "the burdens at the preliminary injunction stage track the burdens

at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). "As the Government bears the burden of proof on the ultimate question of . . . constitutionality, **[Plaintiffs] must be deemed likely to prevail unless the Government has shown** that [their] proposed less restrictive alternatives are less effective than [the mandate]." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004) (emphasis added)

And, the application of the wrong test and impermissibly shifting the burden to Plaintiffs below is plainly an abuse of discretion. *See, e.g.*, *Top Entm't, Inc. v. Torrejon*, 351 F.3d 531, 533 (1st Cir. 2003) ("Where a legal error is committed, there is by definition an abuse of discretion."); *Goya Foods, Inc. v. Wallack Mgmt., Co.*, 290 F.3d 63,75 (1st Cir. 2002) ("In performing that tamisage, we remain mindful that an error of law is the functional equivalent of an abuse of discretion.") In fact, as the Third Circuit held in *Reilly v. City of Harrisburg*, "the district court erred in placing the [narrow tailoring] burden on [Plaintiffs]" At the preliminary injunction stage. 858 F.3d 173, 180 (3d Cir. 2017). Indeed,

> in First Amendment cases where the government bears the burden of proof on the ultimate question of a statute's constitutionality, **plaintiffs must be deemed likely to prevail for the purpose of considering a preliminary inunction unless the government has shown that plaintiffs proposed less restrictive alternatives are less effective than the statute**.

*Id.* (emphasis added) (cleaned up).

41

### 3.    The Government Failed to Demonstrate Narrow Tailoring.

The district court's erroneous decision ignored the proper standard, impermissibly relieved the government of its burden, and failed to require a demonstrable showing by the Defendants that less restrictive alternative were not and are not available. This point is critical because, as part of its narrow tailoring burden, the government must show it "**seriously** undertook to address the problem with less intrusive tools readily available to it," meaning that it "**considered different methods that other jurisdictions have found effective**." *McCullen v. Coakley*, 134 S. Ct. 2518, 2539 (2014) (emphasis added). *See also Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 633 (2d Cir. 2020) (same). And the Governor must "show either that **substantially less-restrictive alternatives were tried and failed**, or that the **alternatives were closely examined and ruled out for good reason**," *Bruni v. City of Pittsburgh*, 824 F.3d 353, 370 (3d Cir. 2016) (emphasis added), and that "imposing lesser burdens on religious liberty 'would fail to achieve the government's interest, not simply that the chosen route was easier.'" *Agudath Israel*, 983 F.3d at 633 (quoting *McCullen*, 134 S. Ct. at 495). **If 48 other states, the Department of Veterans Affairs, and a who's-who of excellent healthcare providers can accommodate their employees' religious beliefs and still advance their interests in protecting patients, Maine can and must do the same.** Maine has brought forth no record facts to even suggest, let alone prove, that the COVID

situation in Maine is so much worse than the rest of the country, to justify its lonesome, draconian approach. In fact, the Governor has admitted quite the opposite.

> **Despite having the oldest median age population in the country, Maine, adjusted for population, ranks third lowest in total number of cases and fourth lowest in number of deaths from COVID-19 from the start of the pandemic, according to the U.S. CDC.**

(*See* dkt. 34-1 at 3, *Mills Administration Provides More Time for Health Care Workers to Meet COVID-19 Vaccination Requirement* (emphasis added).) This is a solution in search of a problem.

Indeed, a VA employee who works 9 miles from Defendant MaineGeneral in Augusta has been given an accommodation, yet Plaintiffs in the same hospital somehow lost their constitutional rights on that short 10-minute drive. If this is "narrow tailoring," that term means nothing.

The district court's only answer to the fact that Maine stands virtually alone in its refusal to extend protections to religious objectors to the COVID-19 vaccine was to guess that perhaps Maine is the only one to get it right. (Dkt. 65, Order at 34.) Specifically, the district court held that "Maine **may be** one of the first states to conclude that it is wise to mandate vaccinations for certain healthcare workers, but it does not follow that other, less demanding approaches are equally effective." (*Id.* (emphasis added)). The is plainly erroneous, and it entirely misstates the standard. The district court's conclusion, unsupported by any factual showing in the record, is nothing more than a repackaging of the government's argument in *McCullen*, where

officials testified that the chosen route "make[s] our job easier." 573 U.S. at 495. The Supreme Court plainly rejected that rationale. Indeed, making the government's job easier is "**not enough to satisfy the First Amendment**." *Id.* (emphasis added). And, the reason for this is simple: a mandate ignoring federal protections might be "easy to enforce, **but the prime objective of the First Amendment is not efficiency**." Put simply, because 48 other states, the Department of Veterans Affairs, and a host of other government agencies have demonstrated that less restrictive alternatives work, "**it is not enough for [Maine] simply to say that other approaches have not worked**." *Id.* (emphasis added). Contrary to the district court's contentions, Maine must present **evidence** as to why everyone else's approach is ineffective. Maine utterly failed that test, and the district court erred in letting Maine off the hook.

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR TITLE VII CLAIMS, AND THE DISTRICT COURT'S SLAPDASH TREATMENT OF PLAINTIFFS' CLAIMS IS ERRONEOUS.

The district court held that Plaintiffs are not entitled to injunctive relief because loss of employment is not irreparable harm sufficient to invoke the need for a preliminary injunction. (Dkt. 65, Order at 36.) This conclusion is erroneous and should be reversed.

A.   **Title Vii Supersedes Maine's Rule Because The Employer Defendants Have Admitted That Title VII's Requirement Of Religious Accommodation And Maine's Revocation Of Religious Exemptions Are In Conflict And That They Cannot Comply With Both.**

Employer Defendants' primary contention concerning their utter refusal to comply with the demands of Title VII is that Maine's revocation of religious exemptions from the COVID-19 Vaccine Mandate are not inconsistent with Title VII, and thus they need not comply. (V. Compl. ¶1.) Employer Defendants are wrong, and so was the district court. Title VII plainly requires that every employer with over 15 employees (which includes all Employer Defendants (V. Compl. ¶ 171)) **must provide religious accommodations** "unless an employer demonstrates that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship." 42 U.S.C. § 2000e(j). *See also Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977) ("the employer's statutory obligation to make reasonable accommodation for the religious observance of its employees, short of incurring an undue hardship, **is clear**" (emphasis added)). Despite that mandate of federal law, Maine has issued a wholesale revocation of religious exemptions and accommodations for healthcare workers and has abolished the entire exemption and accommodation process under Title VII for religious objectors. (V. Compl. ¶ 46 (noting that Maine "eliminate[d] the ability of health care workers in Maine to request and obtain a religious

45

exemption and accommodation from the COVID-19 Vaccine Mandate").)
Additionally, Government Defendants made it abundantly clear that "[t]he health
care immunization law **has removed the allowance for philosophical and
religious exemptions**." (V. Compl. ¶ 49 (quoting Division of Disease Surveillance,
*Maine        Vaccine        Exemption        Law        Change        2021*,
https://www.maine.gov/dhhs/mecdc/infectious-disease/immunization/maine-
vaccine-exemption-law-changes.shtml (emphasis added)).)

Thus, Title VII's requirement that employers provide at least a process for
seeking an accommodation for an employee's sincerely held religious beliefs, and
Maine's refusal to provide such a process, are in direct conflict. Under such a
scheme, the Supremacy Clause demands that Defendants comply with Title VII.
Where—as here—federal law "imposes restrictions [and] confers rights on private
actors," and Maine law "imposes restrictions that conflict with the federal law," "**the
federal law takes precedence** and the state law is preempted." *Murphy v. NCAA*,
138 S. Ct. 1461, 1480 (2018) (emphasis added). Indeed, "**Title VII does not
demand mere neutrality with regard to religious practice . . . rather, it gives
them favored treatment**." *Dr. A.*, 2021 WL 4734404, at *5 (quoting *EEOC v.
Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775 (2015)) (emphasis added).
"Thus, under certain circumstances, Title VII requires otherwise neutral policies to
give way to the need for an accommodation." *Id.* (quoting *Abercrombie*, 575 U.S. at

46

775). And, *Dr. A* held that refusing to given plaintiffs a process in which to seek accommodation for their sincerely held religious beliefs is plainly a Title VII violation. 2021 WL 4734404, at *6 ("What matters is that plaintiffs' current showing establishes that §2.61 has effectively foreclosed the pathway to seeking a religious accommodation that is guaranteed by Title VII.").

Employer Defendants take great pains to suggest that Maine's refusal to extend religious protections is not preempted by Title VII's demand that employers provide a reasonable accommodation for religious beliefs. This is incorrect. Title VII supersedes state laws where—as here—"compliance with both federal and state regulations is a physical impossibility." *California Fed. Savings & Loan Assoc. v. Guerra*, 479 U.S. 272, 281 (1987) (citing *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963)).

In their pre-litigation refusals to consider Plaintiffs' requests for exemption and accommodation, Employer Defendants have claimed that it is not possible for them to comply with both Title VII and Maine's revocation of religious exemptions from the COVID-19 Vaccine Mandate. As shown in the Verified Complaint, Employer Defendants made it clear that they could not comply with Title VII because it would violate state law. (*See, e.g.*, V. Compl. ¶ 86 ("I can share MaineHealth's view that **federal law does not supersede state law in this instance**. . . . Requiring MaineHealth to violate state law by granting unrecognized exemptions

47

would impose such a hardship. **As such, we are not able to grant a request for a religious exemption from the state mandated vaccine**."); *id.* ¶ 94 ("Allowing for a religious exemption would be a violation of the state mandate issued by Governor Mills. So, unfortunately, that is not an option for us.").) Thus, Employer Defendants have admitted that Maine's revocation of a religious exemption is in direct conflict with Title VII and that they cannot comply with both.

Employer Defendants' admission is fatal. "**[T]he Supremacy Clause . . . invalidates state laws that interfere with, or are contrary to, federal law. Under the Supremacy Clause . . . state law is nullified to the extent that it actually conflicts with federal law**." *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712–13 (1985) (emphasis added) (cleaned up). Employer Defendants admit that compliance with both is impossible, which requires a finding that Title VII supersede Maine's inconsistent and contrary rules. *California Fed. Savings & Loan*, 479 U.S. at 281. Maine's discriminatory revocation of religious exemptions simply does not relieve Employer Defendants of their obligations under Title VII, and the Supremacy Clause demands that Maine provide the protections explicitly provided by Title VII. Indeed, "the Supreme Court has long recognized that, 'if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted.'" *Dr. A*,

2021 WL 4734404, at *5 (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015)).

### B.    Title VII Explicitly Preempts State Laws, Like Maine's, That Require The Doing Of An Act That Is Prohibited By Title VII.

Under the plain language of Title VII, Maine's refusal to recognize and accommodate Plaintiffs' sincerely held religious beliefs is preempted and overridden by Title VII**.** Indeed,

> Nothing in this subchapter shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, **other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter**.

42 U.S.C. § 2000e-7 (emphasis added). Thus, because Maine's rule revoking religious exemptions and accommodations "purports to require" discrimination on the basis of religion, and purports to abolish the exemption and accommodation procedure explicitly provided in Title VII, each of which are "an unlawful employment practice" under Title VII, *see* 42 U.S.C. §2000e-2(a), Maine's rules are superseded and preempted by Title VII.

In addition to the explicit textual preemption of Title VII, abundant precedent demonstrates that Maine cannot require employers to engage in a practice that is unlawful under Title VII. *See, e.g.*, *Coalition for Economic Equality v. Wilson*, 122 F.3d 692, 710 (9th Cir. 1997) (noting that Title VII preempts state laws that "purport

49

to require the doing of any act which would be an unlawful employment practice under Title VII"); *Brown v. City of Chicago*, 8 F. Supp. 2d 1095, 1112 (N.D. Ill. 1998) (noting that Congress "'intended to supercede [*sic*] all provisions of State law which require or permit the performance of an act which can be determined to constitute an unlawful employment practice under the terms of Title VII of the Act or are inconsistent with any of its purposes'" (quoting *Rinehart v. Westinghouse Elec. Corp.*, No. C 70-537, 1971 WL 174, *2 (N.D. Ohio Aug. 20, 1971)); *LeBlanc v. S. Bell Tel. & Tel. Co.*, 333 F. Supp. 602, 608 (E.D. La. 1971) (noting that Louisiana's employment law provisions that conflict with Title VII  "are invalid under the Supremacy Clause"). Moreover, Employer Defendants are not permitted to rely upon Maine's revocation of protections for religious objectors as a defense to refusing to do what Title VII requires. *See, e.g.*, *Guardians Ass'n v. Civil Serv. Comm.*, 630 F.2d 79, 104–105 (2d Cir. 1980) ("Nor can the City justify the use of rank-ordering by reliance on what it contends are requirements of state law. Title VII explicitly relieves employers from any duty to observe a state hiring provision "which purports to require or permit" any discriminatory employment practice." (citation omitted).

## III.    PLAINTIFFS ARE SUFFERING IRREPARABLE HARM.

The district court erred in holding that Plaintiffs were only suffering economic harm in the form of loss of employment. (Dkt. 65, Order at 38.) The district court

completely ignored the irreparable First Amendment harm Plaintiffs are suffering and the fact that injunctive relief is appropriate in Title VII cases to preserve the status quo.

### A.    Plaintiffs Are Suffering Irreparable First Amendment Injury.

While it is generally true that a loss of employment does not constitute irreparable harm, **that ignores the seminal First Amendment questions before the Court**. And there can be no dispute that State Defendants' substantial burden on Plaintiffs' religious exercise constitutes irreparable harm as a matter of law. As this Court has held time and again, Plaintiffs "are irreparably harmed by the loss of free exercise rights for even minimal periods of time." *Tandon*, 141 S. Ct. at 1297. Indeed, "**[t]here can be no question that the challenged [mandate], if enforced, will cause irreparable harm**." *Catholic Diocese*, 141 S. Ct. at 67 (emphasis added). Plaintiffs' constitutional injuries in the instant matter are presumed irreparable harm. *See, e.g.*, *Sindicator Puertorriqueno de Trabajaddores v. Fortuno*, 699 F.3d 1, 11 (1sr Cir. 2012) ("irreparable injury is presumed" in First Amendment cases). Put simply, "a violation of plaintiffs' constitutional right, and in particular, a violation of First Amendment rights, constitutes irreparable harm, *per se*." *Westchester Legal Servs., Inc. v. Westchester Cnty.*, 607 F. Supp. 1379, 1385 (S.D.N.Y. 1985).

Defendants' collective false reduction, that Plaintiffs face only the loss of a job rather than the unconscionable loss of First Amendment rights at the hand of

State Defendants, must be rejected. The impact of Maine's far-reaching mandate cannot be understated. Plaintiffs cannot simply go from one employer who unlawfully discriminates, and get a job at a different employer to feed their families while their legal claims are pending. Maine has essentially ensured the Plaintiffs **cannot work anywhere in the entire State**. If that's not irreparable harm, the word has no meaning. Indeed, "**[t]he harm [Plaintiffs] would suffer is not only, as [Defendants] argue[], the loss of [their] job[s]** *per se,* **but also the penalty for exercising [their First Amendment] rights. The chilling effect of that penalty cannot be adequately redressed after the fact**." *Romero Feliciano v. Torres Gaztambide*, 836 F.2d 1, 4 (1st Cir. 1987) (emphasis added).

Indeed, where the Governor's mandate "conflicts with plaintiffs' and other individuals' federally protected right to seek a religious accommodation from their individual employers," injunctive relief is appropriate. *Dr. A*, 2021 WL 4734404, at *10. And, Plaintiffs suffer "irreparable harm from the loss of free exercise rights for even minimal periods of time." *Id.* (citing *Tandon*, 141 S. Ct. at 1297. As the Sixth Circuit held, "[e]nforcement of the [government's COVID-19 vaccine mandate] would deprive plaintiffs of their First Amendment rights, an irreparable injury." *Dahl*, 2021 WL 4618519, at *6.

**B.      Injunctive Relief Is Needed To Preserve The Status Quo For Plaintiffs' Title VII Claims.**

Biding precedent establishes that, even in the Title VII context, injunctive relief is available to preserve the status quo. *See, e.g.*, *Bailey v. Delta Air Lines, Inc.*, 722 F.2d 942, 944-45 (1st Cir. 1983) (holding that plaintiffs in Title VII context may seek injunctive relief while the administrative process plays out in the EEOC). *See also Sheehan v. Purolator Courier Corp.*, 676 F.2d 877, 884 (2d Cir. 1981). Specifically, the Second Circuit held that "if the court eventually will have jurisdiction of the substantive claim and an administrative tribunal has preliminary jurisdiction, **the court has incidental equity jurisdiction to grant temporary relief to preserve the status quo pending ripening of the claim for judicial action on the merits**." *Id.* (emphasis added). It continued, "within the framework of Title VII, we are persuaded that Congress intended the federal courts to have resort to all of their traditional equity powers, direct and incidental, in aid of the enforcement of the Title." *Id.* at 885. Indeed,

> It is noteworthy that the court is the only arbiter of the merits of a discrimination claim, and **we think it plain that for the court to renounce its incidental equity jurisdiction to stay such employer retaliation pending the EEOC's consideration would frustrate Congress's purposes**. Unimpeded retaliation during the now-lengthy (180-day) conciliation period is likely to diminish the EEOC's ability to achieve conciliation. It is likely to have a chilling effect on the complainant's fellow employees who might otherwise desire to assert their equal rights, or to protest the employer's discriminatory acts, or to cooperate with the investigation of a discrimination charge. **And in many cases the effect on the complainant of several months without**

> **work or working in humiliating or otherwise intolerable circumstances will constitute harm that cannot adequately be remedied by a later award of damages**. Given the singular role in 1964 of the individual private action as the only method of enforcing Title VII, and the continued view in 1972 of that right of action as "paramount," **we cannot conclude that Congress intended to preclude the courts' use of their incidental equity power in these circumstances to prevent frustration of Congress's goals**.

*Id.* at 885-86 (emphasis added).

Put simply, "**where a person has filed a Title VII charge with the EEOC, the court has jurisdiction to entertain a motion for temporary injunctive relief against employer retaliation while the charge is pending before the EEOC and before the EEOC has issued a right to sue letter**." *Id.* at 887 (emphasis added). *See also Holt v. Continental Grp., Inc.*, 708 F.2d 87, 89-90 (2d Cir. 1983) (same); *Bermand v. New York City Ballet, Inc.*, 616 F. Supp. 555, 556 (S.D.N.Y. 1985) ("Decisions by our Court of Appeals, however, **firmly establish** . . . this Court has jurisdiction to entertain applications for preliminary injunctive relief for the purpose of preserving the status quo pending EEOC's investigative and conciliatory process." (emphasis added)). Plaintiffs awarded immediate injunctive relief to remedy their present and ongoing loss of First Amendment rights

## IV. PLAINTIFFS SATISFY THE OTHER REQUIREMENTS FOR A PRELIMINARY INJUNCTION.

As *Dr. A* recognized when it enjoined New York's similar scheme, "the public interest lies with enforcing the guarantees enshrined in the Constitution and federal

anti-discrimination laws." *Dr. A*, 2021 WL 4734404, at *10. Indeed, "**[p]roper application of the Constitution . . . serves the public interest [because] it is always in the public interest to prevent a violation of a party's constitutional rights**." *Dahl*, 2021 WL 4618519, at *6 (emphasis added).

Additionally, "**the balance of the hardships clearly favors plaintiffs**." *Id.* (emphasis added). Indeed, as there, "defendants have not shown that granting the same benefit to religious practitioners that was originally included in the August 18 Order would impose any more harm—especially when Plaintiffs have been on the front lines of stopping COVID for the past 18 months while donning PPE and exercising other proper protocols in effectively slowing the spread of the disease." *Id.* The district court should be reversed.

## CONCLUSION

Because the Governor's COVID-19 vaccine mandate completely removes any protections for Plaintiffs' sincerely held religious beliefs and subjects them to especially harsh treatment, it violates the First Amendment. The district court's conclusion to the contrary was in error and should be reversed.

Respectfully submitted,

Dated: October 18, 2021

/s/ Daniel J. Schmid
Mathew D. Staver, *Counsel of Record*
Horatio G. Mihet
Roger K. Gannam
Daniel J. Schmid
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
court@LC.org
hmihet@LC.org
rgannam@LC.org
dschmid@LC.org
*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPE-FACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.     This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). Not counting the items excluded from the length by Fed. R. App. P. 32(f), this document contains 12,986 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). This document has been prepared using Microsoft Word in 14-point Times New Roman font.

/s/ Daniel J. Schmid
Daniel J. Schmid
*Attorney for Plaintiff-Appellant*

57

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was filed via the

Court's ECF filing system and therefore service will be effectuated by the Court's

electronic notification system upon all counsel or parties of record.


/s/ Daniel J. Schmid
Daniel J. Schmid
*Attorney for Plaintiff-Appellant*

# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

JANE DOES 1-6 et al.,      )
                                )
     Plaintiffs,        )
                                )
          v.          )   1:21-cv-00242-JDL
                                )
JANET T. MILLS, in Her Official  )
Capacity as Governor of the    )
State of Maine, et al.,        )
                                )
     Defendants.       )

## ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## I. INTRODUCTION

Plaintiffs, eight individual healthcare workers and one individual healthcare provider, seek a preliminary injunction (ECF No. 3) prohibiting Janet T. Mills, Maine's Governor, and other named defendants from requiring all employees of designated healthcare facilities to be vaccinated against the SARS-CoV-2 coronavirus—the cause of COVID-19 infections—through the enforcement of the rule, Immunization Requirements for Healthcare Workers, 10-144-264 Me. Code R. §§ 1-7 (2021)[1] (the "Rule"), as amended August 12, 2021. The Plaintiffs contend that the vaccination requirement violates their First Amendment and other federal constitutional and statutory rights because it does not exempt from its requirements individuals whose sincerely held religious beliefs cause them to object to being

---

[1] The Rule can be found at https://www.maine.gov/dhhs/mecdc/rules/maine-cdc-rules.shtml (perma.cc/R3UM-ZBN3) (navigate to the text of the Rule by selecting "Emergency," and then choosing "Emergency Rulemaking: 10-144 CMR Ch. 264 – Immunization Requirements for Healthcare Workers.").

vaccinated against COVID-19.  Seven of the nine plaintiffs also contend that their employers violated federal employment law by refusing to grant them a religious exemption from the vaccination requirement.

The Plaintiffs' five-count Complaint (ECF No. 1) names as defendants, in their official capacities, Governor Mills; Dr. Nirav D. Shah, the Director of Maine CDC; and Jeanne M. Lambrew, the Commissioner of the Maine Department of Health and Human Services ("DHHS") (the "State Defendants").  The Complaint also names five incorporated entities that operate healthcare facilities in Maine: Defendants Genesis Healthcare of Maine, LLC; Genesis Healthcare, LLC; Northern Light Health Foundation; MaineHealth; and MaineGeneral Health (the "Hospital Defendants").

The Rule requires all employees of designated healthcare facilities[2] to receive their final dose of the vaccination against the SARS-CoV-2 coronavirus by September 17, 2021.  10-144-264 Me. Code R. § 5(A)(7) (effective Aug. 12, 2021).  On September 2, 2021, the DHHS and Maine CDC announced that they would not begin enforcing the Rule's provisions until October 29, 2021, to allow additional time for employees of designated healthcare facilities to comply with the Rule by receiving their final vaccine dose by October 15.  ECF No. 49-5 at ¶ 37.  If granted, the preliminary

---

[2]  Under the Rule, designated healthcare facility "means a licensed nursing facility, residential care facility, Intermediate Care Facility for Individuals with Intellectual Disabilities (ICF/IID), multi-level healthcare facility, hospital, or home health agency subject to licensure by the State of Maine, Department of Health and Human Services Division of Licensing and Certification."  The Rule also applies to dental health practices (where dentists and/or dental hygienists provide oral health care) and to Emergency Medical Services operations.  10-144-264 Me. Code R. § 1(D), (E), (H) (Aug. 12, 2021).  All references to "designated healthcare facilities" in this Order include all of the entities subject to the Rule's requirements.

injunction would prohibit the Defendants from enforcing the Rule or terminating the Plaintiffs' employment based on their refusal to be vaccinated against COVID-19.

A hearing on the Motion for Preliminary Injunction was held on September 20, 2021.[3]  After careful consideration and for the reasons that follow, I deny the Plaintiffs' motion.  (ECF No 3).

## II.  BACKGROUND

The parties have filed declarations and various exhibits in support of their positions.  Except where otherwise noted, I have based my findings on these documents.[4]  Additionally, I take judicial notice of certain additional facts pertinent to the Motion.  *See In re Colonial Mortgage Bankers Corp.*, 324 F.3d 12, 20 (1st Cir. 2003) (noting that although a district court is generally limited to examining the record, it may also consider "the documents incorporated by reference in it, matters of public record, and other matters susceptible to judicial notice");  *see also Loucka v. Lincoln Nat'l Life Ins. Co.,* 334 F. Supp. 3d 1, 8-9 (D.D.C. 2018) ("[T]he CDC's Lyme-testing criteria and procedures are a matter of public record, and it cannot be reasonably questioned that the agency's website is an accurate source for those standards.").

---

[3] The Plaintiffs' Motion also included a request for an ex parte temporary restraining order to the same effect.  On August 26, 2021, after a conference with the Plaintiffs' counsel, I denied that portion of the Motion (ECF No. 11), concluding that the Plaintiffs had not satisfied the requirements of Federal Rule of Civil Procedure 65(b)(1) for a temporary restraining order without providing notice to the Defendants.

[4] The bulk of my findings regarding the COVID-19 pandemic and the State's response are derived from the Declaration of Dr. Nirav D. Shah, Director of Maine CDC, (ECF No. 49-4) and the Declaration of Sara Gagné-Holmes, Deputy Commissioner of the DHHS (ECF No. 49-5).  The Plaintiffs have not submitted declarations that dispute the factual assertions made in the Shah and Gagné-Holmes declarations.

To provide the necessary background, I begin by addressing: (A) COVID-19 and Maine's response; (B) the asserted religious beliefs that cause Plaintiffs to refuse to be vaccinated against COVID-19; and (C) the origin of the emergency rulemaking that required that healthcare workers be vaccinated against COVID-19.

## A. The COVID-19 Global Pandemic

COVID-19 is a highly contagious disease that can cause serious illness and death. ECF No. 49-4 at ¶¶ 11, 13, 15. In March 2020, the World Health Organization declared COVID-19 to be a global pandemic. ECF No. 49-4 at ¶ 12. As of September 12, 2021, there were approximately 219 million cases of COVID-19 worldwide. ECF No. 49-4 at ¶ 13. Globally, over 4,550,000 people have died from COVID-19, including approximately 660,000 deaths in the United States. ECF No. 49-4 at ¶ 13. As of September 14, 2021, Maine had 81,177 total cases of COVID-19, with 969 deaths. ECF No. 49-4 at ¶ 14.

Variants of the virus have emerged over the course of the pandemic. ECF No. 49-4 at ¶ 20. The Delta variant, which is now the predominant variant of all COVID-19 cases in the United States, ECF No. 49-4 at ¶ 50, is more than twice as contagious as previous variants, ECF No. 49-4 at ¶ 22. As of August 27, 2021, the Delta variant accounted for 96.7% of all positive COVID-19 samples sequenced in Maine. ECF No. 49-4 at ¶ 50. A higher level of contagiousness necessitates a correspondingly higher vaccination rate among the public to achieve "herd immunity."[5] ECF No. 49-4 at

---

[5] Herd immunity refers to the population-level phenomenon whereby the community is sufficiently populated with vaccinated individuals that unvaccinated individuals can enjoy a substantially lessened risk of exposure and, therefore, of infection, as the vaccinated individuals block the virus from spreading from person to person. ECF No. 49-4 at ¶¶ 27-28.

¶ 28.   With the emergence of the Delta variant, epidemiological models have increased the projected vaccination rate needed to achieve herd immunity from 70% to 90%.  ECF No. 49-4 at ¶ 29.

Three COVID-19 vaccines are generally available: Pfizer-BioNTech (the "Pfizer vaccine"), Moderna, and Janssen (the "J&J vaccine").  ECF No. 49-4 at ¶ 40. All three are effective against the Delta variant.  ECF No. 49-4 at ¶ 43.  Prior to their availability, the United States Centers for Disease Control and Prevention ("CDC") and Maine CDC recommended that people wear face coverings and practice physical distancing to limit the spread of the virus.  ECF No. 49-5 at ¶ 5.  Once the first vaccine doses became available in December 2020, Maine CDC prioritized the vaccination of frontline healthcare professionals and patient-facing staff through its eligibility guidelines.  ECF No. 49-5 at ¶¶ 15-18.  The vaccines are now widely available, and the State has worked in parallel with hospital systems to encourage and facilitate the widespread vaccination of Maine residents.  ECF No. 49-5 at ¶¶ 19(f), 23-29.

The Rule was amended in August 2021 to add COVID-19 to the list of infectious diseases for which vaccinations are mandated for employees of designated healthcare facilities.  It represented the latest in a series of measures employed by the State to combat the COVID-19 pandemic in healthcare settings.  When formulating the amendment, Maine CDC reviewed and considered alternatives to mandating vaccinations, including the measures then being employed by Maine healthcare facilities, such as twice-weekly or daily testing, symptom monitoring, and the use of personal protective equipment ("PPE").  ECF No. 49-4 at ¶¶ 59-64.  Maine CDC rejected twice-weekly testing as inadequate given the speed at which the Delta

variant is transmitted—a person infected with the Delta variant can transmit the infection to others within just 24 to 36 hours of exposure. ECF No. 49-4 at ¶¶ 25, 61. Similarly, Maine CDC rejected daily antigen testing as insufficient because the most effective tests (polymerase-chain-reaction tests ("PCR")) require 24 to 72 hours to produce results and the faster rapid-antigen tests are too inaccurate and in short supply. ECF No. 49-4 at ¶ 62. Symptom monitoring as a standalone measure was rejected because the virus can be transmitted by persons who are asymptomatic. ECF No. 49-4 at ¶ 60. Similarly, sole reliance on the use of PPE was rejected because, even if worn correctly, PPE will not stop the spread of COVID-19 in healthcare settings. ECF No. 49-4 at ¶ 64.

Healthcare facilities throughout Maine have used a combination of the preceding measures to control the COVID-19 virus since the beginning of the pandemic; nonetheless, they have been the sites of numerous outbreaks of the virus. ECF No. 49-4 at ¶ 65. The number of outbreaks at designated healthcare facilities rose substantially from early August to early September 2021, notwithstanding the fact that the hospitals where the outbreaks occurred had strong infection control programs in place. ECF No. 49-4 at ¶¶ 46-47. Most of the healthcare facility outbreaks resulted from infected healthcare workers bringing COVID-19 into the facility. ECF No. 49-4 at ¶ 48.

## B.   The Plaintiffs' Objection to the COVID-19 Vaccines

The Plaintiffs are nine individuals who are identified in the Complaint by pseudonyms. The Complaint alleges that Jane Does 1 through 5 and John Does 2 and 3 are healthcare workers employed by the Hospital Defendants. John Doe 1 is a

licensed healthcare provider who operates his own practice. Jane Doe 6 is a healthcare worker employed by John Doe 1.[6,7]

The Plaintiffs object to receiving the COVID-19 vaccines based on their stated belief that "life is sacred from the moment of conception[.]" ECF No. 1 at ¶ 54. They contend that the development of the three COVID-19 vaccines employed or benefitted from the cell lines of aborted fetuses. Specifically, the Plaintiffs object to the Moderna and Pfizer vaccines because both are mRNA vaccines which, the Plaintiffs claim, "have their origins in research on aborted fetal cells lines." ECF No. 1 at ¶ 65.

---

[6] The Complaint alleges the following facts regarding the Plaintiffs:

Plaintiff Jane Doe 1 is a Maine resident and healthcare worker employed by a healthcare facility operated by Defendant MaineHealth in Maine. She submitted a written request for a religious exemption from the vaccine mandate to her employer, which was denied.

Plaintiff John Doe 1 is a licensed healthcare provider who operates a designated healthcare facility in Maine. The Complaint alleges that he and his employees have sincerely held religious objections to receiving the COVID-19 vaccine, and that he faces the closure of his practice and loss of his business license should he consider or grant religious exemptions to the vaccine mandate to his employees.

Plaintiff Jane Doe 6 is a healthcare worker employed by John Doe 1. The Complaint is unclear as to whether she has requested a religious exemption to the mandate from her employer, John Doe 1.

Plaintiffs Jane Doe 2 and John Doe 2 are both Maine residents and healthcare workers employed by healthcare facilities operated by Defendant Genesis Healthcare in Maine. Both submitted written requests for religious exemptions from the vaccine mandate, and Genesis Healthcare denied them. Jane Doe 2 was given until August 23, 2021 to receive the vaccination and alleges that she was terminated from her employment for failure to meet this deadline.

Plaintiffs Jane Does 3 and 4 and John Doe 3 are Maine residents and healthcare workers employed by healthcare facilities operated by Defendant Northern Light Health Foundation in Maine. Each submitted written requests for religious exemptions from the vaccine mandate, and each request was denied.

Plaintiff Jane Doe 5 is a Maine resident and healthcare worker employed by a healthcare facility operated by Defendant MaineGeneral Health in Maine. She submitted a written request for a religious exemption from the vaccine mandate to her employer, which was denied.

[7] The Complaint also names Plaintiffs Jack Does 1 through 1000 and Joan Does 1 through 1000 as putative plaintiffs who have not yet been joined in the action.

Plaintiffs also object to the J&J vaccine, asserting that aborted fetal cell lines were used in both its development and production.  They allege that the use of fetal cell lines to develop the vaccines runs counter to their sincerely held religious beliefs that cause them to oppose abortion.

In their responses to the Plaintiffs' motion seeking preliminary injunctive relief, the Defendants have not challenged the sincerity of the Plaintiffs' asserted religious beliefs or that those beliefs are the reason for the Plaintiffs' refusal to be vaccinated.  I therefore treat these facts as established for purposes of deciding the Preliminary Injunction Motion.[8]

## C.  The COVID-19 Vaccine Mandate

Mandatory vaccination requirements for healthcare workers in Maine were established long before the emergence of COVID-19 in late 2019.  Since 1989, Maine has required by statute that hospitals and other healthcare facilities ensure that their employees are vaccinated against certain communicable diseases.  1989 Me. Legis. Serv. 641 (West).  When the statute, 22 M.R.S.A. § 802 (1989), was first enacted, it required vaccinations for measles and rubella.  Its stated purpose was to report, prevent, and control infectious diseases that pose a potential public health threat to the people of Maine.  *Id*. § 802(1)(D) (1989).

The ensuing years witnessed the development of new vaccines and vaccine recommendations, resulting in frequent revisions to the statute.  In response, the

---

[8] Pursuant to the Court's scheduling order entered on September 2, 2021 (ECF No. 35), the deadline for the Defendants' answers to the Complaint will be set once the Court has entered an order on the Motion for Preliminary Injunction and the period for filing an interlocutory appeal of that order has expired or, if an interlocutory appeal is filed, the appeal has been finally determined.  As a result, the Defendants have not yet filed answers to the Complaint.

statute was again amended in 2001 to delegate to DHHS the authority, by rulemaking, to designate mandatory vaccines for healthcare workers at designated healthcare facilities and for school children. 2001 Me. Legis. Serv. 147 (West). Accordingly, in 2002 DHHS promulgated and first adopted the rule entitled "Immunization Requirements for Healthcare Workers," which is the Rule at issue here. 10-144-264 Me. Code R. §§ 1-7 (Apr. 16, 2002). At its adoption, the Rule required vaccinations for measles, rubella, hepatitis B, mumps, and chickenpox. *Id*. at § 5(A).

From 2001 until 2019, the statute contained three exemptions from the vaccination requirements for both Maine healthcare workers and school children: a "medical exemption" for those who provided "a physician's written statement that immunization against one or more diseases may be medically inadvisable," and both "religious [and] philosophical exemption[s]" for those "who state[d] in writing a sincere religious or philosophical belief that is contrary to the immunization requirement." 22 M.R.S.A. § 802(4-B)(A), (B) (2019). In 2019, the Maine Legislature enacted legislation repealing the exemptions for religious and philosophical beliefs, 2019 Me. Legis. Serv. 386 (West), thus leaving the medical exemption as the sole exemption permitted under law. In response to this legislative change, a statewide veto referendum regarding the new law eliminating the religious and philosophical exemptions was held in March 2020 pursuant to the People's Veto provision of the Maine Constitution, Me. Const. art. IV, pt. III, § 17. The law was upheld, with over

72% of voters voting in favor of it.[9]  In April 2021, DHHS amended the Rule by, among other things, removing the provision describing the permissible exemptions and referring back to the statute which lists medical exemptions as the sole category of exemption.  *See* 10-144-264 Me. Code R. § 3 (effective Apr. 14, 2021); 22 M.R.S.A. § 802(4-B)(B).[10]   In August 2021, DHHS promulgated the current version of the Rule by adding the COVID-19 vaccination to the list of required vaccinations and also adding dental practices and emergency services organizations as enumerated designated healthcare facilities subject to the Rule's requirements.  10-144 C.M.R. Me. Code R. § 1 (effective Aug. 12, 2021).  The Plaintiffs do not challenge the lawfulness of the rulemaking process by which the current version of the Rule was adopted.

The preceding history demonstrates that although Plaintiffs' arguments are directed at the amendment of the Rule in August 2021 and the Rule's failure to include a religious exemption from the COVID-19 vaccination requirement, it was the Legislature's revision of the statute in 2019 which eliminated the religious exemption for all mandatory vaccines.  Therefore, when I refer in this decision to the COVID-19 vaccine mandate, I am referring to the Rule as it operates in conjunction with the statute, 22 M.R.S.A. § 802(4-B), which authorizes it.

---

[9]  Full results are available on the Maine Secretary of State website.  Dep't of Sec'y of State, State of Maine, Tabulations for Elections Held in 2020, https://www.maine.gov/sos/cec/elec/results/results20.html#ref20 (last visited Oct. 10, 2021) (to calculate the percentage, select "March 3, 2020 Special Referendum Election" to access the spreadsheet of results.  Then divide the number of "no" votes (281,750) by the total number of votes cast (388,393).

[10] There is an additional exemption provided specifically for the Hepatis B vaccine, as mandated under Federal Law, 22 M.R.S.A. § 802(4-B)(C), which is distinct and not relevant to the inquiry at hand.

Having provided the necessary background, I turn to the legal standard which would govern the award of a preliminary injunction.

### III. PRELIMINARY INJUNCTION LEGAL STANDARD

"A preliminary injunction is an 'extraordinary and drastic remedy . . . that is never awarded as of right.'" *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quoting *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)).

A trial court must consider four factors when assessing a request for a preliminary injunction: (1) likelihood of success on the merits, (2) whether, absent preliminary relief, the plaintiff will suffer irreparable harm, (3) whether "the balance of equities tips in [the plaintiff's] favor," and (4) whether granting the injunction serves the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). Of these factors, "[t]he movant's likelihood of success on the merits weighs most heavily in the preliminary injunction calculus." *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020). This first factor is so consequential that "[i]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *Me. Educ. Ass'n Benefits Tr. v. Cioppa*, 695 F.3d 145, 152 (1st Cir. 2012) (quoting *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)).

At this preliminary stage, the court "need not conclusively determine the merits of the movant's claim; it is enough for the court simply to evaluate the likelihood . . . that the movant ultimately will prevail on the merits." *Ryan*, 974 F.3d at 18.

# IV. LEGAL ANALYSIS

The Plaintiffs' Complaint presents five claims arising under: (A) the Free Exercise Clause of the First Amendment; (B) Title VII, 42 U.S.C.A. § 2000e to e-17 (West 2021); (C) the Equal Protection Clause of the Fourteenth Amendment; (D) a claim of Conspiracy in violation of 42 U.S.C.A. § 1985 (West 2021); and (E) the Supremacy Clause. As will become apparent, the likelihood of the Plaintiffs' success on their Free Exercise claim largely controls the outcome as to the remaining claims for purposes of determining the Plaintiffs' entitlement to preliminary injunctive relief.

## A. The Free Exercise of Religion

The Free Exercise Clause of the First Amendment, which applies to the states through the Fourteenth Amendment, provides that "Congress shall make no law prohibiting the free exercise" of religion. U.S. Const. amend. I, *see Cantwell v. Connecticut*, 310 U.S. 296, 303-04 (1940) (incorporating the Free Exercise Clause of the First Amendment against the states). The clause "embraces two concepts[:] freedom to believe and freedom to act." *Cantwell*, 310 U.S. at 303. Although the freedom to believe is absolute, the freedom to act on one's religious beliefs "remains subject to regulation for the protection of society." *Id.* at 304.

The Constitution's Free Exercise Clause does not prevent states from enacting a "neutral, generally applicable regulatory law," even when that law infringes on religious practices. *See Emp. Div., Dep't of Hum. Res. of Or. V. Smith*, 494 U.S. 872, 879-882 (1990). Laws that are deemed both neutral and generally applicable are traditionally subject to rational basis review. Thus, in *Smith*, the U.S. Supreme

Court explained: "We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate. On the contrary, the record of more than a century of our free exercise jurisprudence contradicts that proposition." *Id*. at 878-79. Further, "if prohibiting the exercise of religion . . . is not the object of the [state action] but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended."[11] *Id*. at 878. However, if a law burdens a religious practice and does not satisfy the requirements of neutrality and general applicability, the law is invalid under the Free Exercise Clause unless it survives strict scrutiny, meaning it is "justified by a compelling governmental interest and . . . narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-32 (1993).

The parties' dispute under the Free Exercise Clause centers on the standard of constitutional review that applies: rational basis review or strict scrutiny review. The Plaintiffs argue that the COVID-19 vaccine mandate's failure to provide a religious exemption means that the regulation is not neutral and generally applicable and,

---

[11] Writing for the Court's majority in *Smith*, Justice Scalia reasoned that the question of whether a religious exemption or accommodation should be adopted as part of a neutral, generally applicable regulatory law is not within the purview of the courts' role in enforcing the Free Exercise Clause but is instead for the other branches of government to determine:

> But to say that a nondiscriminatory religious-practice exemption is permitted [by the Free Exercise Clause], or even that it is desirable, is not to say that it is constitutionally required, and that the appropriate occasions for its creation can be discerned by the courts. It may fairly be said that leaving accommodation to the political process will place at a relative disadvantage those religious practices that are not widely engaged in; but that unavoidable consequence of democratic government must be preferred to a system in which each conscience is a law unto itself or in which judges weigh the social importance of all laws against the centrality of all religious beliefs.

therefore, must be analyzed under the more demanding strict scrutiny standard. The Defendants disagree, contending that the mandate is neutral and generally applicable notwithstanding the lack of religious exemption, and that the more deferential rational basis standard of review applies.

Under rational basis review, "a neutral, generally applicable regulatory law that compel[s] activity forbidden by an individual's religion" withstands a Free Exercise challenge if there is a rational basis for the regulation. *Smith*, 494 U.S. at 880. Applying rational basis review to the COVID-19 vaccine mandate at issue here would be in keeping with the Supreme Court's foundational decision in the area of mandatory vaccines—*Jacobson v. Massachusetts*, 197 U.S. 11 (1905)—in which the Court upheld the constitutionality of a state mandated smallpox vaccine. In so doing, the Court applied a deferential standard of review and rejected a Fourteenth Amendment substantive due process challenge to the law, concluding that the mandatory vaccination law was constitutional because it had a "real [and] substantial relation to the protection of the public health and the public safety."[12] *Id.* at 31.

---

[12] The Plaintiffs argue that because *Jacobson* pre-dates both the application of the Free Exercise Clause to the states and the Court's adoption of the tiers of scrutiny for constitutional questions, it is inapposite. The Defendants do not solely rest their argument on *Jacobson* but they do argue that it supports the more general proposition that a state may mandate vaccinations and need not include religious exemptions when doing so.

In the years since the Supreme Court recognized that the First Amendment's Free Exercise Clause applies to the states, *Jacobson* has been treated as informative authority both regarding the scope of government power to enact mandatory vaccination requirements to protect public health and for the proposition that the Constitution does not require religious exemptions from state-mandated vaccinations. *See, e.g.*, *Zucht v. King*, 260 U.S. 174, 176 (1922) (affirming that *Jacobson* "settled that it is within the police power of a state to provide for compulsory vaccination"); *Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944) ("The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death."); *Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015) ("[M]andatory vaccination as a condition for admission to school does not violate the Free Exercise Clause"); *Nikolao v. Lyon*, 875 F.3d 310, 316 (6th Cir. 2017) ("[Plaintiff] has not been denied any legal right on the basis of her religion. Constitutionally, [plaintiff]

However, *Jacobson* did not specifically address the scope of an individual's constitutional rights under the First Amendment's Free Exercise Clause in relation to mandatory vaccines, and that inquiry is the crux of the dispute here.

Under strict scrutiny review, a challenged government action may be upheld only if "it is justified by a compelling interest and is narrowly tailored to advance that interest." *Lukumi*, 508 U.S. at 533. "[N]arrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest in reducing the spread of COVID." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296-97 (2021) (per curiam). The government must also demonstrate that it "seriously undertook to address the problem with less intrusive tools readily available to it" and "that it considered different methods that other jurisdictions have found effective." *McCullen v. Coakley*, 573 U.S. 464, 494 (2014).

---

has no right to a [vaccine] exemption."); *Workman v. Mingo Cnty. Bd. Of Educ.*, 419 Fed. App'x 348, 352-54 (4th Cir. 2011) (relying on the *Jacobson*, *Zucht*, and *Prince* line of cases to hold that a state mandatory vaccination law that allowed medical but not religious exemptions was constitutional); *Whitlow v. California*, 203 F. Supp. 3d 1079, 1084, 1086 (S.D. Cal. 2016) ("[I]t is clear that the Constitution does not require the provision of a religious exemption to vaccination requirements" because, "[a]s stated in *Prince*, the right to free exercise does not outweigh the State's interest in public health and safety."); *Klaassen v. Trs. Of Ind. Univ.*, No. 1:21-CV-238, 2021 WL 3073926, at *17-22, *39 (N.D. Ind. July 18, 2021) (providing a detailed analysis of *Jacobson's* continued viability and noting that "courts have consistently held that schools that provided a religious exemption from mandatory vaccination requirements did so *above and beyond* that mandated by the Constitution"), *aff'd*, 7 F.4th 592 (7th Cir. 2021) (relying on *Jacobson* to hold that "there can't be a constitutional problem with vaccination against SARS-CoV-2" because, although *Jacobson* has been criticized, "a court of appeals must apply the law established by the Supreme Court"); *Boone v. Boozman*, 217 F. Supp. 2d 938, 954 (E.D. Ark. 2002) ("The constitutionally-protected free exercise of religion does not excuse an individual from compulsory immunization; in this instance, the right to free exercise of religion . . . [is] subordinated to society's interest in protecting against the spread of disease."); *Harris v. Univ. of Mass., Lowell*, No. 21-cv-11244, 2021 WL 3848012, at *7 (D. Mass. Aug. 27, 2021) (following the *Jacobson* line to hold that "UMass is under no constitutional obligation to offer a religious exemption to its Vaccine Requirement.").

To determine whether rational basis or strict scrutiny review applies, I turn to consider whether the COVID-19 vaccine mandate is both (1) neutral, and (2) generally applicable.

### 1. Neutrality

Neutrality examines whether the State's object, or purpose, was to "infringe upon or restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533. A law is not neutral if its object "is to infringe upon or restrict practices because of their religious motivation." *Id*. The first step in determining the object of a law is to examine whether it is facially neutral. *Id*. ("[T]he minimum requirement of neutrality is that a law not discriminate on its face.").

By this standard, the COVID-19 vaccine mandate challenged here is facially neutral. Neither the applicable statute nor the Rule mention religion, even by implication. Operating in tandem, they require that all healthcare workers employed at designated healthcare facilities receive the COVID-19 vaccination. They do not treat the COVID-19 vaccine differently than any other vaccinations mandated under Maine law.

The vaccine mandate's facial neutrality is not dispositive, though, because the "[g]overnment [also] fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021). Thus, even a facially neutral law may not be neutral for Free Exercise purposes if its object is to discriminate against religious beliefs, practices, or motivations. *Lukumi*, 508 U.S. at 534 ("The Free

16

Exercise Clause protects against governmental hostility, which is masked, as well as overt.").

The Plaintiffs contend that the COVID-19 vaccine mandate is not neutral because the removal of the religious exemption from the Rule "specifically target[ed] Plaintiffs' religious beliefs for disparate and discriminatory treatment." ECF No. 1 ¶ 131. They assert that "Maine has plainly singled out religious employees who decline vaccination for especially harsh treatment (i.e., depriving them from earning a living anywhere in the State), while favoring employees declining vaccination for secular, medical reasons." ECF No. 57 at 4. This argument mirrors claims made recently by healthcare providers challenging New York's COVID-19 vaccine mandate, which also did not provide for religious exemptions. *Dr. A. v. Hochul*, No. 1:21-cv-1009, at **4-6 (N.D.N.Y. Oct. 12, 2021). However, the challenged New York regulation is distinguishable from Maine's COVID-19 vaccine mandate, because the New York regulation originally provided for a religious exemption which was then removed only a few days before the requirement became effective; additionally, New York provides religious exemptions to other mandated vaccinations for healthcare workers. *Id.* at *4, *5, *16 n.9. For these reasons, the court determined that the intentional, last-minute change to the language in the New York regulation was a "religious gerrymander" that required strict scrutiny. *Id.* at *19. In contrast, the Maine Legislature removed the religious exemption as to all mandated vaccines by amending 22 M.R.S.A. § 802(4-B) in 2019. Following the unsuccessful People's Veto held in 2020, DHHS removed the religious exemption from the Rule in April 2021 to conform the Rule to the 2019 statutory change. This revision pre-dated the COVID-

19 vaccine requirement and served to ensure that the Rule was consistent with Maine law.  The history associated with the revision of the Rule does not demonstrate animus toward religion.

In support of their argument, the Plaintiffs cite to a trio of recent per curiam or memorandum decisions issued by the U.S. Supreme Court:  *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 62 (2020) (per curiam); *South Bay Pentecostal Church v. Newsom*, 141 S. Ct. 716 (2021) (mem.); and *Tandon v. Newsom*, 141 S. Ct. 1294 (2021) (per curiam).  Each involved a challenge to a state law aimed at quelling the spread of COVID-19.  Each was issued in response to a motion for emergency injunctive relief to preserve the status quo pending resolution of appellate review.  Of the three, the Plaintiffs rest primarily on *Tandon v. Newsom*.

In *Tandon*, the Supreme Court granted injunctive relief against enforcement of a California regulation that prohibited indoor private gatherings of more than three households during the COVID-19 pandemic.  141 S. Ct. at 1297.  The prohibition had the effect of restricting at-home religious gatherings while allowing groups of more than three households to gather in public settings, such as hair salons, retail stores, and restaurants.  *Id*.  In enjoining the regulation's enforcement, the Court explained that "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise."  *Id*. at 1296.  "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue."  *Id*.  "Comparability is concerned with the risks

various activities pose, not the reasons" motivating the activities. *Id.* The Court's majority concluded that private indoor gatherings of three or more households were comparable to groups of the same or a greater number of households in public businesses, which were not prohibited by the regulation, and granted an injunction against the policy's enforcement pending appellate review. *Id.* at 1297.

Citing *Tandon,* the Plaintiffs argue that the Free Exercise Clause prohibits the treatment of "**any** secular activity more favorably than religious activity." ECF No. 57 at 3 (emphasis in original). This misstates *Tandon*'s holding because it omits the crucial modifier—"comparable"—from the analysis of whether a secular activity has been treated more favorably than a religious activity.

In the unique context of a vaccine mandate intended to protect public health, there is a fundamental difference between a medical exemption—which is integral to achieving the public health aims of the mandate—and exemptions based on religious or philosophical objections—which are unrelated to the mandate's public health goals. The risks associated with the two are not comparable. Reducing the risk of adverse medical consequences for a high-risk segment of the population is essential to achieving the public health objective of the vaccine mandate. A religious exemption would not address a risk associated with the vaccine mandate's central objectives. Under *Tandon*'s reasoning, rational basis review applies.

*Tandon* is distinguishable from this case in another respect. The vaccination requirement challenged here does not prevent the Plaintiffs from exercising their religious beliefs by refusing to receive the COVID-19 vaccination. In contrast, in *Tandon* interference with the free exercise of religion was direct because the statute

prevented like-minded persons from gathering together to perform religious rituals. Here, the Rule does not compel the Plaintiffs to be vaccinated against their will, and the Plaintiffs have, in fact, freely exercised their religious beliefs by declining to be vaccinated. This is not to minimize the seriousness of the indirect consequences of the Plaintiffs' refusal to be vaccinated, as it affects their employment. Nonetheless, the Rule has not prevented the Plaintiffs from staying true to their professed religious beliefs.

The two remaining decisions in the trio relied upon by the Plaintiffs are also readily distinguished. In *South Bay United Pentecostal Church v. Newsom*,[13] the Court partially granted an application for injunctive relief from California Governor Gavin Newsom's executive order limiting attendance at indoor religious gatherings to prevent further spread of COVID-19. 141 S. Ct. at 716, 718. Writing separately, Justice Gorsuch concluded that the restrictions on religious institutions imposed by California followed a pattern of that state "openly impos[ing] more stringent regulations on religious institutions than on many businesses" throughout the pandemic, and that this represented religious discrimination and required strict scrutiny. *Id.* at 717 (statement of Gorsuch, J.). The restrictions considered in *South Bay* are unlike the vaccine mandate at issue here. *Id.* In *South Bay*, California had explicitly imposed stricter attendance limits on in-person worship services, while not

---

[13] The California Order challenged in *South Bay* came before the Court twice on application for injunctive relief: in May 2020, the Court issued a memorandum opinion denying the application, 140 S. Ct. 1613, 1613 (2020) (Mem.); in February 2021 the Court denied relief with respect to the percentage capacity limitations imposed on houses of worship and limitations on singing and chanting during indoor services, and granted the injunction with respect to the other capacity limits, 141 S. Ct. 716, 716 (2021) (Mem.).

imposing similar limits in secular settings.  There is no similar targeted imposition of restrictions on religious practices presented by the COVID-19 vaccine mandate.

Finally, in *Roman Catholic Diocese of Brooklyn v. Cuomo*, the Supreme Court granted injunctive relief from a State of New York order that imposed severe restrictions on religious gatherings in certain high-risk zones of New York City during the first wave of the Covid-19 pandemic.  141 S. Ct. at 66.  Specifically, the order limited attendance at religious gatherings in "red" zones to no more than ten persons and in "orange" zones to no more than 25 persons, while allowing myriad essential businesses in those same locations to admit an unlimited number of persons.  *Id.* at 66-67.  Invoking *Smith,* the Court determined that the challenged order was neither neutral nor generally applicable due to these categorizations.  *Id.* at 67.  Applying strict scrutiny, the Court held that although "[s]temming the spread of COVID-19 is unquestionably a compelling interest," the regulation was likely unconstitutional for lack of narrow tailoring.  *Id.*  There were multiple less restrictive rules that could have achieved the State's goal without burdening the exercise of religion so severely, such as tying the maximum attendance at a house of worship to the size of that facility.  *Id.*  The Court was not persuaded that the State demonstrated that houses of worship, which had "admirable safety records," "contributed to the spread of COVID-19" such that the targeted and restrictive prohibition could be constitutionally sound.  *Id.* at 67-68.

*Roman Catholic Diocese of Brooklyn* is distinguishable from the COVID-19 vaccine mandate at issue here because the mandate does not impose restrictions on religious practices while allowing similar secular conduct to continue unfettered.

Additionally, the vaccine mandate does not compel the Plaintiffs to be vaccinated for COVID-19 involuntarily and, therefore, the Plaintiffs have not been directly prevented from adhering to their religious beliefs as was the case in *Roman Catholic Diocese of Brooklyn*. Finally, as I will soon address, the State Defendants have demonstrated that other less-restrictive measures would be insufficient alternatives to the vaccine mandate.

Therefore, the COVID-19 vaccine mandate is facially neutral, and the trio of recent Supreme Court per curiam and memorandum COVID-19 decisions does not dictate otherwise. Additionally, in probing for covert animus, what matters is the State's motive in removing the vaccine exceptions for religion and philosophy from the statute in 2019 because it was then—not in 2021 as Plaintiffs assert—that the change took effect. The Plaintiffs have not offered any reasoned explanation as to why Maine's COVID-19 vaccine mandate for healthcare workers should be viewed as targeting religious beliefs while vaccines for other communicable diseases that may have involved fetal cell lines in their development or production should not. The record establishes that the Maine Legislature's object in eliminating the religious and philosophical exemptions in 2019 was to further crucial public health goals, and nothing more.

Specifically, the Legislature considered data establishing that it was the religious and philosophical exemptions to mandatory vaccines that had prevented Maine from achieving herd immunity as to several infectious diseases, which is a

prerequisite to eliminating those diseases.[14]  Measles, for example, requires a 95%

population-level vaccination rate, ECF No. 49-4 ¶ 35, and this was undermined in the

years prior to 2019 by the large percentage of unvaccinated persons resulting from

the religious and philosophical exemptions, ECF No. 48-3 at 3-6.  As Representative

McDonald, cosponsor of the legislation, testified:

> Maine has the seventh-highest non-medical exemption rate in the
> nation. . . .  The average philosophical and religious exemption rate for
> kindergarten-aged students in Hancock County, ME was 8.7
> percent. . . .  There are schools [in Hancock County] experiencing non-
> medical exemption rates as high as 33.3 percent.

ECF No. 48-3 at 1.

Then-Acting Director of Maine CDC, Nancy Beardsley, testified that "non-

medical exemptions, which include religious and philosophical reasons, were reported

at 5.0% for Maine, compared to the national rate of 2.0%."  ECF No. 48-4 at 1.  Medical

exemptions, in contrast, accounted for 0.3% of the overall exemption rate.  ECF No.

48-4 at 1.  Beardsley also testified that the high exemption rates in Maine had caused

pertussis outbreaks:

> Hancock and Waldo counties also represent two of the four counties with
> the highest reported rates of pertussis cases in 2018 . . . .  Not only did
> high exemption rates likely contribute to high rates of pertussis disease
> in these two counties, but also in the entire State, as Maine reported the
> highest rate of pertussis disease in the country for 2018.

ECF No. 48-4 at 2.

---

[14] The statistics referenced in the legislative record, and cited here, pertain to vaccination rates for
school children; however, they are relevant to the State's motivations for healthcare workers because
the statute at issue removed religious and philosophical exemptions for both of these groups and there
is no colorable argument (nor have the Plaintiffs advanced one) that the State had a different
motivation for removing the exemptions for healthcare workers than for school children.

The Plaintiffs have not specifically disputed that the reasons put forward by the State Defendants for the Legislature's removal of the religious and philosophical exemptions in 2019 were, in fact, the actual reasons. Accordingly, there is no factual support for the proposition that the August 2021 amendment of the Rule, adding the COVID-19 vaccine to the list of mandatory vaccinations for Maine's healthcare workers, "specifically target[ed] Plaintiffs' religious beliefs for disparate and discriminatory treatment," as the Plaintiffs argue. ECF No. 1 ¶ 131. Moreover, there is no basis to find that the August 2021 amendment of the Rule, including the removal of the religious and philosophical exemptions so that the Rule would conform to the 2019 amendment to the statute, was intended to discriminate against religious beliefs, practices, or motivations. *See Lukumi*, 508 U.S. at 534. For these reasons, the COVID-19 vaccine mandate is neutral because it is facially neutral and it was not intended to discriminate against individuals' religious beliefs, practices, or motivations.

### 2. General Applicability

General applicability addresses whether the State has selectively "impos[ed] burdens only on conduct motivated by religious belief." *Id.* at 543. The Plaintiffs reason that the COVID-19 vaccine mandate is not generally applicable and that it must be subjected to strict scrutiny review because the mandate favors healthcare workers who refuse to be vaccinated for medical reasons over healthcare workers who refuse to be vaccinated for religious reasons. They contend that the State's adoption of medical exemptions as the sole type of exemption reflects a value judgment by the State, one which prioritizes secular interests over religious interests. Thus, they

contend that the vaccine mandate fails the test of general applicability because it burdens religious beliefs while not similarly burdening secular interests.

Individualized exemptions undermine a regulation's general applicability if they display an unconstitutional value judgment that gives preference to secular concerns over religious concerns. In *Fulton*, the Supreme Court explained that "[a] law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877; *see also Cent. Rabbinical Cong. Of U.S. & Can. V. N.Y.C. Dep't. of Health & Mental Hygiene*, 763 F.3d 183, 197 (2d Cir. 2014) (citing *Lukumi*, 508 U.S. at 535-38). ("A law is . . . not generally applicable if it is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it.")  "[W]hen the government makes a value judgment in favor of secular motivations, but not religious motivations, the government's actions must survive heightened scrutiny." *Fraternal Ord. of Police, Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999).

The Plaintiffs contend that the medical exemption at issue here should be treated as an individualized exception which is "sufficiently suggestive of discriminatory intent so as to trigger heightened [strict] scrutiny." *Id*. They point to various judicial decisions applying strict scrutiny and invalidating regulations that permitted medical exemptions but not religious exemptions. However, the decisions cited by the Plaintiffs all relate to government regulations that were primarily intended to achieve governmental objectives other than protecting public health.

Thus, in *Fraternal Order of Police*, *id*, the court applied strict scrutiny and invalidated a regulation that prohibited beards for male police officers that was adopted for the stated purpose of promoting uniformity of the officers' appearance, and which granted a medical exemption from the requirement while not exempting officers who maintained beards as a matter of religious faith. The other decisions cited by the Plaintiffs addressed similar circumstances. *See Litzman v. New York City Police Department*, No. 12 Civ. 4681, 2013 WL 6049066, at *2-3 (S.D.N.Y. Nov. 15, 2013) (requiring religious exemptions to a policy mandating once-yearly facial shaving for male police officers to ensure compliance with respirator fit-testing requirements); *Singh v. McHugh*, 185 F. Supp. 3d 201, 211-13 (D.D.C. 2015) (determining that religious accommodation was required under a policy that would not permit a Sikh student seeking to enroll in the Army's Reserve Officers' Training Corps program to wear a turban, unshorn hair, and beard due to a grooming policy to promote uniformity); and *Cunningham v. City of Shreveport*, 407 F. Supp. 3d 595, 599 (W.D. La. 2019) (determining a policy requiring beards for male officers "for officer safety reasons and to promote a uniform appearance of all officers" required religious accommodations).

Here, the purpose of requiring COVID-19 vaccinations for healthcare workers is to protect public health and not any other policy objective, such as promoting the uniformity of the appearance of police officers or firefighters. Exempting individuals whose health will be threatened if they receive a COVID-19 vaccine is an essential, constituent part of a reasoned public health response to the COVID-19 pandemic. It does not suggest a discriminatory bias against religion. *See W.D. v. Rockland County,*

521 F. Supp. 3d 358, 403 (S.D.N.Y. 2021) (concluding that New York's emergency declaration mandating vaccinations against measles, which provided a medical exemption but not a religious exemption, met the requirement of general applicability by "encouraging vaccination of all those for whom it was medically possible, while protecting those who could not be inoculated for medical reasons.").

The medical exemption at issue here was adopted to protect persons whose health may be jeopardized by receiving a COVID-19 vaccination. The exemption is rightly viewed as an essential facet of the vaccine's core purpose of protecting the health of patients and healthcare workers, including those who, for bona fide medical reasons, cannot be safely vaccinated. Because the medical exemption serves the core purpose of the COVID-19 vaccine mandate, it does not reflect a value judgment prioritizing a purely secular interest—such as the uniformity of appearance of uniformed officers considered in *Fraternal Order of Police*—over religious interests. In addition, the vaccine mandate places an equal burden on all secular beliefs unrelated to protecting public health—for example, philosophical or politically-based objections to state-mandated vaccination requirements—to the same extent that it burdens religious beliefs.

The medical exemption applicable to the COVID-19 vaccine and the other vaccines required under Maine law does not reflect a value judgment unfairly favoring secular interests over religious interests. As an integral part of the vaccine requirement itself, the medical exemption for healthcare workers does not undermine the vaccine mandate's general applicability.

### 3. Conclusion Regarding the Standard of Constitutional Review

For the reasons I have explained, the COVID-19 vaccine mandate is both neutral and generally applicable; therefore, rational basis review applies. The trio of recent Supreme Court *per curiam* and memorandum decisions relied on by the Plaintiffs do not suggest otherwise. I therefore turn to consider whether the mandate satisfies rational basis review.

### 4. Rational Basis Review

The Plaintiffs do not seriously question the existence of a rational basis for the adoption of the COVID-19 vaccine mandate. I address this question nonetheless because it is the key to deciding the requirement's constitutionality under the Free Exercise Clause. "A law survives rational basis review so long as the law is rationally related to a legitimate governmental interest." *Cook v. Gates*, 528 F.3d 42, 55 (1st Cir. 2008).

Stopping the spread of COVID-19 in Maine, and specifically stemming outbreaks in designated healthcare facilities to protect patients and healthcare workers, is a legitimate government interest. For several reasons, the mandate is rationally related to this interest.

First, data collected by Maine CDC throughout the COVID-19 pandemic demonstrates that unvaccinated individuals are substantially more likely both to contract COVID-19 and to suffer serious medical consequences as a result. ECF No. 49-4 ¶¶ 16, 23, 52. Second, the percentage of COVID-19 outbreaks occurring in healthcare facilities is increasing rapidly and most of these outbreaks are caused by healthcare workers bringing the virus into the facilities. ECF No. 49-4 ¶¶ 46-48.

Third, despite widespread availability of COVID-19 vaccinations, the rate of COVID-19 vaccinations for healthcare workers in designated healthcare facilities remains below the 90% threshold needed to stem facility-based outbreaks.  ECF No. 49-4  ¶¶ 53-54.  Mandating COVID-19 vaccinations for healthcare workers at designated healthcare facilities will increase the vaccination rate for a critically important segment of Maine's workforce while lowering the risk of facility-based outbreaks.

The State defendants have provided ample support demonstrating a rational basis for their adoption of the COVID-19 vaccine mandate as a requirement that furthers the government's interest in protecting public health, healthcare workers, vulnerable patients, and Maine's healthcare system from the spread of COVID-19.

### 5.    Strict Scrutiny Review

Although I conclude that rational basis, and not strict scrutiny, is the correct level of constitutional review, even if strict scrutiny were the required standard, the COVID-19 vaccine mandate for healthcare workers still withstands the Plaintiffs' Free Exercise challenge.  As previously discussed, a challenged government action subject to strict scrutiny may be upheld only if "it is justified by a compelling interest and is narrowly tailored to advance that interest."  *Lukumi*, 508 U.S. at 533.  The government must also demonstrate that it "seriously undertook to address the problem with less intrusive tools readily available to it" and "that it considered different methods that other jurisdictions have found effective." *McCullen v. Coakley*, 573 U.S. 464, 494 (2014).

### a.  Compelling Interest

Curbing the spread of COVID-19 is "unquestionably a compelling interest." *Roman Catholic Diocese of Brooklyn*, 141 S. Ct. at 67.  Plaintiffs here admit as much, conceding that "[t]o be sure, efforts to contain the spread of a deadly disease are 'compelling interests of the highest order.'"  ECF No. 57 at 8 (quoting *On Fire Christian Ctr., Inc. v. Fischer*, 453 F. Supp. 3d 901, 910 (W.D. Ky. 2020)).

### b.  Narrow Tailoring

The record establishes that "[t]he gold standard to prevent and stop the spread of communicable diseases, including COVID-19, is vaccination."  ECF No. 49-4 at ¶ 34.  High vaccination rates minimize the number of unvaccinated individuals in group settings—such as healthcare environments—which ultimately facilitates population-level immunity and prevents outbreaks of these diseases both within these settings and in the general population.  ECF No. 49-4 at ¶¶ 35-37.  Achieving the high levels of vaccination needed to establish population-level immunity is crucial to protect the health of the most vulnerable individuals, including "individuals with weakened immune systems, infants too young to be vaccinated, and persons unable to be vaccinated."  ECF No. 49-4 at ¶¶ 38-39.  For "individuals undergoing treatment for serious diseases, and individuals who have a demonstrated allergy to one of the vaccine components," certain vaccinations are inadvisable for medical reasons.  ECF No. 49-4 at ¶ 39.  For these people, receiving a particular vaccine could have adverse health consequences.  ECF No. 49-4 at ¶ 39.

The Plaintiffs' sole challenge to the scientific rationale put forward by the State Defendants for the vaccine mandate is based on the Plaintiffs' citation to an article

published in National Geographic Magazine that reports on a preliminary study that found that vaccinated persons with breakthrough COVID-19 infections can transmit the virus. This preliminary finding, however, does not address the broader question of whether COVID-19 vaccinations reduce the risk of people spreading the virus that causes COVID-19. According to the CDC, they do. CDC, *Key Things to Know About COVID-19 Vaccines*, (Oct. 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html ("COVID-19 vaccines can reduce the risk of people spreading the virus that causes COVID-19."). Nor does the National Geographic article address the related question of whether vaccinated persons become infected at a lesser rate than unvaccinated persons and whether vaccinations provide substantial protection against COVID-19 hospitalizations. On these points as well, the CDC indicates that they do. *Id.* ("People can sometimes get COVID-19 after being fully vaccinated. However, this only happens in a small proportion of people, even with the Delta variant. When these infections occur among vaccinated people, they tend to be mild."); *see also* Ashley Fowlkes et al., *Effectiveness of COVID-19 Vaccines in Preventing SARS-CoV-2 Infection Among Frontline Workers Before and During B.1.617.2 (Delta) Variant Predominance—Eight U.S. Locations, December 2020–August 2021*, CDC (Aug. 27, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7034e4.htm?s_cid=mm7034e4_w; Wesley H. Self, et al., *Comparative Effectiveness of Moderna, Pfizer-BioNTech, and Janssen (Johnson & Johnson) Vaccines in Preventing COVID-19 Hospitalizations Among Adults Without Immunocompromising Conditions—United States, March–August 2021*, CDC (Sept. 24, 2021),

https://www.cdc.gov/mmwr/volumes/70/wr/mm7038e1.htm?s_cid=mm7038e1_w.
The study cited by the Plaintiffs does not establish a lack of narrow tailoring for purposes of strict scrutiny analysis. If vaccinated individuals are less likely to become infected, they are less likely to transmit the disease. The preliminary study cited by the Plaintiffs does not call this crucial point into question.

Plaintiffs further contend that the COVID-19 vaccine mandate is not the least restrictive means of achieving the State's goal to protect public health and the healthcare system from communicable disease. They argue that there are alternatives to vaccination that would not restrict their religious beliefs, and that Maine has not demonstrated that these alternatives would not achieve the objectives of the Rule. Plaintiffs specifically point to the use of PPE and frequent testing as less restrictive tactics that Maine could employ.

The record demonstrates that PPE and regular testing are not sufficient to achieve Maine's compelling interest in stopping the spread of COVID-19. Regular testing, an alternative method proposed by the Plaintiffs, was considered and ultimately rejected because "regular testing for the presence of the virus in employees is insufficient to protect against the Delta variant." ECF No. 49-4 at ¶ 61. The speed of the Delta variant's transmission outpaces test-result availability. ECF No. 49-4 at ¶¶ 61-62. With weekly or twice-weekly testing, "[a]n employee who tests negative on a Monday morning could be exposed that afternoon, and, within 36 hours, could be spreading the virus to others over the course of the several days until the next test." ECF No. 49-4 at ¶ 61. Further, "[b]ecause test results are not available for at least 24 hours, and sometimes up to 72 hours, daily PCR testing is insufficient for the same

reasons." ECF No. 49-4 at ¶ 61. Daily testing, therefore, would require the use of rapid antigen tests, which are both less accurate and in short supply. ECF No. 49-4 at ¶ 62. Accordingly, regular testing is not an alternative measure that would effectively serve to stop the spread of COVID-19.

The use of PPE is also not an equivalent alternative measure. PPE is an important measure to prevent the spread of transmissible diseases, including COVID-19, but "it does not eliminate the possibility of spreading COVID-19, especially in healthcare settings." ECF No. 49-4 at ¶ 64. Maine healthcare facilities have utilized PPE and other practices, including regular testing and symptom monitoring, to reduce healthcare facility-based COVID-19 outbreaks. ECF No. 49-4 at ¶ 65. These measures have not been sufficient to prevent these outbreaks. In the face of the Delta variant and rising percentage of healthcare facility-based outbreaks, they are not alternative equivalent measures that would achieve the compelling interest of curbing the spread of COVID-19.

Next, Plaintiffs argue that Maine currently stands alone in the nation by not providing religious exemptions to vaccine mandates for healthcare workers, [15] which necessarily demonstrates that less restrictive alternatives are available. The Plaintiffs reason that if every other state has been able to offer religious exemptions

---

[15] At least two other states have adopted COVID-19 vaccine mandates which do not provide religious exemptions. In August 2021, the State of New York mandated COVID-19 vaccinations for healthcare workers in the state and did not include a religious exemption within the mandate. *Dr. A. v. Hochul*, No. 1:21-cv-1009, 2021 WL 4189533 (N.D.N.Y. Sept. 14, 2021). A preliminary injunction against the requirement was granted on October 12, 2021, *Dr. A. v. Hochul*, No. 1:21-cv-1009 (N.D.N.Y. Oct. 12, 2021); as previously discussed, this case is distinguishable from Maine's vaccine mandate. Rhode Island has also mandated COVID-19 vaccinations for healthcare workers and did not provide for religious exemptions to that requirement; a temporary injunction was denied on September 30, 2021. *Dr. T v. McKee*, No. 1:21-cv-00387 (D.R.I. Sept. 30, 2021).

to COVID-19 mandates, Maine should as well.  However, the Plaintiffs have not provided any scientific or expert evidence demonstrating the efficacy of the approaches adopted in other states.  Maine may be one of the first states to conclude that it is wise to mandate vaccinations for certain healthcare workers, but it does not follow that other, less demanding approaches are equally effective or even appropriate given the circumstances presented in this state.  The Government Defendants assert that unlike many other states, "the size of Maine's healthcare workforce is limited, such that the impact of any outbreaks among personnel is far greater than it would be in a state with more extensive healthcare delivery systems." ECF No. 49-4 at ¶ 66.  The Plaintiffs have not presented any expert witness declarations, science-based reports or data, or any other information to support their argument that there are equally effective, less restrictive alternatives to the vaccine mandate.  Based on the record before me, there is no basis to conclude that, as the Plaintiffs' position suggests, what may be good enough for other states is necessarily equally good for the conditions presented in Maine.

Accordingly, I conclude that the COVID-19 vaccine mandate is narrowly tailored to serve the compelling interest of containing the spread of this serious communicable disease.  Even if strict scrutiny were required, the Plaintiffs have not shown that they are likely to succeed on the merits of their Free Exercise claim against the Defendants.

## B.     Title VII

Seven plaintiffs[16] assert that the Hospital Defendants refused to consider or grant religious accommodations by failing to grant exemptions from the vaccine mandate and that this refusal violates Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e to e-17 (West 2021).

Title VII forbids an employer "to discriminate against, any individual because of his . . . religion." 42 U.S.C.A. § 2000e-2(c)(1).  Discrimination is effected through an adverse employment action: "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  Title VII requires that employers "offer a reasonable accommodation to resolve a conflict between an employee's sincerely held religious belief and a condition of employment, unless such an accommodation would create an undue hardship for the employer's business." *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 133 (1st Cir. 2004).

The Plaintiffs argue that the Hospital Defendants have unlawfully discriminated against them by refusing to grant exemptions to the COVID-19 vaccine mandate and terminating, or threatening to terminate, their employment for abiding by their sincerely held religious beliefs.  At the time of filing, Plaintiffs had not exhausted the administrative remedies available to them for their claim of unlawful employment discrimination, such as pursuing a complaint with the Maine Human Rights Commission or Equal Employment Opportunity Commission.

---

[16]  Jane Does 1 through 5 and John Does 2 and 3.

The Supreme Court has "set a high standard for obtaining preliminary injunctions restraining termination of employment." *Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840, 845 (7th Cir. 2005) (citing *Sampson v. Murray*, 415 U.S. 61 (1974)). The case must present a "genuinely extraordinary situation" to support granting an injunction, *Sampson*, 415 U.S. at 92 n.68; allegations of "humiliation, damage to reputation, and loss of income" are insufficient to meet that standard, *Bedrossian*, 409 F.3d at 845, as are "deterioration in skills" and "inability to find another job," *id.* at 846. Courts generally do not grant preliminary injunctions to prevent termination of employment, because "the termination . . . of employment typically [is] not found to result in irreparable injury." 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2948.1 (3d ed. 2021). Injuries incurred in employment discrimination claims may be addressed through remedies at law, such as reinstatement, back pay, and damages. 42 U.S.C.A. § 2000e-5(g). In addition, in the ordinary course, Title VII violations must be addressed first through the administrative processes available under federal law. *See* 42 U.S.C.A. § 2000e-5(f)(1)), *see also Rodriguez v. United States*, 852 F.3d 67, 78 (1st Cir. 2017) ("It is settled that a federal court will not entertain employment discrimination claims brought under Title VII unless administrative remedies have first been exhausted.").

The Plaintiffs have not shown that the injuries they have suffered or may suffer—the loss of their employment and economic harm—meet the high standard for preliminary injunctive relief required to restrain an employer from terminating an employee's employment. Administrative remedies are available to the Plaintiffs that have not been exhausted. For these reasons, Plaintiffs have not demonstrated a

likelihood of success on their Title VII claims to the degree needed to support preliminary injunctive relief.

## C.   Equal Protection Clause

The Plaintiffs argue that the COVID-19 vaccine mandate impermissibly creates a class of religious objectors and then subjects them to disparate treatment, in violation of the Equal Protection Clause.   "[W]here a law subject to an equal protection challenge 'does not violate [a plaintiff's] right of free exercise of religion,' courts do not 'apply to the challenged classification a standard of scrutiny stricter than the traditional rational-basis test.'"   *W.D.*, 521 F. Supp. 3d at 410 (second alteration in original) (quoting *A.M. ex rel. Messineo v. French*, 431 F. Supp. 3d 432, 446 (D. Vt. 2019)); *accord Wirzburger v. Galvin*, 412 F.3d 271, 282-83 (1st Cir. 2005) ("Because we [hold] that the [challenged law] does not violate the Free Exercise Clause, we apply rational basis scrutiny to the fundamental rights based claim that [the law] violates equal protection.").

As described above, because the Plaintiffs have not demonstrated a likelihood of success on their Free Exercise Clause claim and I have found, at this stage, that the vaccine mandate is rationally based, the Plaintiffs have not demonstrated a likelihood of success that their Equal Protection claim is warranted, and no additional analysis is required.

## D.   Conspiracy

The Plaintiffs claim that the State and Hospital Defendants conspired to violate their civil rights in violation of 42 U.S.C.A. § 1985, but provide only conclusory, nonfactual allegations in support.   Because a violation of Plaintiffs' First Amendment

rights has not been demonstrated, and the Plaintiffs have not submitted any declarations or other documentary evidence showing a conspiracy among the Defendants, no additional analysis regarding the claimed conspiracy is warranted.

## E.    Supremacy Clause

Finally, the Plaintiffs contend that the Defendants violated the Supremacy Clause of the U.S. Constitution by ignoring federal law and proceeding as if Maine law supersedes federal law.

The Supremacy Clause "is not the 'source of any federal rights,' and certainly does not create a cause of action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324-25 (2015) (quoting *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107 (1989)). Rather, the Supremacy Clause "creates a rule of decision" that "instructs courts what to do when state and federal law clash." *Id*. Additionally, the Plaintiffs' assertion that "Defendants have explicitly claimed to healthcare workers in Maine, including Plaintiffs, that federal law does not apply" in Maine is wholly unsupported by the record. ECF No. 1 at ¶ 1.

The Plaintiffs have not demonstrated a likelihood of success on their Supremacy Clause claim.

## F.    Irreparable Harm, Balancing of the Equities, and Effect of the Court's Action on the Public Interest

Where plaintiffs fail to meet their burden to show a likelihood of success on the merits, "failure to do so is itself preclusive of the requested relief." *Bayley's Campground, Inc. v. Mills*, 985 F.3d 153, 158 (1st Cir. 2021). In the interest of completeness, though, I address the three remaining prongs of the preliminary injunction inquiry.

First, the harm faced by Plaintiffs Jane Does 1 through 6 and John Does 2 through 3 is the loss of their employment, which, while serious and substantial, is not irreparable. These plaintiffs may pursue remedies at law for alleged discriminatory firings, including reinstatement, back pay, and damages. Although John Doe 1, as a healthcare provider, faces the possibility of more consequential harm through the potential loss of a business license, that harm does not outweigh the other factors I must consider.

Second, the balance of equities favors the Defendants because of the strong public interest promoted by the vaccine mandate, which includes preventing facility-based COVID-19 outbreaks that risk the health of vulnerable patients, healthcare workers, and the infrastructure of Maine's healthcare system itself. If Plaintiffs were granted injunctive relief preventing the Rule from being enforced, these objectives would be thwarted. *See Bayley's Campground Inc. v. Mills,* 463 F. Supp. 22, 38 (D. Me. 2020) (denying injunctive relief against Maine's COVID-19 quarantine requirement for out-of-state visitors because "[t]he type of injunctive relief Plaintiffs seek would upset the bedrock of the state's public health response to COVID-19, an area this Court does not wade into lightly"), *aff'd,* 985 F.3d 153 (1st Cir. 2021).

Finally, the vaccine mandate is directly aimed at promoting the public interest. This factor weighs heavily against granting preliminary injunctive relief in this case. Many courts that have examined requests for preliminary injunctions against COVID-19 restrictions have come to this same conclusion, as it is clear that "[w]eakening the State's response to a public-health crisis by enjoining it from enforcing measures employed specifically to stop the spread of COVID-19 is not in

the public interest." *Bimber's Delwood, Inc. v. James*, 496 F. Supp. 3d 760, 789 (W.D.N.Y. Oct. 21, 2020); *see also Harris*, 2021 WL 3848012, at *8 ("[G]iven the public health efforts promoted by the [COVID-19] Vaccine Policy, enjoining the continuation of same is not in the public interest."); *Klaassen*, 2021 WL 3073926, at *43 (noting that when individuals refuse vaccination, "the evidence reasonably shows that they aren't the only ones harmed by refusing to get vaccinated: refusing while also not complying with heightened safety precautions could 'sicken and even kill many others who did not consent to that trade-off,'" which "certainly impacts the public interest" (quoting *Cassell v. Snyders*, 990 F.3d 539, 550 (7th Cir. 2021)).   So too, here. Enjoining the Rule is not in the public interest.

Thus, in addition to failing to show a likelihood of success on the merits, I find that the Plaintiffs have not demonstrated an entitlement to relief under any of the three other factors in the preliminary injunction inquiry.

## V. CONCLUSION

Both the serious risk of illness and death associated with the spread of the COVID-19 virus and the efforts by state and local governments to reduce that risk have burdened most aspects of modern life.   In this case, the Plaintiffs—healthcare workers and a healthcare provider—have shown that their refusal to be vaccinated based on their religious beliefs has resulted or will result in real hardships as it relates to their jobs.   They have not, however, been prevented from staying true to their professed religious beliefs which, they claim, compel them to refuse to be vaccinated against COVID-19.   Neither have they seriously challenged the compelling governmental interest in mandating vaccinations for Maine's healthcare workers, nor

have they demonstrated that, as they contend, the vaccine mandate was motivated by any improper animus toward religion.

Because the Plaintiffs have not established grounds that would warrant the entry of a preliminary injunction enjoining the enforcement of Maine's Covid-19 vaccine mandate for healthcare workers, the Motion for Preliminary Injunction (ECF No. 3) is **DENIED**.

**SO ORDERED.**

**Dated this 13th day of October, 2021.**

_____/s/ JON D. LEVY_____
**CHIEF U.S. DISTRICT JUDGE**